044026/19344/MHW/JJL/RSM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOVAN D. DANIELS, <br><br> Plaintiff, <br><br> v. <br><br> WEXFORD HEALTH SOURCES, INC., *et al.* <br><br> Defendants. | No. 1:16-cv-14 <br><br> Hon. Judge Robert M. Dow, Jr. <br><br> Hon. Magistrate Jeffrey Cummings |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

NOW COME the Defendants, WEXFORD HEALTH SOURCES, INC., LA TANYA WILLIAMS, P.A., and GHALIAH OBAISI, as Independent Executor of the Estate of SALEH OBAISI, M.D. (collectively, the "Defendants"), by and through their attorneys, Matthew H. Weller, Joseph J. Lombardo, and Rachel S. Mahoney of CASSIDAY SCHADE LLP, hereby present their Statement of Undisputed Material Facts pursuant to Local Rule 56.1(a), state as follows:

**Description of the Parties**

1. Plaintiff, Jovan Daniels, is a 44 year old male who is a former inmate of the Illinois Department of Corrections ("IDOC") serving sentences for Perjury, Attempted Armed Robbery, two counts of Aggravated Battery Against a Peace Officer, two counts of Mob Action, Illegal Possession of a Firearm, Illegal Possession of Controlled Substances, and Aggravated Discharge of a Firearm. *See* Exhibit 1, Deposition Transcript of Plaintiff Jovan Daniels, 10:15-13:13; Exhibit 2, IDOC Offender Profile of Jovan Daniels.

2. Dr. Obaisi was employed by Wexford Health Sources, Inc. ("Wexford") as the Medical Director at Stateville Correctional Center ("Stateville") until his death on December 23,

2017. [ECF No. 87, Answer and Affirmative Defenses, ¶ 52; Exhibit 5, Decedent Dr. Obaisi's Estate Documents].

3.      La Tanya Williams, P.A. ("PA Williams") has been employed by Wexford as a Physician's Assistant at Stateville since 2005. [ECF No. 98, PA Williams' Answer and Affirmative Defenses, ¶ 59; see also Exhibit 4, Declaration of PA Williams, ¶ 4].

4.      Wexford is a health care provider that has contracted with the State of Illinois to provide certain medical treatment to inmates of the IDOC, including Stateville. [ECF No. 87, Wexford's Answer and Affirmative Defenses, ¶ 51; Ex. 4, ¶ 5].

### Jurisdiction and Venue

5.      Jurisdiction and venue are proper because Plaintiff filed a federal claim under 42 U.S.C. § 1983 for events that allegedly occurred within the Northern District of Illinois while Plaintiff was an inmate at Stateville. [ECF No. 87, ¶ 48; ECF No. 98, ¶ 48].

### Sick Call at Stateville

6.      Inmates at Stateville sign up for sick call if they would like to be seen for a medical appointment by putting a request slip in their cell bars or submitting it through the institutional mailbox. [Ex. 1, 10:24; Ex. 4, ¶ 9].

7.      Physicians, Physician's Assistants, and Nurse Practitioners do not personally review the aforementioned written requests for medical attention. Instead, any such written request is screened by IDOC-employed correctional medical technicians ("CMTs") or IDOC administrative personnel who then make a determination as to what, if any, action should be taken regarding referral to M.D. sick call. [Ex. 4, ¶ 10].

8.      After an inmate signs up for sick call, they will first be seen by a nurse. [Ex. 1, 19:10-14; Ex. 4, ¶ 20].

9.     Plaintiff's practice is to always report his symptoms to his medical provider, even if the provider does not ask.  [Ex. 1, 22:13-17].

### Timeline of Plaintiff's Relevant Medical Care

10.     On December 10, 2008, Plaintiff presented to PA Williams for complaints of headaches, nausea, dizziness, neck stiffness and tightness, yellow nose discharge, and pain and pressure in his right eye.  *See* Exhibit 3, IDOC Medical Records, pp. 121-22.  After physical examination, and in response to Plaintiff's complaints, PA Williams prescribed the Plaintiff an antihistamine called Periactin (treats numerous allergy symptoms and discomfort); Tylenol for pain; serum H. Pylori (blood or stool test); and directed the Plaintiff to follow up as needed.  [Ex. 3, IDOC 121-22, 125; Ex. 4, ¶ 34].

11.     On May 20, 2009, Plaintiff presented to PA Williams for on-and-off complaints of pain in his left side and sinus problems.  [Ex. 3, IDOC 139].  Plaintiff was given a physical examination and PA Williams prescribed Afrin (nasal spray for sinuses); an antihistamine called CTM (Chlor-Trimeton) for allergic reactions, allergic rhinitis, and cold symptoms; Periactin; self-prepared nasal wash; Naprosyn (NSAID); and ordered a Thyroid profile.  *Id*.; Ex. 4, ¶ 35.

12.     On October 26, 2010, Plaintiff presented to PA Williams for complaints of body joint aches.  [Ex. 3, IDOC 198; Ex. 4, ¶ 36].  PA Williams physically examined the Plaintiff.  She noted that Plaintiff was not in acute distress, his abdomen was soft, flat, and non-tender, Plaintiff exhibited full range of motion, there was no swelling, no tenderness to palpitation, and no deformity.  *Id*.  PA Williams advised Plaintiff to drink more water (water helps relieve joint pains); prescribed Plaintiff 500mg of Tylenol to be taken twice daily for one month; ordered numerous diagnostic testing including ANA (antinuclear antibody testing helps detect and monitor RA), H Pylori testing, ESR blood testing, CRP, CBC (complete blood count), HIV

3

testing, and RA factor testing; and directed Plaintiff to apply heat to the affected area as needed (relieves joint pain and swelling from RA). *Id*.

13. On December 14, 2010, the Plaintiff presented to PA Williams for complaints of joint pain. [Ex. 3, IDOC 201; Ex. 4, ¶ 37]. PA Williams physically examined the Plaintiff. *Id*. She noted that Plaintiff was not in acute distress, there were no deformities, and no swelling. *Id*. PA Williams noted Plaintiff's lab results indicated an elevated rheumatoid factor. *Id*. She further assessed his nasal complaints as allergic rhinitis. *Id*. PA Williams prescribed the Plaintiff nasal saline for his allergic rhinitis and Indocin 25mg for his joint pain. *Id*. Indocin is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate acute pain and relieve symptoms of arthritis (osteoarthritis and rheumatoid arthritis) or gout, such as inflammation, swelling, stiffness, and joint pain. [Ex. 4, ¶ 37].

14. On May 18, 2011, the Plaintiff was given a bilateral hand-x-ray, which did not reveal any fracture or significant arthritic changes. [Ex. 3, IDOC 789; Ex. 4, ¶ 38].

15. On December 12, 2011, Plaintiff was given a lumbar spine x-ray, which did not reveal any fractures or significant arthritic changes. [Ex. 3, IDOC 790; Ex. 4, ¶ 39].

16. On July 28, 2012, Plaintiff presented with complaints of shortness of breath and wheezing the prior evening. [Ex. 3, IDOC 852-53; Ex. 4, ¶ 40]. Plaintiff was assessed as exhibiting asthma and bronchitis symptoms, and he was prescribed Prednisone, an oral steroid. *Id*. He was continually monitored. *Id*.

17. On September 26, 2012, Plaintiff presented to PA Williams for complaints of joint pain, off and on; stomach-ache; seeing blood on tissue, off and on; and some itching. [Ex. 3, IDOC 856-57; Ex. 4, ¶ 41]. PA Williams physically examined the Plaintiff and noted that Plaintiff was not in acute distress. *Id*. She assessed Plaintiff's conditions as R.A. (rheumatoid

4

arthritis) and dysuria (pain, discomfort, or burning during urination). *Id*. She recommended a digital rectal exam, H. Pylori testing and numerous other diagnostic screenings (such as CBC, RF, and urine analysis) to further evaluate and diagnose his medical issues. *Id*. Lastly, PA Williams provided him with education regarding his conditions and reassured the patient. *Id.*

18. On October 9, 2012, Plaintiff indicated that he did not receive Naprosyn from his last visit. [Ex. 3, IDOC 857; Ex. 4, ¶ 42]. Per Plaintiff's request, PA Williams prescribed the Plaintiff Naprosyn 500mg twice daily for three months. *Id*.

19. On March 8, 2013, Plaintiff was given a bilateral shoulder x-ray and bilateral knees x-ray, which came back unremarkable and without any degenerative changes. [Ex. 3, IDOC 788, 882; Ex. 4, ¶ 43]. On this same date, the Plaintiff was given a lumbar spine x-ray that did not reveal any significant degenerative changes. *Id*. There was a finding of a metallic density that could be an artifact. *Id*. This artifact was believed to be a remnant of a bullet from a gunshot wound to his midsection/torso that was permanently left in the subcutaneous tissues of Plaintiff. [Ex. 3, IDOC 7, 399; Ex. 4, ¶ 43]. The metallic density was visible and could complicate imaging studies like x-rays, or otherwise appear as anomalies. [Ex. 4, ¶ 43].

20. On September 4, 2014, the Plaintiff presented to PA Williams with complaints of joint pain. [Ex. 3, IDOC 964; Ex. 4, ¶ 44]. Plaintiff stated that his prescriptions for Naprosyn and Motrin were not working and he made his own decision to stop taking these medications. *Id*.; see also Ex. 1, 55:13-56:4. This was contrary to PA Williams' medical directives. [Ex. 4, ¶ 44]. PA Williams did not discontinue Plaintiff's prescriptions for Motrin or Naprosyn, nor did she recommend that Plaintiff stop taking these medications. [Ex. 3, IDOC 964; Ex. 4, ¶ 44]. Moreover, at this appointment, PA Williams ordered diagnostic labs and blood work screening for the Plaintiff. *Id*.

5

21. On January 20, 2015, the Plaintiff presented to PA Williams with complaints of joint pain. [Ex. 3, IDOC 481; Ex. 4, ¶ 45]. PA Williams physically examined the Plaintiff. *Id.* She noted Plaintiff was not in acute distress, he was not hot to touch, there was no presence of swelling, he exhibited a full range of motion, there was minimal tenderness to palpitation, and no appearance of deformity. *Id*. PA Williams directed Plaintiff to continue to take the medication that Dr. Alma Martija (Stateville physician) had recently begun prescribing for Plaintiff: Piroxicam. [Ex. 3, 481, 727; Ex. 4, ¶ 45]. In addition, PA Williams ordered a thyroid profile and prescribed Dulcolax for Plaintiff's complaints of constipation. [Ex. 3, IDOC 481; Ex. 4, ¶ 45].

22. Piroxicam is an NSAID that is primarily used to reduce pain, swelling, and joint stiffness from arthritis, including rheumatoid arthritis. [Ex. 4, ¶ 46]. This medication was primarily geared to address and treat the symptoms and condition that Plaintiff presented with. *Id*.

23. On February 10, 2015, Plaintiff presented to PA Williams for complaints of joint pain. [Ex. 3, IDOC 483; Ex. 4, ¶ 47]. The Plaintiff reported that the Piroxicam prescribed by Dr. Martija was not working and he did not want any more medication. *Id*. Plaintiff did not take his medication fully as directed (as he wanted to cease taking his prescription prior to its expiration), which is contrary to PA Williams' medical directive. [Ex. 4, ¶ 47]. PA Williams referred the Plaintiff to the Medical Director, Dr. Obaisi, for management of what PA Williams believed to be rheumatoid arthritis. *Id*.

24. On March 27, 2015, the Plaintiff presented to the Medical Director, Dr. Obaisi, for complaints of joint pain and Plaintiff stated his medication was not helping. [Ex. 3, IDOC 485; Ex. 4, ¶ 48]. Dr. Obaisi also noted that Plaintiff presented with irritable bowel syndrome.

*Id*. Dr. Obaisi physically examined the Plaintiff. *Id*. He prescribed Bentyl, Zantac, Mobic, Sulfasalazine, and directed the Plaintiff to follow up in eight weeks. *Id*.

25. Bentyl is a medication used to treat irritable bowel syndrome. [Ex. 4, ¶ 49]. Zantac is an antihistamine and antacid used to treat and prevent heartburn, stomach ulcers, and gastroesophageal reflux disease (GERD). *Id*. Mobic is an NSAID, particularly used to treat symptoms of osteoarthritis, rheumatoid arthritis, and moderate to severe pain. *Id*. Finally, Sulfasalazine is a disease-modifying anti-rhematic drug (DMARD) that reduces pain and swelling of the joints. *Id*. Sulfasalazine is used to treat symptoms of rheumatoid arthritis. *Id*.

26. On May 21, 2015, Plaintiff presented to Dr. Obaisi for complaints of joint pain. [Ex. 1, 63:6-14; Ex. 4, ¶ 50]. Plaintiff stated the pain medication was not working and wanted to see a rheumatologist. *Id*. At this appointment, Dr. Obaisi made a referral for the Plaintiff to be seen for a rheumatology consult. [Ex. 3, IDOC 657; Ex. 4, ¶ 50].

27. On June 25, 2015, Plaintiff was transferred to Menard Correctional Center. [Complaint, ¶ 147; Ex. 1, 65:10-14; Ex. 4, ¶ 51]. Following his transfer, Plaintiff never returned to Stateville and never saw PA Williams or Dr. Obaisi again. [Ex. 1, 65:19-66:3; Ex. 4, ¶ 51].

28. After the Plaintiff was transferred to Menard, Plaintiff began visiting a neurology and arthritis clinic per Dr. Obaisi's prior referral on May 21, 2015. [Ex. 1, 66:4-10].

29. Throughout January and February of 2016, Plaintiff was evaluated by Rheumatologist and Neurologist, Amar Sawar, M.D. [Ex. 3, N&A Clinic 000002-13]. Plaintiff was prescribed Methotrexate (an Immunosuppressive drug to treat rheumatoid arthritis), which he took for approximately 2-3 months but reported that it did not help with his symptoms. [*Id.* at DANIELS-SUPP-0000002, 38]. After extensive diagnostic testing and evaluation, Dr. Sawar's impressions were "minor degenerative changes but no overt radiographic evidence of rheumatoid

7

arthritis." [*Id*. at N&A Clinic 000013]. Dr. Sawar made no further recommendations. [*See Generally*, Ex. 3, N&A Clinic 000002-13].

30. Plaintiff was paroled from IDOC in July 2019. [Ex. 1, 69:22-70:1].

31. On November 4, 2019, Plaintiff was evaluated at Cook County Health for a "full body checkup" in connection to complaints of rheumatoid arthritis [Ex. 3, DANIELS-SUPP-00000038, 42], where it was noted by his physician that there was no obvious synovitis. *Id.* On November 26, 2019, Plaintiff returned to Cook County Health for diagnostic testing, where it was noted that x-rays of both Plaintiff's hands, wrists, knees, and lumbosacral spine had no acute fracture, dislocation, focal bone erosion, no significant joint space narrowing, and no foreign body. [*Id.* at DANIELS-SUPP-00000032-36]. Plaintiff's primary care physician did not make any further recommendations. *Id.*

32. On January 29, 2021, Plaintiff was evaluated at Cook County Health by a new treater, Dr. Awais Azmat, M.D., where laboratory testing was ordered for February 5, 2021. [Ex. 3, DANIELS-SUPP-00000017-20]. On March 11, 2021, Plaintiff was seen at Cook County Health for a follow up on his lab work, which resulted in Dr. Azmat diagnosing Plaintiff with the following: Polyarthralgia, Asthma, and Vitamin D deficiency. [*Id.* at DANIELS-SUPP-00000002-7]. The Doctor did not make further recommendations or order treatment in connection with rheumatoid arthritis. *Id.*

**Additional Testimony of Plaintiff**

33. When Plaintiff would go to Stateville's commissary, he would typically purchase food items such as noodles, peanut butter, beans and rice, chips, snacks, coffee, meat, pies, pastries, and summer sausage; he occasionally purchased hygiene products or clothing. [Ex. 1, 25:17-26:11, 45:19-23, 46:22-47:9].

8

34. Plaintiff was able to, and did, purchase pain medications at Stateville's commissary. [Ex. 1, 26:23-27:3].

35. Plaintiff brought suit against PA Williams and Dr. Obaisi for their alleged failure to provide adequate medical treatment for Plaintiff's rheumatoid arthritis and GERD. [Ex. 1, 32:2-33:20]. Plaintiff also testified that he named Wexford as a Defendant because it was the employer of Dr. Obaisi and PA Williams. [Ex. 1, 33:21-23].

36. Plaintiff has no medical training. [Ex. 1, 10:1-2].

### Additional Testimony of Physician's Assistant La Tanya Williams

37. PA Williams did not intend to cause Plaintiff any harm with her treatment. PA Williams only desired the best medical outcome possible for the Plaintiff. [Ex. 4, ¶ 52].

38. As a Physician's Assistant with years of experience, PA Williams is familiar with the standard of care applicable in this case. [Ex. 4, ¶ 53].

39. PA Williams complied with the applicable community standard of medical care in treating Plaintiff. [Ex. 4, ¶ 54].

40. For instance, many forms of treatment were offered to Plaintiff throughout the course of his care for the complaints he presented with. Plaintiff was given numerous x-rays to rule out potential orthopedic injuries; he was given Periactin; Tylenol; blood and stool testing; Afrin; CTM antihistamine; nasal wash; Naprosyn; Naproxen; thyroid profiles; numerous physical examinations that included testing Plaintiff's range of motion, tenderness, palpitations, gait, deformities, inflammation, swelling, and other symptoms; offered recommendations (e.g., drinking additional water or applying heat to affected areas) and reassurance which is highly important for patient care; antibody testing; ordering complete blood counts; testing Plaintiff's RA factor; prescribing Indocin; Prednisone; Motrin; Dulcolax for bowel complaints; Piroxicam

9

for reduction of joint pain, swelling, and stiffness; referral to the medical director for evaluation; and subsequent prescription of Bentyl; Zantac; and Sulfasalazine. After these forms of treatment proved to be ineffectual, Dr. Obaisi as the Medical Director made a referral for Plaintiff to be seen by a rheumatologist. This extensive amount of treatment was appropriate and complied with the community standard of care in treating Plaintiff's medical conditions. [Ex. 4, ¶ 55].

41. Furthermore, PA Williams is familiar with Dr. Obaisi, whom she worked with from 2012 until Dr. Obaisi's death in December 2017. In PA Williams' professional medical opinion, Dr. Obaisi complied with the applicable community standard of medical care in treating Plaintiff for his conditions. [Ex. 4, ¶ 56].

42. For instance, when Plaintiff presented to Dr. Obaisi on July 28, 2012 with complaints of shortness of breath and wheezing, it was reasonable for a medical provider to assess the patient with asthma and bronchitis symptoms, prescribe prednisone, and monitor the patient. [Ex. 4, ¶ 57].

43. Moreover, on March 27, 2015, Plaintiff presented to Dr. Obaisi with joint pain and irritable bowel syndrome. It was reasonable for a medical provider to prescribe Bentyl, Zantac, Mobic, Sulfasalazine, and to recommend a follow-up appointment in eight weeks. When Dr. Obaisi determined that the foregoing methods of treatment were proving ineffectual, Dr. Obaisi made a reasonable decision to escalate Plaintiff's course of treatment by referring the Plaintiff to a rheumatologist. [Ex. 4, ¶ 58].

44. Nothing that PA Williams, Dr. Obaisi, or any Wexford medical provider did, or did not do, caused Plaintiff any damage or injury. [Ex. 4, ¶ 59].

45. Plaintiff acted contrary to medical directives when he refused to continue taking certain medications for joint pain, including Naprosyn, Motrin, and Piroxicam. [Ex. 3, IDOC

483, 964; Ex. 4, ¶ 60]. These medications were prescribed to treat or manage Plaintiff's symptoms and medical complaints. Moreover, Plaintiff conceded to eating several foods that would exacerbate his RA and GERD conditions and worsen the pain he experienced, such as snacks, pastries, pies, and processed foods such as summer sausage. It is critical that an RA patient be mindful of their diet to reduce their pain and discomfort from RA, which is an uncurable condition. Therefore, Plaintiff's decisions would cause his medical condition to worsen or enlarge the timeline of his treatment. [Ex. 4, ¶ 60].

46. PA Williams did not consider the cost of treatment when making any of her medical treatment decisions for Plaintiff. Wexford does not instruct its providers to limit patient care based on cost factors; rather, providers are expected to utilize their independent medical judgment in treating patients. [Ex. 4, ¶ 61].

47. It remains PA Williams' belief that the course of care and treatment that she, as well as Dr. Obaisi, provided to Plaintiff was right, proper, reasonable, beneficial, and met the community standard of medical care. [Ex. 4, ¶ 62].

**Additional Testimony of Dr. Arthur Funk, M.D., Wexford's Regional Medical Director**

48. In 1982, Dr. Funk obtained his medical degree from the University of Illinois. *See* Exhibit 6, Deposition Transcript of Wexford's 30(b)(6) Corporate Representative, Dr. Arthur Funk, M.D., 45:11-46:3. Dr. Funk completed his internship and residency in internal medicine. *Id*. He received certifications in correctional health care and is board certified in internal medicine. *Id.*

49. As of 2005, Dr. Funk has been the Illinois Regional Medical Director for Wexford. [Ex. 6, 28:7-9]. Prior to Dr. Funk's role as the Illinois Regional Medical Director, he worked for seven and a half years as Wexford's site Medical Director. *Id*. at 29:4-6. Dr. Funk's

responsibilities as the Illinois Regional Medical Director entail clinical and administrative duties. *Id.* at 34:22-35:4. His responsibilities include: supervising the medical directors at the facilities he is assigned to, providing direct care to patients (when applicable), reviewing care provided by other physicians, responding to legal matters, attending meetings, and reviewing data and information. *Id.* at 34:22-35:24.

50. Dr. Funk had his own medical practice for approximately eight years, prior to his employment with Wexford. [Ex. 6, 36:10-12; 44:21-45:10]. Dr. Funk specialized in internal medicine. *Id.* He has experience treating and diagnosing patients with rheumatoid arthritis. *Id.* at 52:1-17.

51. Dr. Funk is of the opinion that Plaintiff does not have rheumatoid arthritis as he does not meet the criteria for a variety of reasons. [Ex. 6, 78:5-7; 157:7-9].

52. Dr. Funk opines that Plaintiff's clinical picture does not fit rheumatoid arthritis as the only factor Plaintiff exhibits is a slight elevation in his rheumatoid factor, which is not out of range. [Ex. 6, 78:8-13]. Further, Plaintiff's following factors are inconsistent with someone who has rheumatoid arthritis: Plaintiff's history, an absence of other laboratory parameters that are characteristically seen in rheumatoid arthritis, his clinical course, his lack of response to Methotrexate (his symptoms worsened after he was given this medication), a lack of radiographic findings, the duration of time that Plaintiff had an abnormal rheumatoid factor, and his physician's most recent findings at Cook County Jail, which included documentation of Plaintiff's reported symptoms and a negative rheumatoid factor. *Id*. at 78:14-79:13; 80:16-24; 83:8-15. Consequently, Dr. Funk is of the opinion that the fact Plaintiff did not improve with the extensive treatment offered at Stateville and subsequent treatment once transferred to Menard Correctional Center, and the findings of physicians that had seen Plaintiff years later, aids in his

assessment that Plaintiff does not have rheumatoid arthritis. *Id*. at 77:23-78:8. All of these factors together speak against rheumatoid arthritis being a reasonable disease for Plaintiff. *Id*. at 79:14-16.

53. Per Dr. Funk's review of hundreds of pages of Plaintiff's medical records, Plaintiff's complaints regarding joint paint and stomach pain never required emergent or urgent medical care. [Ex. 6, 170:7-22].

54. Dr. Obaisi referred Plaintiff to a rheumatologist for a specialist's opinion as rheumatoid arthritis could have been considered as a possible cause of Plaintiff's symptoms. [Ex. 6, 77:23-78:8].

55. Dr. Funk's opinions regarding Plaintiff's medical condition and treatment thereof were made to a degree of medical certainty. [Ex. 6, 171:7-17].

Respectfully submitted,

WEXFORD HEALTH SOURCES, INC., LA TANYA WILLIAMS, P.A., and GHALIAH OBAISI, as Independent Executor of the Estate of SALEH OBAISI, M.D.

By: /s/ *Rachel S. Mahoney*
Matthew H. Weller/ARDC No. 6278685
Joseph J. Lombardo/ARDC No. 6306466
Rachel S. Mahoney/ARDC No. 6330303
CASSIDAY SCHADE LLP
222 W. Adams Street, Suite 2900
Chicago, IL 60606
(312) 641-3100
(312) 444-1669 – Fax
mweller@cassiday.com
jlombardo@cassiday.com
rmahoney@cassiday.com

## **TABLE OF EXHIBITS**

Exhibit 1................................................................Deposition Transcript of Plaintiff Jovan Daniels

Exhibit 2.........................................................................Plaintiff's IDOC Offender Profile Page

Exhibit 3................................................................................Plaintiff's IDOC Medical Records

Exhibit 4..........................................................................Declaration of LaTanya Williams, P.A.

Exhibit 5...................................................................... Estate Documents of Saleh Obaisi, M.D.

Exhibit 6 …………..........................................Deposition Transcript of Dr. Arthur Funk, M.D.

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2022, I electronically filed the foregoing document with the clerk of the court for Northern District of Illinois, Eastern Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ *Rachel S. Mahoney*

9773851