## Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JOVAN D. DANIELS,    )

    Plaintiff,  ) Civil Action

    vs.     ) No. 1:16-cv-00014

WEXFORD HEALTH SOURCES, INC.,)

et al.,    )

    Defendants.  )

The 30(b)(6) deposition of WEXFORD

HEALTH SOURCES, INC., by ARTHUR FUNK, M.D., called

for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before KRISTIN C. BRAJKOVICH, a

Certified Shorthand Reporter, CSR. No. 84-3810, of

said state, via Zoom, on the 18th day of March,

A.D. 2022, at 10:00 a.m.

## Page 2

1    PRESENT:

2

3    FOLEY & LARDNER LLP,

4    (321 North Clark Street, Suite 3000,

5    Chicago, Illinois 60654-5313,

6    1-312-832-4500), by:

7    MS. JASMINE REED,

8    jreed@foley.com, and

9    MS. ELVIA R. ANGUIANO,

10    eanguiano@foley.com,

11    appeared via zoom on behalf of

12    Plaintiff;

13

14    CASSIDAY SCHADE LLP,

15    (222 West Adams Street, Suite 2900,

16    Chicago, Illinois 60606,

17    1-312-641-3100), by:

18    MR. JOSEPH J. LOMBARDO,

19    jlombardo@cassiday.com,

20    appeared via Zoom on behalf of

21    Defendants.

22

23    REPORTED BY:  KRISTIN C. BRAJKOVICH,

24    CSR No. 84-3810.

## Page 3

1    I N D E X

2    WITNESS      EXAMINATION

3    ARTHUR FUNK, M.D.

4    By Ms. Reed    4

5    By Mr. Lombardo    166

6

7

8    E X H I B I T S

9    NUMBER      PAGE

10    Funk Deposition Exhibit No. 1    172

11    Funk Deposition Exhibit No. 2    172

12    Funk Deposition Exhibit No. 3    172

13    Funk Deposition Exhibit No. 4    172

14    Funk Deposition Exhibit No. 5    172

15    Funk Deposition Exhibit No. 6    172

16    Funk Deposition Exhibit No. 7    172

17

18

19

20

21

22

23

24

## Page 4

10:02 1    MS. REED:  Thank you.  We are here for the

10:02 2    30(b)(6) deposition of -- give me one second --

10:02 3    Wexford.

4    ARTHUR FUNK, M.D.,

5    called as a witness herein, having been first duly

6    sworn, was examined and testified as follows:

7    EXAMINATION

8    BY MS. REED:

10:02 9    Q.   And, Dr. Funk, you have been designated

10:03 10    by Wexford to be their corporate rep today; is that

10:03 11    correct?

10:03 12    A.   Yes.

10:03 13    Q.   And have you been deposed before?

10:03 14    A.   Yes.

10:03 15    Q.   Okay.  Well, I'm just going to go over

10:03 16    three quick ground rules just to make sure that we

10:03 17    are on the same page, but I'm not going to do my

10:03 18    whole spiel for you.  Is that okay?

10:03 19    A.   That is fine with me.

10:03 20    Q.   So the first one and most important one

10:03 21    is, remember the court reporter, the lovely court

10:03 22    reporter is taking down everything we say, so we

10:03 23    just want to make sure that we don't talk over each

10:03 24    other so it makes it easier for her.  Are you okay

## Page 5

```
10:03  1   with that?
10:03  2       A.   That's fine.
10:03  3       Q.   Second one, make sure you understand my
10:03  4   question.  I'm back in the Midwest now.  But I used
10:03  5   to practice in Denver and California, so I would
10:03  6   use weird Midwest words and they would just look at
10:03  7   me like I was crazy.  So this was generally my
10:03  8   warning, like, if you don't understand a word I use
10:03  9   or if I'm using a weird word, I probably have
10:03 10   adopted some Colorado words over the years.  Just
10:03 11   go ahead and ask me to clarify, and I'll do it.  Is
10:04 12   that okay?
10:04 13       A.   That is fine.  And English isn't my
10:04 14   first language, so I may use some odd words myself.
10:04 15       Q.   Fair enough.  The last one is, if you
10:04 16   need a break, I'm happy to let you take one.  The
10:04 17   only thing that I ask of you is that you answer the
10:04 18   last question that I posed before we take a break.
10:04 19   Is that okay?
10:04 20       A.   Sure.
10:04 21       Q.   Okay.  Now, there might be points in
10:04 22   time where your counsel objects.  You have been
10:04 23   through this before.  You know you still have to
10:04 24   answer the question unless he instructs you not to?
```

## Page 6

```
10:04  1       A.   I understand.
10:04  2       Q.   Now, is there any reason why you feel
10:04  3   like you cannot answer truthfully and accurately in
10:04  4   this deposition today?
10:04  5       A.   Yes.
10:04  6       MS. REED:  Ms. Court Reporter, could you read
10:04  7   back my question.  I want to give Dr. Funk another
10:04  8   chance to answer it.
10:04  9           (WHEREUPON, the record was read by
10:05 10       the reporter.)
10:05 11       MR. LOMBARDO:  So, Dr. Funk, you answered,
10:05 12   yes, there was a reason you could not testify
10:05 13   truthfully today.
10:05 14       THE WITNESS:  No, that is not correct.
10:05 15       MR. LOMBARDO:  Okay.  Do you want to change
10:05 16   your answer?
10:05 17       THE WITNESS:  No.  My answer is correct.
10:05 18   BY MS. REED:
10:05 19       Q.   Let me ask a different question, try it
10:05 20   a different way.
10:05 21           Dr. Funk, are you able to give your best
10:05 22   and most accurate testimony today?
10:05 23       A.   My best and most accurate, is what you
10:05 24   asked?
```

## Page 7

```
10:05  1       Q.   Yes.
10:05  2       A.   To the best of my knowledge I would be
10:05  3   able to do that, yes.
10:05  4       Q.   Okay.  And is there any reason that you
10:05  5   can think of sitting here today that you would not
10:06  6   be able to give your best testimony today?
10:06  7       A.   No, not that I wouldn't at the time I
10:06  8   was asked the question.  I sometimes may remember
10:06  9   facts later on.  People refer to that as having
10:06 10   their memory refreshed or being refreshed, so that
10:06 11   occurs sometimes.  So other than that, no, I would
10:06 12   not know of any other reason.
10:06 13       Q.   Okay.  Fair enough.  Just to give you
10:06 14   some background, like I said, I practiced in
10:06 15   Colorado, so this is essentially my veiled way of
10:06 16   saying, Did you smoke weed this morning before this
10:06 17   deposition?  It's just a standard question to make
10:06 18   sure that you are able to answer everything.  Okay?
10:06 19       A.   I understand.  I'm just trying to answer
10:06 20   your questions accurately.
10:06 21       Q.   Yes.  I appreciate that.  Now, those are
10:06 22   the ground rules.
10:06 23           Could you state and spell your name for
10:07 24   the record?
```

## Page 8

```
10:07  1       A.   Yes, Arthur Funk, A-r-t-h-u-r, F-u-n-k.
10:07  2       Q.   And you had mentioned that you had been
10:07  3   deposed before; is that correct?
10:07  4       A.   Yes.
10:07  5       Q.   And how many times?
10:07  6       A.   Lots.
10:07  7       Q.   Can you give me a rough estimate?
10:07  8       A.   I would say between 400 and 500.
10:07  9       Q.   Okay.  And have you been a 30(b)(6) --
10:07 10   or strike that.
10:07 11           Have you been a corporate representative
10:07 12   in a deposition for Wexford before?
10:07 13       A.   Yes.
10:07 14       Q.   And about how many times?
10:07 15       A.   More than 200.  Between 200 and 300, I
10:07 16   would guess.
10:07 17       Q.   And what about within the last year,
10:07 18   have you acted as a corporate representative in a
10:07 19   deposition for Wexford?
10:07 20       A.   This calendar year or the last
10:07 21   12 months?
10:07 22       Q.   The last 12 months.
10:07 23       A.   Yes.  Of course, yes.
10:08 24       Q.   How many times within the last
```

## Page 9

10:08 1 12 months?

10:08 2     A. Again, I don't keep track, so I'm just

10:08 3 guessing off the top of my head. Probably 30, 40,

10:08 4 somewhere around there.

10:08 5     Q. Do you recall if any of those

10:08 6 depositions involved a rheumatoid arthritis

10:08 7 diagnosis?

10:08 8     A. Not that I recall. I don't think so,

10:08 9 but perhaps. Again, there's been many, but I don't

10:08 10 believe any were from -- about rheumatoid

10:08 11 arthritis.

10:08 12     Q. Okay. About when did you find out that

10:09 13 you would have to appear for this deposition today?

10:09 14     A. I didn't -- I was never told I had to

10:09 15 appear. I volunteered to be the 30(b)(6)

10:09 16 representative, and I don't remember when. It was

10:09 17 some months ago, but I don't keep track of things

10:09 18 like that. So it was months ago.

10:09 19     Q. All right. Now, you mentioned that you

10:09 20 volunteered to be the 30(b)(6) representative. Are

10:09 21 there other people in your office that you know of

10:09 22 who act as corporate representatives in these types

10:09 23 of cases?

10:09 24     A. Not in my office. In the corporation

## Page 10

10:09 1 there are, yes.

10:09 2     Q. Where is your office located?

10:09 3     A. In Chicago.

10:10 4     Q. And can you state your business address

10:10 5 for the record?

10:10 6     A. No. I can be contacted through my

10:10 7 attorney.

10:10 8     MR. LOMBARDO: Jasmine, I think we are going

10:10 9 to make an objection just for security purposes. I

10:10 10 think that Dr. Funk has a home office, so his home

10:10 11 office and business office would be the same. And

10:10 12 just because of Mr. Daniels' record, for security

10:10 13 purposes we'll object to that.

10:10 14     He could give you Wexford's corporate

10:10 15 office in Pittsburgh, but that is not where he is

10:10 16 actually physically located, if you want that.

10:10 17 BY THE WITNESS:

10:10 18     A. I can certainly give you that address,

10:10 19 if you would like.

10:10 20 BY MS. REED:

10:10 21     Q. I guess I just need you to confirm for

10:10 22 the record -- and I note that your attorney did it,

10:10 23 but I just need you to say it -- that your office

10:10 24 is not the actual corporate headquarters. You have

## Page 11

10:11 1 a separate one?

10:11 2     A. That's correct, yes.

10:11 3     Q. Okay. Did you do anything to prepare

10:11 4 for this deposition today?

10:11 5     A. Yes.

10:11 6     Q. Can you tell me -- can you describe

10:11 7 generally what you did to prepare for this

10:11 8 deposition?

10:11 9     A. Primarily, I reviewed records that

10:11 10 Mr. Lombardo had provided to me and other documents

10:11 11 related to the deposition.

10:11 12     Q. Did you conduct any searches on your own

10:11 13 for documents related to this deposition?

10:11 14     A. No. I would have -- at the time the

10:11 15 litigation was first filed, I would have

10:11 16 participated in a litigation hold, it's called,

10:11 17 from the company, where any documents relative to

10:12 18 the complaint would have been forwarded to the risk

10:12 19 management office, but I did not do that recently.

10:12 20     Q. And just to clarify, can you say with

10:12 21 relative certainty that you did, in fact,

10:12 22 participate in the litigation hold process for this

10:12 23 case, or do you just typically participate in that?

10:12 24     A. That is my practice, and I believe I

## Page 12

10:12 1 did. I have no reason to believe I didn't.

10:12 2     Q. Okay. Other than reviewing records and

10:12 3 documents, did you do anything else to prepare for

10:12 4 the deposition?

10:12 5     A. I reviewed the standards of care for

10:13 6 rheumatoid arthritis and some related disorders.

10:13 7 That is all -- that is the only other thing I

10:13 8 recall having done.

10:13 9     Q. Okay. Did you speak with anyone in

10:13 10 preparation for the deposition?

10:13 11     A. Just counsel, Mr. Lombardo, and I would

10:13 12 have communicated with the director of risk

10:13 13 management at the corporate office, Mr. Joe Ebbitt,

10:13 14 but that was just in regards to scheduling of the

10:13 15 deposition.

10:14 16     Q. When you were preparing for the

10:14 17 deposition, about how many times did you speak

10:14 18 with, say via phone or video conference or in

10:14 19 person, Mr. Lombardo?

10:14 20     A. I think it was three or four times, but

10:14 21 the conversations would not have been restricted to

10:14 22 this claim. It would have been any other claims

10:14 23 that were pending that he was involved -- or we

10:14 24 were both involved in.

Page 13

```
10:14  1        Q.   Okay.  And of those three or four times,
10:14  2   can you give me an estimate of the percentage of
10:14  3   that time that was spent actually speaking about
10:14  4   this deposition for this case?
10:15  5        A.   It would have been the majority of the
10:15  6   time, but I can't estimate what percent.
10:15  7        Q.   Okay.  And about how long did these
10:15  8   conversations last?
10:15  9        A.   Less than an hour, more than ten
10:15 10   minutes.  Between ten minutes and, I would say,
10:15 11   45 minutes, is what I would guess.
10:15 12        Q.   Okay.  I'm going to show you what will
10:15 13   be marked as the first exhibit for this deposition.
10:16 14   Okay.  So how this works is, I'm going to type the
10:16 15   exhibit number in the chat and then attach the
10:16 16   document, just to make sure everyone has it.
10:17 17             Okay.  So, Dr. Funk, can you see my
10:17 18   screen now?
10:17 19        A.   Yes, I can.
10:17 20        Q.   And is that font size fine, or do I need
10:17 21   to blow it up a little bit?
10:17 22        A.   You'd need to blow it up for me to
10:17 23   actually read the print.
10:17 24        Q.   Okay.  How is that?
```

Page 14

```
10:18  1        A.   That's a lot better.
10:18  2        Q.   Okay.  So I'm showing you what has been
10:18  3   marked as Exhibit 1 for the deposition, and it's
10:18  4   titled Second Amended Notice of Rule 30(b)(6)
10:18  5   Remote Video Conference Deposition for Wexford
10:18  6   Health Sources, Incorporated.  Did I read that
10:18  7   accurately?
10:18  8        A.   Yes.
10:18  9        Q.   I'm going to slowly scroll through this.
10:18 10   So before today, had you seen this notice of
10:18 11   deposition before?
10:18 12        A.   Yes.  It appears to be what I was
10:18 13   provided by Mr. Lombardo.
10:18 14        Q.   Okay.  So now I'm going to go through
10:18 15   each of the topics and ask you if you are prepared
10:18 16   to testify about them today, so you know where I'm
10:19 17   going with this.
10:19 18             We are starting on page 2 of Exhibit
10:19 19   No. 1, Topic No. 1 reads, Policies related to
10:19 20   medical treatment of prisoners at Illinois
10:19 21   Department of Corrections.
10:19 22             Are you prepared to testify about Topic
10:19 23   No. 1 today?
10:19 24        A.   Yes.
```

Page 15

```
10:19  1        Q.   Okay.  And how did you get prepared?
10:19  2        A.   As I stated, by reviewing the
10:19  3   information that was provided to me, my familiarity
10:19  4   from my working in the department of corrections,
10:19  5   and, specifically, for Wexford Health Sources.
10:19  6        Q.   Okay.  And I know it's repetitive, but
10:19  7   I'm going to have to ask you the same question for
10:19  8   every one.  I understand that you'll say, As I just
10:19  9   said.  I'm just letting you know, I just have to
10:19 10   make the record.
10:19 11        A.   Sure.
10:19 12        Q.   So Topic No. 2, Policies, procedures,
10:19 13   and protocols for treatment of serious medical
10:20 14   conditions, serious medical needs, or chronic
10:20 15   medical conditions, including but not limited to,
10:20 16   joint pain, arthritis, rheumatoid arthritis,
10:20 17   elevated Rh factors, ulcers, abdominal pain, GERD,
10:20 18   acid reflux, and gastritis.
10:20 19             Are you prepared to testify about Topic
10:20 20   No. 2, as I just read it?
10:20 21        A.   Yes.
10:20 22        Q.   And how are you prepared to testify
10:20 23   about it?
10:20 24        A.   The same response as to No. 1.
```

Page 16

```
10:20  1        Q.   Okay.  Topic No. 3, Policies,
10:20  2   procedures, and protocols for screening inmates
10:20  3   with serious medical conditions, serious medical
10:20  4   needs, or chronic medical conditions including, but
10:20  5   not limited to, joint pain, arthritis, rheumatoid
10:20  6   arthritis, elevated Rh factors, ulcers, abdominal
10:20  7   pain, GERD, acid reflux, and gastritis.
10:21  8             Are you prepared to testify concerning
10:21  9   Topic No. 3, as I have just read it?
10:21 10        A.   Yes.
10:21 11        Q.   And how did you prepare yourself to
10:21 12   testify on Topic No. 3?
10:21 13        A.   The same response as Topic No. 1.
10:21 14        Q.   Topic No. 4, Policies, procedures, and
10:21 15   protocols for requesting outside medical tests
10:21 16   and/or consultations with outside medical
10:21 17   specialists.
10:21 18             Are you prepared to testify on Topic
10:21 19   No. 4, as I just read it?
10:21 20        A.   Yes.
10:21 21        Q.   And how did you prepare to testify for
10:21 22   Topic No. 4?
10:21 23        A.   The same response as No. 1.
10:21 24        Q.   Topic No. 5, Policies for participation
```

Page 17

10:21 1 in grievance process at IDOC. Are you prepared to
10:21 2 testify about Topic No. 5, as I just read it?
10:21 3 A. Yes.
10:21 4 Q. And how did you prepare yourself to
10:21 5 testify about Topic No. 5?
10:21 6 A. Again. Same response as No. 1.
10:22 7 Q. Topic No. 6, Policies, procedures, and
10:22 8 protocols for ordered medication not on the
10:22 9 approved medication list. Are you prepared to
10:22 10 testify about Topic No. 6, as I just read it?
10:22 11 A. Yes.
10:22 12 Q. And how did you prepare yourself to
10:22 13 testify for Topic No. 6?
10:22 14 A. Again, same response as to No. 1.
10:22 15 Q. Okay. Topic No. 7, Policy to ensure
10:22 16 that all medical services are provided in
10:22 17 accordance with medically accepted community
10:22 18 standards of care.
10:22 19 Are you prepared to testify about Topic
10:22 20 No. 7, as I just read it?
10:22 21 A. Yes.
10:22 22 Q. And how did you prepare yourself to
10:22 23 testify about Topic No. 7?
10:22 24 A. Again, same response as to No. 1.

Page 18

10:22 1 Q. Topic No. 8, Point of contact for
10:22 2 interaction between IDOC and Wexford. Are you
10:22 3 prepared to testify about Topic No. 8, as I just
10:22 4 read it?
10:22 5 A. Yes.
10:22 6 Q. And how did you prepare yourself to
10:22 7 testify about Topic No. 8?
10:23 8 A. Same response as to No. 1.
10:23 9 Q. Okay. Topic No. 9, Policies,
10:23 10 procedures, and protocols for Wexford's internal
10:23 11 review of inmates' medical records.
10:23 12 Are you prepared to testify about Topic
10:23 13 No. 9, as I just read it?
10:23 14 A. Yes.
10:23 15 Q. How did you prepare yourself to testify
10:23 16 about Topic No. 9?
10:23 17 A. The same response as to No. 1.
10:23 18 Q. Topic No. 10, Intake, treatment, and
10:23 19 screening of plaintiff. Are you prepared to
10:23 20 testify about Topic No. 10, as I just read it?
10:23 21 A. Yes.
10:23 22 Q. And how did you prepare yourself to
10:23 23 testify about Topic No. 10?
10:23 24 A. Same response as to No. 1.

Page 19

10:23 1 Q. Okay. Topic No. 11, Wexford's
10:23 2 correspondence and/or communications with Saleh
10:23 3 Obaisi, M.D., and/or LaTonya Williams regarding the
10:23 4 treatment of plaintiff.
10:23 5 Are you prepared to testify about Topic
10:23 6 No. 11, as I just read it?
10:23 7 A. Yes.
10:23 8 Q. And how did you prepare yourself to
10:23 9 testify about Topic No. 11?
10:24 10 A. Same response as to No. 1.
10:24 11 Q. Topic No. 12, Wexford's correspondence
10:24 12 and/or communications with physicians and/or other
10:24 13 health care professionals regarding the treatment
10:24 14 of plaintiff.
10:24 15 Are you prepared to testify about Topic
10:24 16 No. 12, as I just read it?
10:24 17 A. Yes.
10:24 18 Q. And how did you prepare yourself to
10:24 19 testify about Topic No. 12?
10:24 20 A. Same response as to No. 1.
10:24 21 Q. Okay. Topic No. 13, Policies,
10:24 22 procedures, and protocols related to the diagnosis
10:24 23 and/or administration of prescription medications
10:24 24 including, without limitation, any related to

Page 20

10:24 1 inappropriately accelerated diseases.
10:24 2 Are you prepared to testify about Topic
10:24 3 No. 13?
10:24 4 A. Yes.
10:24 5 Q. How did you prepare yourself to testify
10:24 6 about Topic No. 13?
10:24 7 A. Same response as to No. 1.
10:24 8 Q. Topic No. 14, Policies, procedures, and
10:24 9 protocols related to intake, medical treatment, and
10:24 10 screening inmates for medical conditions at IDOC.
10:25 11 Are you prepared to testify about Topic
10:25 12 No. 14, as I just read it?
10:25 13 A. Yes.
10:25 14 Q. And how did you prepare yourself to
10:25 15 testify about Topic No. 14?
10:25 16 A. Same response as to No. 1.
10:25 17 Q. Okay. Topic No. 15, Policies,
10:25 18 procedures, and protocols related to handling sick
10:25 19 call records, medical call reports, incident
10:25 20 reports, and monitoring of inmates.
10:25 21 Are you prepared to testify about Topic
10:25 22 No. 15, as I just read it?
10:25 23 A. Yes.
10:25 24 Q. And how did you prepare yourself to

Page 21

| | | |
|---|---|---|
| 10:25 | 1 | testify about Topic No. 15? |
| 10:25 | 2 | A. Same response as to No. 1. |
| 10:25 | 3 | Q. Topic No. 16, Policies and -- policies |
| 10:25 | 4 | and related to the prescription and/or |
| 10:25 | 5 | administration of prescription medication. |
| 10:25 | 6 | Are you prepared to testify about Topic |
| 10:25 | 7 | No. 16, as I just read it? |
| 10:25 | 8 | A. Yes. |
| 10:25 | 9 | Q. Okay. And how did you prepare yourself |
| 10:25 | 10 | to testify about Topic No. 16? |
| 10:25 | 11 | A. Same response as to No. 1. |
| 10:25 | 12 | Q. Okay. Topic No. 17, Wexford's document |
| 10:26 | 13 | retention policies regarding documents that are |
| 10:26 | 14 | relevant to this lawsuit. |
| 10:26 | 15 | Are you prepared to testify about Topic |
| 10:26 | 16 | No. 17, as I just read it? |
| 10:26 | 17 | A. Yes. |
| 10:26 | 18 | Q. Okay. How did you prepare yourself to |
| 10:26 | 19 | testify about Topic No. 17? |
| 10:26 | 20 | A. Same response as to No. 1. |
| 10:26 | 21 | Q. Okay. That is the end of the topics. |
| 10:26 | 22 | Now I'm going to dig a little further |
| 10:26 | 23 | into your response to Topic No. 1 and how you |
| 10:26 | 24 | prepared, as it applies to all of the topics. |

Page 22

| | | |
|---|---|---|
| 10:26 | 1 | Now, earlier when we talked about what |
| 10:26 | 2 | you did to prepare, you said that you reviewed |
| 10:26 | 3 | records and other documents; is that correct? |
| 10:26 | 4 | A. Yes. |
| 10:26 | 5 | Q. Okay. And you also said that you |
| 10:26 | 6 | reviewed the standards of care of rheumatoid |
| 10:26 | 7 | arthritis and other diseases? |
| 10:26 | 8 | A. For rheumatoid related diseases, is what |
| 10:26 | 9 | I said, yes. |
| 10:26 | 10 | Q. Okay. Related. I apologize. Let's |
| 10:27 | 11 | start with the records you reviewed. |
| 10:27 | 12 | First of all, what types of records did |
| 10:27 | 13 | you review for this file? |
| 10:27 | 14 | A. The records that were provided by |
| 10:27 | 15 | Mr. Lombardo. |
| 10:27 | 16 | Q. And what did those records consist of? |
| 10:27 | 17 | A. There were medical records. There were |
| 10:27 | 18 | different legal correspondences and documents. I |
| 10:27 | 19 | recall two grievances. There were some Wexford |
| 10:27 | 20 | guidelines or policies. The deposition of the |
| 10:27 | 21 | plaintiff and some utilization management records. |
| 10:28 | 22 | That is what I recall, but there may have been some |
| 10:28 | 23 | other documents. It's been some time since I |
| 10:28 | 24 | reviewed them. |

Page 23

| | | |
|---|---|---|
| 10:28 | 1 | Q. That last thing, did you say utilization |
| 10:28 | 2 | management records? |
| 10:28 | 3 | A. Yes. |
| 10:28 | 4 | Q. So my list consists of, for the |
| 10:28 | 5 | documents that you remember reviewing, medical |
| 10:28 | 6 | records, legal correspondence, grievances, Wexford |
| 10:28 | 7 | guidelines, the deposition of plaintiff, and |
| 10:28 | 8 | utilization management records. Is there anything |
| 10:28 | 9 | else that you can think of? |
| 10:28 | 10 | A. I said legal correspondences or legal |
| 10:28 | 11 | documents in the plural, not in the singular. |
| 10:28 | 12 | Q. Okay. Anything else? |
| 10:28 | 13 | A. Well, this deposition notice and some |
| 10:28 | 14 | other documents, but, no, I don't recall anything |
| 10:28 | 15 | else. |
| 10:28 | 16 | Q. The medical records that you reviewed, |
| 10:29 | 17 | what institution did those medical records come |
| 10:29 | 18 | from? |
| 10:29 | 19 | A. Several. |
| 10:29 | 20 | Q. Which ones? |
| 10:29 | 21 | A. Primarily, the Department of |
| 10:29 | 22 | Corrections. A rheumatologist that was in Illinois |
| 10:29 | 23 | but from his office somewhere in Central Illinois, |
| 10:29 | 24 | and then just yesterday afternoon, I received some |

Page 24

| | | |
|---|---|---|
| 10:29 | 1 | records from Mr. Lombardo from the Cook County |
| 10:29 | 2 | Health System for treatment of the plaintiff for |
| 10:29 | 3 | four visits that he had there. |
| 10:29 | 4 | Q. Okay. Any other institutions that you |
| 10:29 | 5 | can recall? |
| 10:30 | 6 | A. He may have had some testing at other |
| 10:30 | 7 | facilities that I did not mention, but I don't know |
| 10:30 | 8 | the name of them, as I'm sitting here right now. |
| 10:30 | 9 | Q. Do you have those documents with you? |
| 10:30 | 10 | A. No. |
| 10:30 | 11 | Q. How were those documents sent to you? |
| 10:30 | 12 | A. Via courier primarily. The records I |
| 10:30 | 13 | received yesterday afternoon were scanned and sent |
| 10:30 | 14 | electronically. |
| 10:30 | 15 | Q. Okay. Now, the legal correspondence, I |
| 10:30 | 16 | don't want to get into communications between you |
| 10:30 | 17 | and your attorney, so can you just generally |
| 10:30 | 18 | describe what you meant by legal correspondences? |
| 10:31 | 19 | A. The different legal documents, such as |
| 10:31 | 20 | the response to interrogatories, like this notice |
| 10:31 | 21 | of deposition, the things like requests to admit, |
| 10:31 | 22 | things like that. |
| 10:31 | 23 | Q. Okay. And by grievances, were you |
| 10:31 | 24 | referring to the plaintiff's grievances that he |

Page 25

10:31 1   filed?

10:31 2     A. Yes. I believe there were two, yes.

10:31 3     Q. Now, let's discuss the Wexford

10:31 4   guidelines that you reviewed. Was that one

10:31 5   document, or was it multiple sets of guidelines?

10:32 6     A. There were portions taken out of

10:32 7   guidelines that -- I believe there were more than

10:32 8   one. I just scanned those. They were also just

10:32 9   provided yesterday afternoon.

10:32 10     Q. Were those provided via e-mail?

10:32 11     A. Yes.

10:32 12     Q. All right. Do you recall the names of

10:32 13   those guidelines?

10:32 14     A. Medical guidelines and medical policies

10:32 15   and procedures, one or the other.

10:32 16     Q. Any other names or guidelines?

10:32 17     A. Not that I recall. I did not really

10:32 18   have time because of the short notice to review

10:33 19   them, but I have reviewed those -- all of Wexford's

10:33 20   documents for other depositions, so I did not feel

10:33 21   that I had a need to look at it specifically.

10:33 22     Q. Okay. And by deposition of the

10:33 23   plaintiff, you mean the plaintiff in this case,

10:33 24   correct?

Page 26

10:33 1     A. Yes.

10:33 2     Q. Now, describe for me what utilization

10:33 3   management records are.

10:33 4     A. They are records generated from

10:33 5   Wexford's utilization management department

10:33 6   regarding services that are primarily done outside

10:33 7   of the facility, that is of the correctional

10:33 8   facility where the plaintiff was housed.

10:33 9     Q. Can you give me an example?

10:34 10     A. They appear as screen shots, a computer

10:34 11   screen shot with information written in that

10:34 12   pertains to Mr. Daniels, so it would have his

10:34 13   identifying information and clinical information,

10:34 14   such as what service or study was requested and

10:34 15   then a summary of the conversation and

10:34 16   justification for that service.

10:34 17     Q. Who fills out these or who creates or

10:34 18   develops these records, the utilization management

10:35 19   records?

10:35 20     A. The utilization management nurse in the

10:35 21   corporate office in Pittsburgh.

10:35 22     Q. Okay. Now, let's switch to the

10:35 23   standards of care for rheumatoid arthritis, the

10:35 24   documents that you reviewed concerning that. Can

Page 27

10:35 1   you describe for me what you reviewed to determine

10:35 2   the standards of care for rheumatoid arthritis?

10:35 3     A. I reviewed documents that were published

10:36 4   by a source called UpToDate. It's a medical

10:36 5   reference that clinicians use.

10:36 6     Q. Is this an online resource?

10:36 7     A. Yes.

10:36 8     Q. Anything else?

10:36 9     A. No, that is what I recall.

10:36 10     Q. Okay. So the documents by UpToDate

10:36 11   covered standards for rheumatoid arthritis and

10:36 12   related diseases?

10:36 13     A. Yes. That is not all it contains, but

10:36 14   it has those illnesses and many other illnesses.

10:36 15     Q. Okay. Did you speak with any of the

10:37 16   employees involved in this lawsuit to prep for the

10:37 17   deposition?

10:37 18     A. No.

10:37 19     Q. Okay. Other than your attorney and the

10:37 20   risk management person, do you recall speaking with

10:37 21   anyone else to prepare for this deposition?

10:37 22     A. No.

10:37 23     Q. Okay. You mentioned that you are

10:38 24   familiar with Wexford's procedures based on your

Page 28

10:38 1   own experience; is that accurate?

10:38 2     A. Yes.

10:38 3     Q. Okay. So now I'm just going to ask you

10:38 4   some background questions, so I understand what

10:38 5   your experience is. Is that okay?

10:38 6     A. Sure.

10:38 7     Q. Your current position is the regional

10:38 8   medical director for Wexford; is that correct?

10:38 9     A. For Illinois.

10:38 10     Q. For Illinois. How long have you been in

10:38 11   that position?

10:38 12     A. Since 2005.

10:38 13     Q. And what did you do before that,

10:38 14   immediately before?

10:38 15     A. I was site medical director for a

10:39 16   facility in Illinois, and I also -- for about six

10:39 17   or eight months, as I remember, I performed

10:39 18   utilization management functions for Wexford. That

10:39 19   was in 2004 to 2005.

10:39 20     Q. Okay. So you were the regional -- or

10:39 21   you are the regional medical director and you have

10:39 22   been the regional medical director of Illinois

10:39 23   since 2005, correct?

10:39 24     A. Yes.

Page 29

10:39 1     Q. And prior to that, you were a site
10:40 2 medical director?
10:40 3     A. Correct.
10:40 4     Q. And how long were you a site medical
10:40 5 director?
10:40 6     A. Seven and a half years.
10:40 7     Q. And then concurrently with that
10:40 8 position, you also had some utilization management
10:40 9 duties from 2004 to 2005; is that correct?
10:40 10     A. Yes.
10:40 11     Q. When you were a site director, could you
10:40 12 just generally describe for me what your duties
10:40 13 were?
10:40 14     A. Clinical and administrative duties for
10:40 15 the facility, and I supervised the clinical staff
10:40 16 at the facility.
10:40 17     Q. And can you give me a little bit more
10:41 18 detail about what it means to supervise the
10:41 19 clinical staff at the facility?
10:41 20     A. Yes. I oversaw the services, the health
10:41 21 care services that were delivered from all of the
10:41 22 different departments at the facility, nursing,
10:41 23 radiology, phlebotomy, dental, mental health, and
10:41 24 then clinical. And then I was the direct

Page 30

10:41 1 supervisor of the physicians, the staff physicians,
10:41 2 that provided the direct care to the population.
10:41 3     Q. As a site medical director, were you
10:41 4 involved with training of the physicians when they
10:42 5 started?
10:42 6     A. Yes.
10:42 7     Q. Can you give me an overview of what the
10:42 8 training entailed for a new physician at the site?
10:42 9     A. Yes. It consisted primarily of
10:42 10 Wexford's orientation program and then some related
10:42 11 documents that would have been applicable at the
10:42 12 time of the orientation.
10:42 13     Q. What types of documents?
10:42 14     A. The provider handbook, policies from the
10:42 15 State, different guidelines from the State,
10:42 16 practices of the facility, the job description.
10:43 17 And it would also include -- and it would depend on
10:43 18 the individual candidate as to their experience,
10:43 19 the clinical experience and whether they have
10:43 20 correctional experience, but it would also include
10:43 21 some mentoring that would either be done by me --
10:43 22 myself or with another physician.
10:43 23     Q. Okay. Let's switch to your utilization
10:43 24 management duties. Could you just give me a brief

Page 31

10:43 1 summary of what that entailed?
10:43 2     A. Wexford has a utilization management
10:43 3 function called collegial review, where a physician
10:43 4 reviews the requests by another physician. Those
10:43 5 are requests for services outside of the facility.
10:44 6 It is a teleconference meeting that consists of the
10:44 7 physician who is making the request, a utilization
10:44 8 management nurse, utilization management physician,
10:44 9 in which case I was fulfilling that role, and the
10:44 10 site scheduler. That is the person who schedules
10:44 11 the request.
10:44 12     It consists at least of those four
10:44 13 individuals, but sometimes others may join on the
10:44 14 call, such as the health care unit administrator or
10:44 15 director of nursing or somebody -- sometimes
10:44 16 somebody from the administrative staff at the
10:44 17 facility. And the call consists of the request,
10:44 18 and then the review of the person's request, a
10:44 19 discussion ensues and then a decision is made as to
10:44 20 the best course of treatment consistent with the
10:45 21 contract and the community standard of care.
10:45 22     Q. So is it fair to say that the purpose of
10:45 23 those collegial reviews was to determine whether
10:45 24 the patient should be referred outside of the

Page 32

10:45 1 facility to another physician?
10:45 2     A. Whether it was appropriate, yes.
10:45 3     Q. And what were some reasons that during
10:45 4 your tenure you would deny that request?
10:45 5     A. If it was not covered by the contract,
10:45 6 not a service that we were to provide by the
10:45 7 contract, or if it was not clinically consistent or
10:45 8 reasonable or there was a better course of action.
10:46 9     Q. Can you give me a little bit more detail
10:46 10 by what you mean by -- when you say something is
10:46 11 not covered by the contract?
10:46 12     A. Yes, for each facility, Wexford has a
10:46 13 contract to provide specific services, and it
10:46 14 details and defines what services we are to
10:46 15 provide, and then there are services that are not
10:46 16 covered or not provided.
10:46 17     So the first would be to determine
10:46 18 whether the service being requested was something
10:46 19 that was under our contract to provide.
10:46 20     Q. Can you give me an example of something
10:46 21 that would not be covered by the contract?
10:46 22     A. You are talking about Illinois?
10:46 23     Q. Yes.
10:46 24     A. Cosmetic procedures, organ transplant,

Page 33

10:47 1 treatment of Hepatitis C and HIV, medication
10:47 2 treatment I'm referring to, dialysis services at
10:47 3 the time. That has since changed. It's now under
10:47 4 our contract, but for most of the contract or the
10:47 5 time period in question, it would have been
10:47 6 dialysis services. Abortion services, sex change
10:47 7 services, sex reassignment services, surgical sex
10:47 8 reassignment.
10:47 9 Those are the ones that come to mind.
10:47 10 Again, the contract defines what we do primarily,
10:47 11 not what we don't do, but it does make reference to
10:47 12 certain illnesses that I mentioned that are the
10:47 13 Department of Corrections' responsibility.
10:47 14 Q. Okay. And so if something is not
10:47 15 covered by the contract and you tell the physician
10:47 16 from the site that it's not covered, then what is
10:48 17 the next step for that physician?
10:48 18 A. He would need to resolve that. He would
10:48 19 need to respond to that by telling the patient that
10:48 20 the service is not provided and why it's not
10:48 21 provided and then give them an avenue to whom -- to
10:48 22 request that service.
10:48 23 Q. Okay. In your current role, are you
10:48 24 still familiar with the utilization management

Page 34

10:48 1 duties?
10:48 2 A. Yes.
10:48 3 Q. Okay. And as you have just described,
10:48 4 the duties that you were doing from 2004 to 2005,
10:48 5 has that collegial review process stayed the same
10:48 6 throughout your tenure as the regional medical
10:48 7 director?
10:49 8 A. Different individuals were involved, but
10:49 9 recently the collegial review by -- my contract was
10:49 10 eliminated with the last contract renewal, which
10:49 11 was about nine months ago.
10:49 12 Q. Do you know why?
10:49 13 A. It was a request from the Department of
10:49 14 Corrections.
10:49 15 Q. Okay. So prior to the elimination of
10:49 16 the collegial review process, did that process stay
10:49 17 the same as you have described it to me today?
10:49 18 A. Yes, approximately the same. There were
10:49 19 tweaks with the policy that occurred over time,
10:49 20 refining it and clarifying, but the procedure
10:49 21 basically remained the same.
10:49 22 Q. Okay. Now, I'm going to pivot here to
10:50 23 your regional medical director position. Can you
10:50 24 generally describe for me your duties as the

Page 35

10:50 1 regional medical director for Illinois?
10:50 2 A. Yes. I perform clinical and
10:50 3 administrative duties as assigned to me by my
10:50 4 supervisors.
10:50 5 Q. Who are your supervisors?
10:50 6 A. The clinical supervisor would be
10:50 7 Dr. Stephen Ritz, and then my administrative
10:50 8 supervisor would be Stacey Scott.
10:50 9 Q. What type of clinical duties does your
10:50 10 supervisor assign to you?
10:51 11 A. To supervise the medical directors at
10:51 12 the facilities that I'm assigned to and provide
10:51 13 direct care, when called for, review care provided
10:51 14 by other physicians. That may be the individuals
10:51 15 that I'm supervising or other staff at the
10:51 16 facility, but it would primarily be confined to the
10:51 17 facilities that I oversee.
10:51 18 Q. Okay. And what are some of your
10:51 19 administrative duties that are assigned to you from
10:51 20 your supervisor?
10:51 21 A. Well, responding to legal matters would
10:51 22 be one, such as this deposition. Related to that,
10:51 23 other claims that come from inmates, attending
10:52 24 meetings, reviewing data, information, things like

Page 36

10:52 1 that.
10:52 2 Q. Okay. Do you have a separate medical
10:52 3 practice outside from your role as a regional
10:52 4 medical director for Illinois?
10:52 5 A. No.
10:52 6 Q. Okay. How long have you been employed
10:52 7 by Wexford?
10:52 8 A. Since 1995, with the exception of about
10:52 9 three years.
10:52 10 Q. Okay. Have you ever had a separate
10:53 11 medical practice?
10:53 12 A. Yes.
10:53 13 Q. Okay. When did that end?
10:53 14 A. 1993 abouts.
10:53 15 Q. Okay. Just so I understand the
10:53 16 hierarchy a little bit. Right now, when you
10:53 17 supervise medical directors, are you supervising
10:53 18 site medical directors, i.e., the prior position
10:53 19 that you had?
10:53 20 A. Correct. That's correct.
10:54 21 Q. Are you involved with hiring at all?
10:54 22 A. Yes.
10:54 23 Q. Okay. And what are your duties related
10:54 24 to hiring?

Page 37

```
10:54  1        A.  I interview prospective applicants.
10:54  2   That is, either physicians or midlevel providers.
10:54  3        Q.  And you --
10:54  4        A.  Sorry.  Just to clarify.  Just for my
10:54  5   region, not for the entire state.
10:54  6        Q.  When you say "your region" but "not the
10:54  7   entire state," which part of the state is your
10:54  8   region?
10:54  9        A.  The northern part.  The state is divided
10:54 10   into three for the regional medical director
10:55 11   districts, so there's a northern, a central, and a
10:55 12   southern.  I'm the northern.
10:55 13        Q.  So you are involved with interviewing
10:55 14   physicians that work at the sites; is that
10:55 15   accurate?
10:55 16        A.  Yes.
10:55 17        Q.  Okay.  Is there a formal criteria or
10:55 18   list that a physician has to meet in order to be
10:55 19   employed at one of the sites?
10:55 20        A.  There are requirements, yes.
10:55 21        Q.  Okay.  Are those requirements set forth
10:55 22   in any document?
10:55 23        A.  Yes.
10:55 24        Q.  What document is that?
```

Page 38

```
10:55  1        A.  Well, in several documents, one of which
10:55  2   would be the job description would define what
10:56  3   services are -- what credentials are necessary.
10:56  4   It's also defined in the contract of what
10:56  5   credentials are necessary for each position.
10:56  6        Q.  Now, when you refer to "the contract,"
10:56  7   is that the contract with that specific physician
10:56  8   or the contract that you have with the Department
10:56  9   of Corrections?
10:56 10        A.  The contract that we have with the
10:56 11   Department of Corrections and Health and Family
10:56 12   Services.
10:56 13        Q.  Okay.  Once the physicians and other
10:56 14   employees are hired, are you involved with training
10:56 15   in your current role?
10:56 16        A.  Yes.
10:56 17        Q.  And what are your responsibilities
10:56 18   related to training?
10:56 19        A.  Orientation of the physician or
10:56 20   sometimes midlevel provider, depending on the
10:57 21   individual circumstance.
10:57 22        Q.  Other than the orientation, is there any
10:57 23   other type of training?
10:57 24        A.  A mentoring process usually occurs,
```

Page 39

```
10:57  1   where the physician will work alongside another
10:57  2   physician, and then there's ongoing training that
10:57  3   occurs as the need arises.
10:57  4        Q.  How frequent is the ongoing training?
10:57  5        A.  As the need arises, so like -- excuse
10:57  6   me.  Let me just get this.
10:57  7             (WHEREUPON, there was a short
10:57  8             interruption.)
       BY THE WITNESS:
10:57 10        A.  I'm sorry.  I said, As the need arises.
       BY MS. REED:
10:57 12        Q.  Okay.  So in your experience, how
10:57 13   typically does the need arise?  Is it once a year,
10:58 14   more than that?
10:58 15        A.  So it may be daily in some cases, but
10:58 16   then it may be several months.  It depends on the
10:58 17   time the person was hired.  It could be more
10:58 18   frequent or more -- it would be more relevant to
10:58 19   occur shortly after the person was hired, and then
10:58 20   if somebody has worked for several years, in some
10:58 21   cases we have had physicians that have worked for
10:58 22   over 30 years, there would be less interaction in
10:58 23   that instance.  But whenever there was a change of
10:58 24   policy, there would be some discussion of that.
```

Page 40

```
10:58  1        Q.  Okay.  Are the physicians reviewed on a
10:58  2   regular basis?
10:58  3        A.  Yes.
10:58  4        Q.  Are you involved with the review of
10:58  5   their performance?
10:58  6        A.  Of the physicians that I supervise, yes.
10:59  7        Q.  And what does that entail?
10:59  8        A.  Reviewing their performance as it
10:59  9   relates to their decisions that they make and their
10:59 10   functioning in their role, in their position.  That
10:59 11   occurs on an ongoing basis.
10:59 12        Q.  Do the physicians ever receive written
10:59 13   feedback on their performance?
10:59 14        A.  Yes.
10:59 15        Q.  How often do they receive written
10:59 16   feedback?
10:59 17        A.  As called for.  If there is a corrective
10:59 18   action that is necessary, they would certainly
10:59 19   receive correspondence, or in some cases if it's a
10:59 20   positive review, positive finding after review,
10:59 21   they may receive that or it may be done verbally.
10:59 22   Generally, it's done verbally, but it may occur in
10:59 23   writing.  Then there are -- the corporation does
11:00 24   annual reviews of its employees.  That also takes
```

Page 41

11:00 1    place.

11:00 2    Q. Okay. So is it fair to say the

11:00 3    physicians that you supervise are reviewed on an

11:00 4    annual basis and then as needed aside from that?

11:00 5    A. I would say the review occurs on an

11:00 6    ongoing basis as they make decisions and I critique

11:00 7    their decision-making process and their performance

11:00 8    in their position, whenever I have interaction of

11:00 9    that.

11:00 10    In addition, there's a review that

11:00 11    occurs, an annual review that occurs, that I may

11:00 12    participate in, but the review is on an ongoing

11:00 13    basis. It would not be reasonable to have a

11:00 14    deficiency unaddressed and reviewed at the end of

11:01 15    the year. It has to be done at the time so that

11:01 16    the review can be -- can be appropriate and any

11:01 17    response could be done in a timely manner.

11:01 18    Q. Let me dig into that a little bit. So

11:01 19    I'm trying to figure out, like, do you review every

11:01 20    decision they make, or is it just like there's a

11:01 21    certain level of decision that triggers your

11:01 22    review? I'm just trying to get --

11:01 23    A. No, only those that I'm involved in. So

11:01 24    I have nine facilities, there are nine medical

Page 42

11:01 1    directors. They are making decisions continually.

11:01 2    I obviously can't review all of those decisions.

11:01 3    Q. Right.

11:01 4    A. So it would only be those that came to

11:01 5    my attention that I had involvement with.

11:01 6    Q. Okay. And I just want to clarify, so

11:01 7    you review the site medical directors as well as

11:02 8    the physicians that work under those directors?

11:02 9    A. I review specific aspects of their work

11:02 10    for both the -- for the medical staff. That

11:02 11    includes site medical directors and physicians.

11:02 12    Some facilities don't have a physician in addition

11:02 13    to a medical director, a few of them actually only

11:02 14    do, but that would apply.

11:02 15    The direct supervisor of the physician

11:02 16    would be the medical director, so they would

11:02 17    actually be the supervisor that is responsible for

11:02 18    the oversight of that person's performance. But I

11:02 19    would also -- I'm an indirect supervisor of that

11:02 20    individual as well, and if something came to my

11:02 21    attention, I would review that event and the

11:02 22    performance and the response of that person in that

11:02 23    situation.

11:02 24    Q. Is there any type of situation that you

Page 43

11:02 1    can think of that is always going to be escalated

11:03 2    to you for review?

11:03 3    A. Not any specific matter, but anything of

11:03 4    significance would be escalated to me. I mean, if

11:03 5    there was a -- anything of significance. I can't

11:03 6    think of a specific matter. I mean, there are

11:03 7    certain diseases, like meningitis, for example,

11:03 8    it's an uncommon serious disease. That would

11:03 9    certainly be brought to my attention.

11:03 10    There are many other very significant,

11:03 11    very rare illnesses that certainly would come to my

11:03 12    attention, but I can't -- yeah, I can't really list

11:03 13    all of them.

11:03 14    Q. Can you list a few of them, just so I

11:04 15    get an idea of the types?

11:04 16    A. Well, meningitis. There is a syndrome

11:04 17    called neuroleptic malignant syndrome. An illness

11:04 18    that was unexpected and resulted in death. Serious

11:04 19    infections, like Ebola type of infections. There's

11:04 20    a disease called necrotizing fasciitis, which is a

11:04 21    very serious illness. That would be brought to my

11:04 22    attention. So those are the illnesses that would

11:04 23    be brought to my attention, but other matters

11:04 24    relating to the employee would be brought to my

Page 44

11:04 1    attention. Illness or, you know, death or

11:04 2    something like that has actually occurred with one

11:04 3    of the plaintiffs here. Things like that obviously

11:04 4    would be brought to my attention.

11:04 5    Q. So if a physician asked for an outside

11:05 6    referral, which triggered the collegial review,

11:05 7    would that be brought to your attention?

11:05 8    A. No.

11:05 9    Q. Okay.

11:05 10    A. Not in the current or in the recent.

11:05 11    Obviously, it did when I was performing that

11:05 12    function, and then when I took the position of

11:05 13    regional medical director, one of our duties was to

11:05 14    be the utilization management physician, do the

11:05 15    collegial review for our facilities. That went on

11:05 16    for about four or five years, as I remember, so

11:05 17    that would have been 2005 to 2009 or '10.

11:05 18    Then it was assigned to another

11:05 19    physician in the corporate office. It was removed

11:05 20    from our responsibilities.

11:06 21    Q. You mentioned that you had a separate

11:06 22    practice up until about 1993; is that correct?

11:06 23    A. Not a separate practice. I had a

11:06 24    practice.

Page 45

| | | |
|---|---|---|
| 11:06 | 1 | Q. Oh, you had a practice? |
| 11:06 | 2 | A. I did not have one in addition to |
| 11:06 | 3 | working for Wexford, I think is what you asked, but |
| 11:06 | 4 | I had my own medical practice, yes. |
| 11:06 | 5 | Q. And did you have a specialty? |
| 11:06 | 6 | A. Yes. |
| 11:06 | 7 | Q. What was your specialty? |
| 11:06 | 8 | A. Internal medicine. |
| 11:06 | 9 | Q. How long did you have that practice? |
| 11:06 | 10 | A. About eight years. |
| 11:06 | 11 | Q. Could you just generally recite your |
| 11:07 | 12 | education, your degrees that you have? |
| 11:07 | 13 | A. M.D. degree, University of Illinois, and |
| 11:07 | 14 | then after that, I did an internship and residency |
| 11:07 | 15 | in internal medicine, so my degree is M.D. |
| 11:07 | 16 | Q. Okay. And what year did you attain your |
| 11:07 | 17 | M.D.? |
| 11:07 | 18 | A. '82, 1982. |
| 11:07 | 19 | Q. Okay. And have you received or obtained |
| 11:07 | 20 | any other certifications related to your practice? |
| 11:07 | 21 | A. Yes. |
| 11:07 | 22 | Q. What certifications? |
| 11:07 | 23 | A. CCHP and board certification in internal |
| 11:08 | 24 | medicine. |

Page 46

| | | |
|---|---|---|
| 11:08 | 1 | Q. What does CCHP stand for? |
| 11:08 | 2 | A. Certified correctional health care |
| 11:08 | 3 | provider. |
| 11:08 | 4 | Q. When did you receive that certification? |
| 11:08 | 5 | A. I don't recall the year. It would have |
| 11:08 | 6 | been in the '90s, sometime in the late '90s, |
| 11:08 | 7 | mid-'90s. |
| 11:08 | 8 | Q. Is that certification still active? |
| 11:08 | 9 | A. Yes. |
| 11:08 | 10 | Q. Okay. Do you have to participate in any |
| 11:08 | 11 | continuing education to keep that certification |
| 11:08 | 12 | active? |
| 11:08 | 13 | A. Yes. |
| 11:08 | 14 | Q. Okay. In your position as a regional |
| 11:08 | 15 | medical director, how often are you onsite at a |
| 11:08 | 16 | facility? |
| 11:08 | 17 | A. It varies. It's been different since |
| 11:09 | 18 | the advent of COVID, where we have gone mostly to |
| 11:09 | 19 | remote contact. So prior to COVID, most days. I |
| 11:09 | 20 | would say four out of five days I would be at a |
| 11:09 | 21 | site, three to four out of the week. Now, about |
| 11:09 | 22 | once a week. |
| 11:09 | 23 | Q. Did you have a particular schedule for |
| 11:09 | 24 | your site visits? |

Page 47

| | | |
|---|---|---|
| 11:09 | 1 | A. There were some meetings that I would |
| 11:09 | 2 | attend, but few. Mostly it was on an as-needed |
| 11:09 | 3 | basis. |
| 11:09 | 4 | Q. Okay. Are you familiar with the |
| 11:10 | 5 | Stateville Correctional Center? |
| 11:10 | 6 | A. Yes. |
| 11:10 | 7 | Q. And have you been onsite at that |
| 11:10 | 8 | correctional center? |
| 11:10 | 9 | A. Yes. |
| 11:10 | 10 | Q. Has that always been one of the |
| 11:10 | 11 | facilities in your region? |
| 11:10 | 12 | A. Yes. |
| 11:10 | 13 | Q. And by "always," I mean since you became |
| 11:10 | 14 | the regional director. |
| 11:10 | 15 | A. Correct. |
| 11:10 | 16 | Q. Okay. Now, of the physicians that work |
| 11:10 | 17 | for the site medical directors, are physicians |
| 11:10 | 18 | assigned to a particular facility or do they tend |
| 11:10 | 19 | to rotate? |
| 11:10 | 20 | A. Generally, yes, they have a primary |
| 11:10 | 21 | position. In some cases there is a sharing, and |
| 11:10 | 22 | that would be limited in my region to Stateville |
| 11:11 | 23 | and its neighboring facility, Stateville NRC. They |
| 11:11 | 24 | are immediately adjacent, and they do share |

Page 48

| | | |
|---|---|---|
| 11:11 | 1 | providers because of the unique demands of those |
| 11:11 | 2 | facilities. |
| 11:11 | 3 | Q. Okay. So have you observed physicians |
| 11:11 | 4 | meeting with patients at your facilities? |
| 11:11 | 5 | A. Yes. |
| 11:11 | 6 | Q. And can you describe for me the |
| 11:12 | 7 | procedures that they follow when meeting with the |
| 11:12 | 8 | patient? |
| 11:12 | 9 | A. Yes. They would introduce themselves. |
| 11:12 | 10 | They would have the patient seated. And then they |
| 11:12 | 11 | would conduct an interview while the chart was |
| 11:12 | 12 | present and determine the reason for the visit, and |
| 11:12 | 13 | then ask appropriate questions, give the patient an |
| 11:12 | 14 | opportunity to respond and to voice their concerns, |
| 11:12 | 15 | their medical concerns. |
| 11:12 | 16 | Then they would conduct an examination |
| 11:12 | 17 | and come to a decision for a plan of care, based |
| 11:12 | 18 | upon their findings. That would be documented in |
| 11:13 | 19 | the progress note of the chart. The patient would |
| 11:13 | 20 | be advised as to what the physician's thought |
| 11:13 | 21 | process was and what course of action was being |
| 11:13 | 22 | undertaken, and if medications were prescribed, |
| 11:13 | 23 | what they were, what the side effects were, and |
| 11:13 | 24 | what they were to expect in terms of when to |

Page 49

11:13 1 receive the medication. And then subsequent care
11:13 2 that would be provided, whether that was X-rays or
11:13 3 blood tests or follow-up visits or a referral to
11:13 4 somebody. So that is a rough overview of what
11:13 5 occurs.
11:13 6 Q. Now, you mentioned they would conduct an
11:13 7 interview of the patient and they had the chart
11:13 8 with them during that interview; is that correct?
11:13 9 A. Yes.
11:13 10 Q. Okay. And was it standard practice for
11:14 11 the physicians to review the patient's prior
11:14 12 medical records or charts before seeing them?
11:14 13 A. As applicable to that visit. So that
11:14 14 may entail a review of that volume or sometimes
11:14 15 there's more volumes, or it may not. It depends on
11:14 16 the complaint.
11:14 17 Q. Okay. So there were some complaints
11:14 18 that would not require review of the prior medical
11:14 19 records?
11:14 20 A. Some complaints and some situations.
11:14 21 For example, a physician that had regularly seen a
11:14 22 patient would have knowledge of that patient's past
11:14 23 record and findings and wouldn't need to or they
11:14 24 may just scan it to refresh their memory or review

Page 50

11:14 1 their notes. But there are some conditions that --
11:14 2 where a review of the record would be very limited.
11:15 3 So I would -- I'll correct myself. It's not that
11:15 4 they wouldn't need to review it at all, but they
11:15 5 would not need to review it in depth.
11:15 6 Q. What types of conditions, for example?
11:15 7 A. If a person had a rash that had never
11:15 8 occurred before, there would be no need to look
11:15 9 through the patient's entire record, but you would
11:15 10 look at relevant things, such as their medications,
11:15 11 their allergy history, their general medical
11:15 12 conditions, if they have something called a problem
11:15 13 list. It would just be a review of a limited
11:15 14 portion of the record.
11:15 15 Q. Okay.
11:15 16 A. Or I'll give you another example. If
11:15 17 somebody has a fracture, if they are playing
11:15 18 basketball and they fracture their ankle, again,
11:15 19 the review would be limited relevant to that visit.
11:15 20 Even if they had another fracture, it's really not
11:16 21 relevant to that visit. What is relevant is their
11:16 22 current fracture, the state of the fracture and the
11:16 23 degree and where the fracture is located. And all
11:16 24 what would be relevant would be to know their

Page 51

11:16 1 general health, their allergy history, other
11:16 2 medical conditions that might impact on the
11:16 3 treatment that might be necessary, such as surgery,
11:16 4 things like that, but you would not go over their
11:16 5 entire medical history for something like that.
11:16 6 Q. And if a patient presented with pain in
11:16 7 various areas of their body, would that be
11:16 8 something that would require a review of the
11:16 9 medical records?
11:16 10 MR. LOMBARDO: I'm going to object to form,
11:16 11 incomplete hypothetical. You can answer to the
11:16 12 best of your ability, Doctor.
11:16 13 BY THE WITNESS:
11:16 14 A. Yes. Generally, if a patient had that
11:16 15 complaint, it would depend on a number of factors,
11:16 16 the specifics of when the -- am I being heard
11:17 17 because I'm not being shown. Can you hear me?
11:17 18 BY MS. REED:
11:17 19 Q. I can hear you, yes.
11:17 20 A. Oh, okay. It would depend on the
11:17 21 specifics of it, but, in general, yes, it would
11:17 22 require -- it should require a review of the record
11:17 23 as it pertains to that symptom and to look for
11:17 24 other visits that may have been similar.

Page 52

11:17 1 Q. Let's talk about the standards of care
11:17 2 for rheumatoid arthritis. Now in your prior
11:17 3 practice in internal medicine, did you have
11:18 4 experience with rheumatoid arthritis?
11:18 5 A. Patients with rheumatoid arthritis?
11:18 6 Q. Yes.
11:18 7 A. Yes.
11:18 8 Q. Okay. Did you ever diagnose somebody
11:18 9 with rheumatoid arthritis during your medical
11:18 10 practice?
11:18 11 A. Yes.
11:18 12 Q. How often roughly did you have to deal
11:18 13 with patients with rheumatoid arthritis?
11:18 14 A. Whenever it applied, whenever a patient
11:18 15 had the illness. So whenever I was taking care of
11:18 16 a patient and they had it, then I would deal with
11:18 17 it.
11:18 18 Q. Can you give me an estimate of the
11:18 19 percentage of your patients at your private
11:18 20 practice that had rheumatoid arthritis?
11:18 21 A. It's an uncommon illness. It would
11:18 22 affect just a few or 1 percent of the population
11:19 23 that I was taking care of, I would guess. Maybe
11:19 24 less than 1 percent. It's not a common illness.

Page 53

11:19 1     Q.   When you had your private practice and
11:19 2  you came across a patient or diagnosed a patient
11:19 3  with rheumatoid arthritis, did you have to refer
11:19 4  them to a specialist or did you continue to treat
11:19 5  them for the rheumatoid arthritis?
11:19 6     A.  I did not have to, no, and I did
11:19 7  continue -- I would continue to treat them.
11:19 8     Q.  During your time at Wexford, did you
11:20 9  ever work solely as a physician at a site?
11:20 10    A.  Yes.
11:20 11    Q.  Okay.  What was the time period in which
11:20 12  you did that?
11:20 13    A.  From 1995 to 1998.
11:20 14    Q.  Based on your review of the literature
11:20 15  on the standards of care for rheumatoid arthritis,
11:20 16  if someone were diagnosed with rheumatoid
11:20 17  arthritis, can you describe the treatment that you
11:20 18  would recommend?
11:21 19    A.  It would depend on the patient-specific
11:21 20  circumstances, their findings as to what treatment
11:21 21  would be appropriate.  There is no general
11:21 22  treatment or universal treatment that would be
11:21 23  appropriate to apply to all patients.
11:21 24    Q.  What types of information do you need to

Page 54

11:21 1  get from the patient to determine the appropriate
11:21 2  treatment for rheumatoid arthritis?
11:21 3    A.  Their history, their clinical findings,
11:21 4  their laboratory findings, X-ray findings, the
11:21 5  course of their illness, duration of their illness,
11:21 6  response to any treatments that have been provided
11:21 7  and adverse reactions perhaps to any treatments
11:21 8  that have been provided.
11:22 9       Family history has some relevance.
11:22 10  Comorbid illnesses, that is other illnesses that
11:22 11  the person may have that may impact on their
11:22 12  illness.
11:22 13    Q.  Anything else?
11:22 14    A.  The records.  So that would include
11:22 15  evaluations that were done by other physicians,
11:22 16  their findings at the time.  Sometimes family
11:22 17  members provide valuable information that augments
11:22 18  the patient's history.  That is what comes to mind,
11:22 19  but what you are interested in is all information
11:22 20  that is relevant to that specific patient, and that
11:22 21  varies significantly.  Some patients, because of a
11:23 22  stroke, are not able to speak, for example, so the
11:23 23  information is gathered from other sources,
11:23 24  relatives or records.

Page 55

11:23 1       But all information that is pertinent
11:23 2  and based upon something coming up that may open
11:23 3  the door for other information that -- that would
11:23 4  be accessed or be queried.
11:23 5    Q.  Are you aware of particular medications
11:23 6  used to treat rheumatoid arthritis?
11:23 7    A.  Yes.
11:23 8    Q.  Okay.  What are the ones that you are
11:23 9  aware of?
11:23 10    A.  They primarily are a group of
11:24 11  medications called nonsteroidal antiinflammatory
11:24 12  agents.  Also, acetaminophen, which is Tylenol.
11:24 13  Then there's another group of medications that
11:24 14  serve to depress the immune response of an
11:24 15  individual.  Prednisone, methotrexate, and there is
11:24 16  a group of newer diseases, biologic agents, that
11:24 17  are also utilized and can be utilized in rheumatoid
11:24 18  arthritis.
11:24 19       So there are many agents that are
11:24 20  treated in a stepwise fashion.  So we start with
11:24 21  medications that have the lower side effect risk
11:24 22  and profile, and based upon the specific findings
11:24 23  of the patient that is being treated, it would
11:25 24  dictate and determine which medications would be

Page 56

11:25 1  used.
11:25 2    Q.  Are there any other treatment options
11:25 3  besides medication for rheumatoid arthritis?
11:25 4    A.  Yes.
11:25 5    Q.  Like what?
11:25 6    A.  Affected joints can be injected with
11:25 7  cortisone.  Other modalities are things like
11:25 8  bracing, splints, crutches or canes that are used
11:25 9  in ambulation.  Physical therapy is sometimes used
11:25 10  in patients, again, individualized to a specific
11:25 11  patient.  There are also other pain medications,
11:25 12  simple pain medication, narcotic medications or
11:25 13  narcotic-like medications, such as Tramadol that
11:26 14  are sometimes used and, again, limited to specific
11:26 15  patients and usually for limited periods of time.
11:26 16    Q.  So for nonmedication treatments, you
11:26 17  listed a few things, such as cortisone, bracing
11:26 18  splints, physical therapy.  Is there anything else
11:26 19  that you can think of that you have not talked
11:26 20  about?
11:26 21    A.  Surgery might be used in cases where --
11:26 22  patients who have limited -- those extreme
11:26 23  deformities that -- for those few patients that
11:26 24  have an unfortunate severe case of rheumatoid

Page 57

11:26 1 arthritis. You know, those would be the -- those
11:26 2 would be the modalities that are used.
11:26 3 Q. Are you familiar with the Rh factor?
11:27 4 A. I'm familiar with an Rh factor, yes.
11:27 5 Q. Okay. In your experience, in your
11:27 6 review of the literature, how is an Rh factor used
11:27 7 in coming to a diagnosis of rheumatoid arthritis?
11:27 8 A. So, first of all, Rh factor refers to a
11:27 9 blood antibody. That is -- the blood type is the
11:27 10 Rh. It's also used -- it's actually RA for
11:27 11 rheumatoid arthritis, but it is sometimes stated as
11:27 12 Rh. The question that you are asking is about the
11:27 13 rheumatoid factor, just to be clear. So rheumatoid
11:27 14 factor is -- your question, I'm sorry, is what?
11:27 15 You were asking about what?
11:27 16 Q. Yes. I can ask a better question this
11:27 17 time. How do you use the rheumatoid factor in
11:28 18 determining a diagnosis of rheumatoid arthritis?
11:28 19 A. It's one of the parameters that is
11:28 20 looked at in determining what a patient's condition
11:28 21 might be. So if a patient has symptoms that might
11:28 22 be caused by rheumatoid arthritis or a related
11:28 23 disease, that is a blood test that a clinician
11:28 24 would order and then interpret in the setting of

Page 58

11:28 1 that patient.
11:28 2 Q. So aside from rheumatoid arthritis, when
11:28 3 might -- what other types of diseases would the
11:28 4 rheumatoid factor indicate?
11:28 5 A. The elevated, you mean?
11:28 6 Q. Yes, if it's elevated.
11:28 7 A. About 100 other diseases.
11:28 8 Q. Are those other diseases related to
11:28 9 rheumatoid arthritis, in your experience?
11:28 10 A. No. Most of them are not.
11:29 11 Q. Can you give me an example of some of
11:29 12 these other diseases?
11:29 13 A. Malignancies. So any cancer may give a
11:29 14 positive rheumatoid factor. Many inflammatory
11:29 15 illnesses, endocarditis is a characteristic disease
11:29 16 which will give a positive rheumatoid factor. But
11:29 17 any severe infection may give a positive rheumatoid
11:29 18 factor. And, again, hundreds of infections, and
11:29 19 there's hundreds of malignancies and any of those
11:29 20 could do that.
11:29 21 Now, it can also be found in a healthy
11:29 22 individual that has no identified illness. The
11:29 23 rheumatoid factor can be positive. And then,
11:29 24 conversely, it's maybe not positive in patients who

Page 59

11:29 1 have known rheumatoid arthritis.
11:30 2 Q. You mentioned that a healthy patient
11:30 3 could have an elevated Rh factor. Do you know what
11:30 4 the percentage of healthy patients who have an
11:30 5 elevated Rh or rheumatoid factors is?
11:30 6 A. I don't believe that statistic is known
11:30 7 because people would not test that. It's not
11:30 8 indicated to test for people who are healthy, but
11:30 9 it is occasionally done, sometimes by mistake. And
11:30 10 then one looks at it and determines, finds out on
11:30 11 asking the person, that they don't have any joint
11:30 12 problems whatsoever, and nevertheless have a
11:30 13 positive number. I don't think that statistic is
11:30 14 known or could be known because, again, it would be
11:30 15 inappropriate to do that testing.
11:30 16 Q. Sure. In your experience, what types of
11:30 17 symptoms would cause you to test someone's
11:30 18 rheumatoid factor?
11:31 19 A. Specific joint complaints that are
11:31 20 characteristically seen in rheumatoid arthritis.
11:31 21 Q. Anything else?
11:31 22 A. Well, the joints involve the specifics
11:31 23 of that. That is, the time of the day, the
11:31 24 symptoms that they have, including things like

Page 60

11:31 1 redness, inflammation, changes in the appearance of
11:31 2 their joints, specifically their hands. There's a
11:31 3 characteristic thing that happens to the joints and
11:31 4 that the fingers will deviate outwards or ulnar
11:31 5 deviation. Clinical findings consistent with
11:31 6 rheumatoid arthritis, such as rheumatoid nodules,
11:31 7 associated illnesses that may occur that are seen
11:32 8 in rheumatoid arthritis.
11:32 9 Laboratory -- somebody who may have
11:32 10 laboratory findings. Did you ask about symptoms
11:32 11 only or things in general that would provoke you to
11:32 12 test for that?
11:32 13 Q. My question was just about symptoms, but
11:32 14 you can expand it to general.
11:32 15 A. So the first things that I mentioned
11:32 16 would be -- the main thing would be the patient's
11:32 17 complaints of joint pain, specifically the joints
11:32 18 involved, the stiffness accompanying the pain.
11:32 19 Those symptoms would prompt me to consider
11:32 20 rheumatoid arthritis as a cause of the person's
11:32 21 joint pain.
11:32 22 Q. And once somebody presents with elevated
11:32 23 rheumatoid factors, what would be the next step in
11:32 24 your investigation to determine whether that person

Page 61

11:32 1  had rheumatoid arthritis?

11:32 2      A.  Well, if a patient has an elevated

11:33 3  rheumatoid factor, that would be part of the

11:33 4  evaluation of that patient, along with all of the

11:33 5  other things that would be necessary in determining

11:33 6  the relevance of that finding, beginning with the

11:33 7  patient's history, starting when the patient's

11:33 8  symptoms started, the specifics of their symptoms.

11:33 9  Again, not just joint pain.

11:33 10      It varies according to what the cause

11:33 11  is, whether it's pain in their knees or in their

11:33 12  hands or where, whether it's one side or both

11:33 13  sides. All of those things make a difference, what

11:33 14  is associated with it, whether they have stiffness,

11:33 15  whether they have swelling of the joints.

11:33 16  Radiographic findings, and that would be dependent

11:33 17  on the course of their illness. Like somebody who

11:33 18  had symptoms early would unlikely have radiographic

11:34 19  findings, but somebody that had longstanding would

11:34 20  necessarily -- virtually necessarily have to have

11:34 21  radiographic findings. Other blood testing, signs

11:34 22  that are commonly associated with rheumatoid

11:34 23  arthritis, but also may indicate other illnesses.

11:34 24      For example, if a person, like I

Page 62

11:34 1  mentioned, had a rheumatoid factor and had

11:34 2  endocarditis, that would lead you to believe that

11:34 3  that was the cause of the elevated rheumatoid

11:34 4  factor. All of the information that I have

11:34 5  previously mentioned is necessary to -- review

11:34 6  and to assimilate in determining the relevance of

11:34 7  the rheumatoid factor.

11:34 8      Q.  In your experience, if someone has a

11:34 9  family history of rheumatoid arthritis, does that

11:35 10  make it more likely that they might also be

11:35 11  diagnosed with it?

11:35 12      A.  Yes, it does run in family lines. It is

11:35 13  more likely, assuming the diagnosis is accurate.

11:35 14  It sometimes is not when a patient relays that

11:35 15  history because patients sometimes refer to

11:35 16  arthritis as rheumatism and confuse that with

11:35 17  rheumatoid arthritis, which is not the same thing.

11:35 18  So in my experience, I have had patients provide

11:35 19  that history incorrectly. Their family did not

11:35 20  actually have rheumatoid arthritis but actually had

11:35 21  rheumatism and confused the two terms.

11:35 22      Q.  Switching back for a quick second to

11:35 23  your work as the regional director. Do your

11:35 24  physicians have a way to verify medical history

Page 63

11:35 1  that is outside of the prison? For example, if an

11:35 2  inmate comes in and talks about his prior treatment

11:36 3  before incarceration.

11:36 4      Do the physicians have access -- are

11:36 5  they able to go out and get those records from the

11:36 6  physicians outside of the prison?

11:36 7      A.  They are not able to get them. They can

11:36 8  request them. The patient's consent is required,

11:36 9  and then he obviously has to have the information

11:36 10  as to where that care was provided. That often is

11:36 11  missing. They don't remember the doctor's name or

11:36 12  location, so there's no way of accessing it without

11:36 13  that information.

11:36 14      But if they have that information, then

11:36 15  a request for medical information can be sent, and

11:36 16  if the records are available and the provider

11:36 17  provides them, they can be sent.

11:36 18      Q.  Okay. When you worked as a physician

11:36 19  between '95 and '98, do you have a recollection of

11:36 20  ever going out to get records on a patient that

11:37 21  were outside of the facility?

11:37 22      A.  Yes, certainly.

11:37 23      Q.  About how often did that occur when you

11:37 24  were a physician for Wexford?

Page 64

11:37 1      A.  Whenever it was relevant for the

11:37 2  illness. And most of our patients are -- well,

11:37 3  people in prison are not there because they are

11:37 4  sick. They are there because they committed a

11:37 5  crime, so they are generally a healthy population

11:37 6  that usually does not have a serious illness for

11:37 7  which the records would be necessary, something

11:37 8  like cancer, surgery from previous illnesses, but

11:37 9  when that situation occurred, yes, records would be

11:37 10  requested.

11:37 11      But it would not be done on every

11:37 12  patient or where that information was unlikely to

11:37 13  yield anything of any benefit. It was not simply

11:37 14  done as an exercise because, again, it would not be

11:37 15  fruitful and it would just be a waste of time for

11:37 16  everyone.

11:37 17      Q.  And so you have referred to several

11:38 18  different diseases as serious medical disease.

11:38 19  Would you classify rheumatoid arthritis as a

11:38 20  serious medical disease?

11:38 21      A.  The spectrum varies greatly. That is,

11:38 22  somebody can have rheumatoid arthritis and no

11:38 23  active symptoms almost from the illness, and then

11:38 24  it can also be a very devastating, deforming

Page 65

11:38 1    illness that may put somebody as bedridden. So it
11:38 2    can vary.
11:38 3         In some instances, it can -- it
11:38 4    certainly is a serious illness. In other
11:38 5    instances, it's not -- people have the illness, if
11:38 6    they were -- and are not aware of it. They are
11:38 7    attributing joint pains to something else, so they
11:38 8    live a relatively normal life, being unaware of
11:38 9    their illness. So it varies significantly. I
11:38 10   would not say that -- certainly not that all
11:38 11   patients with rheumatoid arthritis are -- that it's
11:38 12   a serious illness in all patients.
11:39 13        MS. REED: Okay. I think now is a good time
11:39 14   to take a break. Can we go off the record?
11:39 15        THE WITNESS: Sure.
11:39 16        (WHEREUPON, discussion was had off
11:39 17        the record.)
11:54 18   BY MS. REED:
11:54 19        Q. Dr. Funk, do you understand that you are
11:54 20   still under oath?
11:54 21        A. Yes.
11:54 22        Q. Okay. We'll proceed.
11:54 23        When we were talking earlier, you
11:54 24   mentioned that you participate in the litigation

Page 66

11:54 1    hold process --
11:55 2         A. Yes.
11:55 3         Q. -- for your region?
11:55 4         A. Well, I, as an employee, participate in
11:55 5    it, yes.
11:55 6         Q. I'm sorry. Can you say that one more
11:55 7    time?
11:55 8         A. Not just for my region. As an employee,
11:55 9    when I am sent a litigation hold, I respond to it.
11:55 10        Q. Okay. Now, for the litigation hold for
11:55 11   this case, do you recall when that started?
11:55 12        A. No.
11:55 13        Q. Okay. What types of documents would
11:55 14   have been included in the litigation hold?
11:55 15        A. Any that pertain specifically to the
11:55 16   patient, so any that would appear from the inmate
11:55 17   number, the Department of Corrections inmate
11:55 18   number, that is the number that is queried, and is
11:55 19   used in communication to identify a person, and I
11:55 20   put that number in and then do a search for that.
11:56 21        Q. Okay. Now, when you do this search,
11:56 22   would that include, for example, you know, e-mails
11:56 23   between physicians and their site directors which
11:56 24   reference an inmate?

Page 67

11:56 1         A. Yes, if his -- if he was referenced and
11:56 2    I received it, then yes.
11:56 3         Q. Well, let me ask that question again. I
11:56 4    was saying e-mails between a physician and a site
11:56 5    director, so not necessarily the e-mails to you as
11:56 6    the regional medical director but the physician and
11:56 7    the site director. Would those e-mails be
11:56 8    encompassed in your litigation hold search?
11:56 9         A. Only if I was included in that. If I
11:56 10   was not a part of that communication, then I would
11:56 11   not. If I was included in it, then it would.
11:56 12        Q. Okay. Do you have a way to capture the
11:56 13   e-mails that are not included, which reference the
11:57 14   inmates?
11:57 15        A. I personally don't, no.
11:57 16        Q. But I assume the litigation hold would
11:57 17   also go to the site director and the individual
11:57 18   physicians involved with the inmate's treatment; is
11:57 19   that correct?
11:57 20        A. Yes.
11:57 21        Q. Okay. And who makes sure that they
11:57 22   preserve their e-mails with regards to the inmate?
11:57 23        A. Well, after they are sent to the risk
11:57 24   management office, they preserve them. That is

Page 68

11:57 1    their responsibility to preserve them.
11:57 2         Q. So if a litigation hold goes out to a
11:57 3    number of physicians who are all involved with
11:57 4    treatment of an inmate and one of those physicians
11:57 5    does not respond, does risk management follow up
11:58 6    with them to get their e-mails?
11:58 7         A. No. They are -- it would not be assumed
11:58 8    that they have e-mails. That is sent to everyone.
11:58 9    If they don't respond, it's assuming that they
11:58 10   don't have -- they don't have anything to respond
11:58 11   with, but they don't -- would not routinely, unless
11:58 12   there was some reason to say, Well, you know, you
11:58 13   have not responded because we don't respond with
11:58 14   the negative or the fact that there is no
11:58 15   information.
11:58 16        Q. Okay. In your experience as the
11:58 17   regional medical -- as a regional medical director,
11:58 18   are e-mails widely used to discuss treatment?
11:58 19        A. No.
11:58 20        Q. Okay. If a site director or physician
11:59 21   would like your advice on a treatment strategy, how
11:59 22   do they contact you?
11:59 23        A. By phone. Generally by phone.
11:59 24        Q. And if you need to review medical

Page 69

| | | |
|---|---|---|
| 11:59 | 1 | records in order to provide advice, how do you get |
| 11:59 | 2 | access to those medical records? |
| 11:59 | 3 | A. It would be from the physician relaying |
| 11:59 | 4 | them to me as part of the discussion. It would be |
| 11:59 | 5 | uncommon for me to review data. I would simply -- |
| 11:59 | 6 | the conversation would include that information |
| 11:59 | 7 | that he would relay, so it would be an exchange and |
| 11:59 | 8 | I would talk to him and ask him what this showed or |
| 11:59 | 9 | that showed. But it's not effective to transmit |
| 11:59 | 10 | that type of -- that information electronically |
| 11:59 | 11 | because it's an exchange. I would ask questions |
| 12:00 | 12 | and he would respond to my questions, and he |
| 12:00 | 13 | wouldn't know necessarily what my question was to |
| 12:00 | 14 | be able to answer it in a written format. It would |
| 12:00 | 15 | be cumbersome and not productive. |
| 12:00 | 16 | Q. I agree. I wish you would tell that to |
| 12:00 | 17 | some of the partners that I work for. |
| 12:00 | 18 | A. I would be happy to. |
| 12:00 | 19 | Q. Now, in responding to the litigation |
| 12:00 | 20 | hold for this case, do you recall whether you had |
| 12:00 | 21 | e-mails with regards to those medical records? |
| 12:00 | 22 | A. No, I don't recall. I think he first |
| 12:00 | 23 | filed it in 2015, and that is when the litigation |
| 12:00 | 24 | hold would have been done. So it's five years ago. |

Page 70

| | | |
|---|---|---|
| 12:00 | 1 | I don't remember. |
| 12:00 | 2 | Q. Okay. |
| 12:00 | 3 | A. Or seven years ago. I'm sorry. |
| 12:00 | 4 | Q. In preparation for this deposition, did |
| 12:00 | 5 | you go back and determine whether you had sent any |
| 12:00 | 6 | e-mails with regard to this plaintiff? |
| 12:00 | 7 | A. I generally do that. I don't recall if |
| 12:00 | 8 | I did it for this case. I may have done it, but I |
| 12:01 | 9 | don't recall. I generally do that just for my own |
| 12:01 | 10 | purpose, but I don't recall that I did or that I |
| 12:01 | 11 | didn't. |
| 12:01 | 12 | Q. Other than e-mails and patient records |
| 12:01 | 13 | and utilization management records and grievances, |
| 12:01 | 14 | are there any other types of documents that you |
| 12:01 | 15 | would expect to see as the result of a litigation |
| 12:01 | 16 | hold for someone like the plaintiff? |
| 12:01 | 17 | A. Well, I would not expect those records |
| 12:01 | 18 | that you mentioned in a litigation hold. I would |
| 12:01 | 19 | not expect to see medical records, grievances. I |
| 12:01 | 20 | would only expect correspondences specific to the |
| 12:01 | 21 | patient from a clinician or from some other person |
| 12:02 | 22 | in the system, but I would not expect all of those |
| 12:02 | 23 | documents. As a matter of fact, those documents |
| 12:02 | 24 | never occur. |

Page 71

| | | |
|---|---|---|
| 12:02 | 1 | But to answer your question -- I'm sorry |
| 12:02 | 2 | again. What was your question? |
| 12:02 | 3 | Q. I was asking you if there were any other |
| 12:02 | 4 | types of records that you would expect to see as a |
| 12:02 | 5 | result of a litigation hold? |
| 12:02 | 6 | A. No. Just correspondences from a provider |
| 12:02 | 7 | or a site regarding the patient, some concern |
| 12:02 | 8 | regarding them, some event that had occurred. |
| 12:02 | 9 | Q. In preparation for the deposition, did |
| 12:02 | 10 | you ask risk management for all of their documents |
| 12:02 | 11 | that were being held as a result of the litigation |
| 12:02 | 12 | hold? |
| 12:03 | 13 | A. Not specifically, but I asked the |
| 12:03 | 14 | counsel for all of the documents relative to this |
| 12:03 | 15 | case, that he provide them to me and that would |
| 12:03 | 16 | include that. That has been the practice. I did |
| 12:03 | 17 | not specifically voice that, but I have done many |
| 12:03 | 18 | of these and it is that request that I always make |
| 12:03 | 19 | to the attorneys representing these claims. And |
| 12:03 | 20 | that would include that information certainly. |
| 12:03 | 21 | Q. Okay. When you reviewed the records in |
| 12:03 | 22 | preparation for this deposition, was there anything |
| 12:03 | 23 | that you did not receive that you would have liked |
| 12:03 | 24 | to have in order to prepare? |

Page 72

| | | |
|---|---|---|
| 12:03 | 1 | A. The unknown, you mean? I don't know |
| 12:03 | 2 | what I didn't receive. I only know what I did |
| 12:03 | 3 | receive. There is nothing that I was expecting to |
| 12:03 | 4 | have received that I did not receive. |
| 12:03 | 5 | Q. Okay. I want to switch gears a little |
| 12:04 | 6 | bit. Have you met the plaintiff, Jovan Daniels? |
| 12:04 | 7 | A. Not that I'm aware of. |
| 12:04 | 8 | Q. Okay. And I'm just going to ask you |
| 12:04 | 9 | about various parties and people or entities |
| 12:04 | 10 | involved in the case and ask you about your |
| 12:04 | 11 | familiarity. |
| 12:04 | 12 | A. Yes. |
| 12:04 | 13 | Q. So the late Dr. Saleh Obaisi -- |
| 12:04 | 14 | A. Obaisi, yes. |
| 12:04 | 15 | Q. -- Obaisi. Were you familiar with him? |
| 12:04 | 16 | A. Yes, very familiar. |
| 12:04 | 17 | Q. And can you describe for me your |
| 12:04 | 18 | relationship? |
| 12:04 | 19 | A. I was his supervisor. He was a medical |
| 12:04 | 20 | director. I was his direct supervisor. |
| 12:05 | 21 | Q. So based on what we talked about |
| 12:05 | 22 | earlier, you would have participated in his annual |
| 12:05 | 23 | reviews; is that correct? |
| 12:05 | 24 | A. Yes. |

Page 73

12:05 1    Q.   Okay.  And are those reviews documented
12:05 2    somewhere within the company?
12:05 3    A.   I have seen written -- I have seen some
12:05 4    that were written, yes.  I'm not sure that they are
12:05 5    always done written and in a written format, but I
12:05 6    have seen some that were in writing.
12:05 7    Q.   Let me ask my question another way.
12:05 8    When you reviewed Dr. Obaisi, did you have to fill
12:05 9    out a form for the annual review?  Just to clarify.
12:05 10   A.   We at one time did.  Then the
12:05 11   responsibility was shifted to the regional manager
12:05 12   and that transition occurred, oh, probably eight or
12:06 13   nine years ago, when the responsibility of the
12:06 14   annual review was delegated to the regional
12:06 15   manager.  Prior to that, it was a written
12:06 16   evaluation that was done that I would have done.
12:06 17   Q.   Okay.  And aside from being Dr. Obaisi's
12:06 18   supervisor, did you have any other relationship
12:06 19   outside of work with him?
12:06 20   A.   No.
12:06 21   Q.   And based on your familiarity from
12:06 22   reviewing and supervising Dr. Obaisi, was there
12:06 23   ever any corrective actions issued with regards to
12:06 24   his decisions?

Page 74

12:06 1    A.   There was one incident I recall that had
12:07 2    to do with his documentation that took place during
12:07 3    the time that I was his supervisor.
12:07 4    Q.   Sorry.  Could you repeat that last part
12:07 5    one more time?
12:07 6    A.   During the time that I was his
12:07 7    supervisor, there was one incident that I'm aware
12:07 8    of.
12:07 9    Q.   Okay.  Did you know Dr. Obaisi prior to
12:07 10   the time that you became his supervisor?
12:07 11   A.   Yes.
12:07 12   Q.   And during that time, do you know of any
12:07 13   corrective actions that were issued to him?
12:07 14   A.   There was an incident that occurred when
12:07 15   he was at another site that I was not supervising
12:07 16   that I became aware of somehow, and I don't
12:07 17   remember how it was.  But that I became aware of,
12:08 18   but it was not clinical.  It did not have anything
12:08 19   to do with clinical -- it was not a clinical matter
12:08 20   or a patient matter.
12:08 21   Q.   Other than the two corrective actions
12:08 22   that we have talked about, are you aware of any
12:08 23   other corrective actions issued to Dr. Obaisi?
12:08 24   A.   No, not that I'm aware of.

Page 75

12:08 1    Q.   Did you hire Dr. Obaisi?
12:08 2    A.   I don't recall if I was involved with
12:08 3    his hiring or not.  He had worked for the company
12:08 4    for many years.  I don't recall my involvement with
12:08 5    his hiring.
12:08 6    Q.   Do you recall any involvement with his
12:09 7    training?
12:09 8    A.   No.  He had been working for Wexford
12:09 9    prior to my becoming his supervisor for a number of
12:09 10   years, so I would not have been involved.
12:09 11   Q.   Okay.  In your supervision of
12:09 12   Dr. Obaisi, can you think of a time where you
12:09 13   disagreed with the diagnosis that he made?
12:09 14   A.   I can't recall a specific time, but
12:09 15   physicians often disagree on diagnoses.  That is a
12:09 16   very common -- when we render an opinion, but I
12:09 17   don't recall a specific instance or an adverse
12:10 18   result as to our difference that may have occurred.
12:10 19   Again, I don't recall, but, again, it's
12:10 20   very common that -- physicians are required to use
12:10 21   their own judgment.  And in that, that judgment
12:10 22   will differ, and it's not -- it's not unusual to
12:10 23   have a difference in a diagnosis.
12:10 24   Q.   Similar to lawyers.  We disagree about

Page 76

12:10 1    how to do things.
12:10 2    A.   Yes.  Right, right.
12:10 3    Q.   Have you reviewed Dr. Obaisi's progress
12:10 4    notes for the plaintiff?
12:10 5    A.   Yes.  I reviewed the records, and I
12:10 6    would have reviewed his notes, yes.
12:10 7    Q.   As you sit here today, do you recall
12:10 8    anything that you disagreed with, any
12:11 9    recommendations that he wrote in his progress notes
12:11 10   that you disagreed with?
12:11 11   A.   That I disagreed with him offering at
12:11 12   the time or my opinion of what his -- what the
12:11 13   diagnosis was or the impression was of the
12:11 14   patient's condition?  Those are two different
12:11 15   things.
12:11 16   Q.   Let's start with the latter.
12:11 17   A.   I don't know -- I don't recall
12:11 18   specifically if his impression was that the patient
12:11 19   had rheumatoid arthritis.  I know it was a
12:11 20   consideration.  I don't recall, and I did not
12:11 21   really review that with that in mind.  But if his
12:12 22   impression was that he had rheumatoid arthritis,
12:12 23   and it may have been, I would disagree with that.
12:12 24   My impression is that the patient does not have

Page 77

12:12 1   rheumatoid arthritis.

12:12 2       Now, whether that opinion would have

12:12 3   been done contemporaneously, I don't know. I have

12:12 4   the benefit of retrospect and knowing things that

12:12 5   Dr. Obaisi didn't. That is, the fact that he did

12:12 6   not improve with the treatment and subsequent --

12:12 7   his subsequent course and opinion -- other findings

12:12 8   of physicians that had seen him years later, so I

12:12 9   have a completely different perspective than

12:12 10   Dr. Obaisi had. But my opinion is -- it would be

12:12 11   different if Dr. Obaisi felt he had rheumatoid

12:12 12   arthritis.

12:12 13     Q.  Okay. So can you give me a little more

12:13 14   detail about why, if you -- let me strike that.

12:13 15       Assuming for the purposes of this

12:13 16   question that Dr. Obaisi believed that the

12:13 17   plaintiff had rheumatoid arthritis. Are you saying

12:13 18   now that you would disagree with that assessment?

12:13 19   I guess I'm just trying to make sure what your

12:13 20   disagreement is.

12:13 21     A.  Yes, I would disagree with that, if that

12:13 22   was, in fact, his assessment, which I'm not saying

12:13 23   that it was. I don't know. He did refer him to a

12:13 24   rheumatologist, but that does not mean that he

Page 78

12:13 1   believed that. People refer -- doctors refer

12:14 2   patients for opinions, and that does not mean that

12:14 3   he was in belief but he certainly considered it as

12:14 4   a cause of his symptoms.

12:14 5     Q.  And why do you think that the plaintiff

12:14 6   does not have rheumatoid arthritis?

12:14 7     A.  For a number of reasons. The clinical

12:14 8   picture does not fit rheumatoid arthritis. The

12:14 9   only thing is that he has a slight elevation in

12:14 10   rheumatoid -- in his rheumatoid factor. He

12:14 11   characterizes it as out of range. It's not out of

12:14 12   range. It's in range, but it's beyond what is

12:14 13   typically seen in a healthy person.

12:14 14       But his history does not fit rheumatoid

12:14 15   arthritis. His laboratory parameters do not fit

12:14 16   rheumatoid arthritis. His clinical course does not

12:14 17   fit rheumatoid arthritis. His lack of response to

12:15 18   methotrexate -- well, I would say actually his

12:15 19   symptoms, from my review of the record, actually

12:15 20   worsened after he was given methotrexate. The lack

12:15 21   of radiographic findings and the duration of time

12:15 22   that he has had an abnormal rheumatoid factor, an

12:15 23   elevated rheumatoid factor is not consistent with

12:15 24   rheumatoid arthritis.

Page 79

12:15 1       His current most recent findings by the

12:15 2   physician that he saw in the Cook County system,

12:15 3   his documentation of his symptoms, his findings,

12:15 4   and also it was -- although I did not see it, I

12:15 5   just got the records yesterday afternoon, but it

12:15 6   was stated by the physician that his rheumatoid

12:15 7   factor was negative in the note.

12:15 8       I looked for that and I could not find

12:15 9   the actual report, but it is stated in the last

12:16 10   visit, recognizing that he had previously had, by

12:16 11   his history, an elevated rheumatoid factor, and he

12:16 12   had mentioned that the rheumatoid factor was

12:16 13   negative.

12:16 14       So those things -- so the whole thing

12:16 15   together all speaks against rheumatoid arthritis as

12:16 16   being a reasonable disease for Mr. Daniels.

12:16 17     Q.  Okay. I'm going to dig into some of

12:16 18   those -- the things that you listed.

12:16 19     A.  Yes.

12:16 20     Q.  So one of the things that you talked

12:16 21   about is his rheumatoid factor levels, and my

12:16 22   understanding of what you said -- and correct me if

12:16 23   I'm wrong -- is that his levels were only slightly

12:17 24   elevated?

Page 80

12:17 1     A.  Yes.

12:17 2     Q.  Okay. And so why does that to you

12:17 3   indicate that he did not have rheumatoid arthritis?

12:17 4     A.  There is a correlation with the degree

12:17 5   of the titer. That is, how highest it's elevated

12:17 6   and the likelihood of the patient having the

12:17 7   illness as opposed to it being caused by another

12:17 8   condition or by no condition at all. So he is in

12:17 9   the range where it's not significantly elevated,

12:17 10   and that would be defined as less than three times

12:17 11   the upper limit of normal.

12:17 12     Q.  And you mention that his history also

12:17 13   causes you to believe that he does not have

12:18 14   rheumatoid arthritis. What about his history

12:18 15   supports your conclusion?

12:18 16     A.  Well, I also mentioned -- I think you

12:18 17   missed this. I mentioned the other factors that

12:18 18   were not present, other laboratory factors that

12:18 19   were not present, typically seen in rheumatoid

12:18 20   arthritis. I just want to clarify that it's not

12:18 21   simply the rheumatoid factor in him that was looked

12:18 22   at, but the absence of other laboratory parameters

12:18 23   that are characteristically seen in rheumatoid

12:18 24   arthritis were not present in Mr. Daniels.

Page 81

```
12:18  1       Q.   That was my next thing on the list.
12:18  2       A.   I'm sorry.
12:18  3       Q.   That's okay, but that makes sense to
12:18  4   talk about it now.  So there was an absence of
12:18  5   other factors that would typically indicate
12:18  6   rheumatoid arthritis; is that what you are saying?
12:18  7       A.   Laboratory.  Specifically laboratory.
12:18  8   Also, radiographic X-ray but specifically
12:18  9   laboratory were absent.
12:18 10       Q.   So what laboratory factors would you
12:18 11   expect to be present if someone had rheumatoid
12:19 12   arthritis?
12:19 13       A.   They are inflammatory markers, something
12:19 14   called a sed rate.  It's abbreviated ESR.  Another
12:19 15   parameter, I don't remember if they mentioned it
12:19 16   was measured, but something called C reactive
12:19 17   protein.
12:19 18          Those numbers are inflammatory markers
12:19 19   and are usually very elevated, reliably very
12:19 20   elevated, and inflammatory conditions, such as
12:19 21   rheumatoid arthritis, when someone has rheumatoid
12:19 22   arthritis, active rheumatoid arthritis.  I know his
12:19 23   sed rate was consistently very low, which is just
12:19 24   not consistent with rheumatoid arthritis.  I don't
```

Page 82

```
12:19  1   recall what his C reactive protein was.
12:19  2          There's another antibody called anti-CCP
12:19  3   that is characteristically seen in rheumatoid
12:19  4   arthritis as a positive.  He was negative.  Other
12:20  5   things that are commonly seen are results in
12:20  6   inflammation resulting in anemia, specifically a
12:20  7   type of anemia called anemia of chronic disease.
12:20  8   He was not anemic and depressed protein, as another
12:20  9   phenomenon that occurs in people who have
12:20 10   inflammatory diseases, such as rheumatoid
12:20 11   arthritis, and specifically albumin will be
12:20 12   depressed.  He did not have a depressed albumin.
12:20 13          So of the many laboratory things that I
12:20 14   looked at, he only had one, and that was only a
12:20 15   weakly positive finding.
12:20 16       Q.   The other laboratory factors that you
12:20 17   just named, were you looking at the results from
12:20 18   the time that he was incarcerated, or are you
12:20 19   referring -- I guess I just want the time period.
12:20 20       A.   I looked at every record, every page, so
12:21 21   that was the 15 years that he -- 12 years.  2005 to
12:21 22   2017, I think, when he was released.  I looked at
12:21 23   all of those records and also the records that were
12:21 24   just provided yesterday afternoon, but I just
```

Page 83

```
12:21  1   scanned through them.  I did not have time to look
12:21  2   at them very carefully.
12:21  3       Q.   Okay.  So it's your testimony that the
12:21  4   inflammatory factors that you would typically
12:21  5   expect to be elevated were not for the plaintiff?
12:21  6       A.   Markers, yes.  Inflammatory markers were
12:21  7   absent, yes.
12:21  8       Q.   Okay.  Now switching back to the
12:21  9   history, what about the plaintiff's history causes
12:21 10   you or adds to your conclusion that he does not
12:21 11   have rheumatoid arthritis?
12:22 12       A.   His history being inconsistent with the
12:22 13   history of somebody who has rheumatoid arthritis
12:22 14   and him having an explanation -- other explanations
12:22 15   for what his symptoms might be attributable to.
12:22 16       Q.   Okay.  What would you expect from a
12:22 17   person who does have rheumatoid arthritis?
12:22 18       A.   They typically will have symmetrical
12:22 19   pain and stiffness.  They will complain the two.
12:22 20   Their hands are almost always involved, and because
12:22 21   of the use of the hands, it becomes a complaint
12:22 22   that people have and it will be consistent with
12:22 23   they will have stiffness and pain of the joints of
12:22 24   the hand, particularly the MTP joints, metatarsal
```

Page 84

```
12:23  1   phalangeal joints, the knuckles of the hands and
12:23  2   then lesser to the fingers, the PIP joints and of
12:23  3   the wrist.
12:23  4          They will characteristically have early
12:23  5   morning stiffness and pain.  Grasping will be
12:23  6   painful, and they may have weakness.  That is
12:23  7   another complaint that is characteristic of people
12:23  8   who have rheumatoid arthritis.  It rarely affects
12:23  9   the joints he complained about, his back and elbow.
12:23 10   It does sometimes, but it was just one elbow.
12:23 11          And his complaints, when he complained
12:23 12   of joint pain, were infrequent relative to his
12:23 13   other complaints, and they were not typical of
12:23 14   somebody who is a rheumatoid patient.
12:23 15       Q.   You also mentioned his clinical courses?
12:24 16       A.   Clinical course, yes.
12:24 17       Q.   Sorry.  One more time?
12:24 18       A.   Clinical course.
12:24 19       Q.   Clinical course is one of the things
12:24 20   that you considered in forming your opinion that he
12:24 21   does not have rheumatoid arthritis.  What about the
12:24 22   clinical course contributes to your opinion?
12:24 23       A.   So a patient who has especially
12:24 24   untreated rheumatoid arthritis, that is without an
```

Page 85

```
12:24  1    immunosuppressive agent, their illness would be
12:24  2    expected to progress, and that would show -- result
12:24  3    in clinical findings that the disease worsens and
12:24  4    radiographic and laboratory findings.
12:24  5        So all of those things should expand
12:24  6    over time, amplify over time. So having the
12:24  7    benefit of looking retrospectively at what occurred
12:25  8    and currently what his status is, he does not have
12:25  9    findings, even in the present day, after having had
12:25 10    this elevated rheumatoid factor for, what, at least
12:25 11    10 or 15 years. So that is, again, completely
12:25 12    inconsistent with it being a diagnosis of
12:25 13    rheumatoid arthritis, and especially in the face of
12:25 14    him not being on any immunosuppressive agent which
12:25 15    could have slowed down the progression of the
12:25 16    illness.
12:25 17        In addition, when he was -- except for
12:25 18    that short period of time, three months or so. And
12:25 19    then during the time when he was on a medication
12:25 20    for which symptoms would be expected to resolve or
12:25 21    mitigate, his symptoms actually amplified. He
12:25 22    complained more about joint pain during the time he
12:25 23    was treated with the agent which is used to reduce
12:26 24    the symptoms of rheumatoid arthritis, and he even
```

Page 86

```
12:26  1    acknowledged that in his subsequent notes, that it
12:26  2    was ineffective.
12:26  3        Q.   What is the agent that is used to reduce
12:26  4    the symptoms of rheumatoid arthritis?
12:26  5        A.   Well, the immunosuppressive agent that I
12:26  6    was referring to was methotrexate.
12:26  7        Q.   Okay. Now, I think that moves us on to
12:26  8    our next one, lack of response to the methotrexate.
12:26  9    What response would you have expected to see?
12:26 10        A.   Well, from reviewing the record, he
12:26 11    didn't have a diminution in his joint pain that
12:27 12    would have been expected to have occurred. So
12:27 13    either there would have been no improvement but
12:27 14    likely there should have been an improvement. But
12:27 15    what actually happened was, there was an increase
12:27 16    in his complaints of joint pain that occurred
12:27 17    during the time that he was receiving the
12:27 18    treatment, which, again, is completely inconsistent
12:27 19    with rheumatoid as a diagnosis.
12:27 20        Q.   Then in the Cook County documents, you
12:27 21    mentioned that the -- there was a negative
12:27 22    rheumatoid factor?
12:27 23        A.   I mentioned it was in the note of the
12:27 24    physician that there was a negative rheumatoid
```

Page 87

```
12:27  1    factor. I did not actually see the result. I
12:27  2    could not find -- even though there was some --
12:28  3    laboratory results were submitted, I did not see
12:28  4    it. But, again, I did not have much time to look
12:28  5    at it.
12:28  6        It's actually -- the last sentence of
12:28  7    the last visit states that rheumatoid factor is
12:28  8    negative, and it acknowledges that it had been
12:28  9    positive.
12:28 10        Q.   The fact that it was -- or that there's
12:28 11    a progress note talking about the rheumatoid factor
12:28 12    being negative, how does that factor contribute to
12:28 13    your opinion?
12:28 14        A.   It just strengthens it. I would not
12:28 15    change it. I would not expect that it would be
12:28 16    negative. That surprises me a little bit, but it
12:28 17    does not alter my opinion. It would, if anything,
12:28 18    just strengthen it, but it doesn't change it.
12:28 19        Q.   Why does it surprise you?
12:28 20        A.   Generally, if it was positive for the
12:28 21    length of time that it was, from the lab reports
12:28 22    that I had seen, whatever is causing it to be
12:28 23    elevated, I believe, is still there. He's the same
12:29 24    biologic person, and then whatever -- it generally
```

Page 88

```
12:29  1    does not just disappear. It is present in some
12:29  2    individuals and it's unexplained. I mean, it's
12:29  3    associated with certain illnesses, but in some
12:29  4    people it's just present and it's not known why,
12:29  5    but they generally have it. It does fluctuate, as
12:29  6    it did in this case, but it usually does not become
12:29  7    negative once it's elevated.
12:29  8        Q.   In your experience, are there certain
12:29  9    environmental factors that could cause someone to
12:29 10    develop rheumatoid arthritis?
12:29 11        A.   No. Not external environmental factors,
12:29 12    no.
12:29 13        Q.   Okay. Was there anything else about the
12:29 14    clinical picture, other than the things that we
12:29 15    just talked about, that contributed to your opinion
12:29 16    about the diagnosis of rheumatoid arthritis?
12:30 17        A.   I mentioned -- I'm sure I mentioned the
12:30 18    findings of the physicians and their opinion of
12:30 19    those that had seen him recently, subsequent to his
12:30 20    parole or release from prison, what their findings
12:30 21    were and opinion about his -- what the cause of his
12:30 22    symptoms were. That also played a role in my
12:30 23    opinion.
12:30 24        Q.   Okay.
```

Page 89

12:30 1    A.  Another thing I would say is, what also
12:30 2  moved my opinion was Mr. Daniels' deposition, where
12:30 3  what he stated was, when he was asked why he was
12:30 4  filing a lawsuit, he stated because he had an
12:30 5  elevated rheumatoid factor and it appeared to me
12:30 6  that he -- his belief has been influenced by that
12:31 7  laboratory result as patients sometimes are. They
12:31 8  believe they have the disease because they have
12:31 9  this laboratory finding, which is often seen in the
12:31 10  disease, and they attribute or believe they have
12:31 11  the disease.
12:31 12    So his belief is that he has the
12:31 13  illness, and, therefore, may attribute some of his
12:31 14  symptoms or suggest that some of his symptoms may
12:31 15  be related to that and that that seemed to happen,
12:31 16  from the interview with the rheumatologist, where
12:31 17  he had asked him some questions of rheumatoid
12:31 18  symptoms that he responded to but were not actually
12:31 19  elicited by Mr. Daniels over the many years he had
12:31 20  seen providers in the prison system.
12:31 21    So I believe he's been -- it was
12:32 22  suggested to him or he believes that he has the
12:32 23  illness, and, therefore, some of those symptoms
12:32 24  that he's relaying are things that he believes

Page 90

12:32 1  would be consistent with that or his judgment has
12:32 2  been prejudiced by the laboratory data that he has.
12:32 3    Q.  A few follow-up questions. Does
12:32 4  methotrexate impact your rheumatoid levels at all?
12:32 5    A.  It may. It may actually depress the
12:32 6  level. It's -- again, that is not the purpose of
12:32 7  the medication, but it may reduce the titer of the
12:32 8  rheumatoid factor.
12:33 9    Q.  And in your experience, have you ever
12:33 10  seen patients who did not have the typical
12:33 11  inflammatory markers but in your belief did have
12:33 12  rheumatoid arthritis?
12:33 13    A.  Yes. The disease can -- has a wide
12:33 14  range in its presentation, but characteristically
12:33 15  those are the findings that you would -- that were
12:33 16  discussed. Those are the findings that you expect
12:33 17  to see.
12:33 18    There are patients who have inactive
12:33 19  disease that may have rheumatoid arthritis but not
12:33 20  have an active form or the manifestations of that.
12:33 21  That does exist, but the common presentation is the
12:33 22  person that has those other findings.
12:33 23    Q.  And in your experience as a physician
12:34 24  and medical director, have you seen patients who

Page 91

12:34 1  have rheumatoid levels that are not significantly
12:34 2  elevated but they still, in your belief, possess
12:34 3  the disease?
12:34 4    A.  That can exist, yes. Again, it's looked
12:34 5  at as one of the parameters in making that
12:34 6  judgment. It would be inappropriate to make a
12:34 7  determination solely defined on their rheumatoid
12:34 8  factor or their level.
12:34 9    Q.  Okay. I'm going to go back to the
12:35 10  various employees. Are you familiar with a Paul or
12:35 11  a Dr. Paul Williams?
12:35 12    A.  No.
12:35 13    Q.  Okay. Are you familiar with a
12:35 14  Dr. Adrian Feinerman?
12:35 15    A.  Yes.
12:35 16    Q.  Okay. What is your familiarity with
12:35 17  Dr. Feinerman?
12:35 18    A.  He was a medical director at a facility
12:35 19  that I did not supervise, but I knew of him from
12:35 20  meetings that we had. I knew he was the medical
12:35 21  director there.
12:35 22    Q.  Okay. Is he still the medical director?
12:35 23    A.  No.
12:35 24    Q.  Okay.

Page 92

12:35 1    A.  I believe he -- he may have passed, but
12:35 2  I'm not -- I heard he had a stroke, but that was
12:36 3  years ago.
12:36 4    Q.  Okay. What about a Dr. John R.
12:36 5  Shepherd?
12:36 6    A.  Yes.
12:36 7    Q.  And how are you familiar with
12:36 8  Dr. Shepherd?
12:36 9    A.  He was a doctor that I had met at
12:36 10  company meetings. He was a physician that worked
12:36 11  at other facilities but not that I was direct
12:36 12  supervisor of.
12:36 13    Q.  Okay. What about Rashida Pollion?
12:36 14    A.  Spell that, please. What is the last
12:36 15  name?
12:36 16    Q.  P-o-l-l-i-o-n.
12:36 17    A.  I don't know that person. I don't
12:36 18  believe -- it's probably a nurse, but I don't think
12:36 19  that I know that person.
12:36 20    Q.  Okay. And does your supervisory duties
12:37 21  include supervising nurses?
12:37 22    A.  Not directly, no.
12:37 23    Q.  What about Mikhail Magdel?
12:37 24    A.  Dr. Magdel, yes, I do know him.

Page 93

12:37 1    Q.  And what is your familiarity with
12:37 2  Dr. Magdel?
12:37 3    A.  He was a -- I know I interviewed him,
12:37 4  and I know he had worked as a physician for a
12:37 5  number of years, but not at a facility that I
12:37 6  supervised.
12:37 7    Q.  What about Kimberly Criss, C-r-i-s-s?
12:37 8    A.  I don't personally know that individual.
12:39 9    Q.  Okay.  What about LaTonya Williams?
12:37 10    A.  I do know LaTonya Williams.  She's a
12:37 11  physician assistant at Stateville or was.
12:37 12    Q.  Okay.  And do you have any supervisory
12:37 13  duties with respect to LaTonya?
12:37 14    A.  Not directly.  It would be a facility in
12:38 15  my district, but I would not be her direct
12:38 16  supervisor.  The site medical director would be.
12:38 17    Q.  With regards to nurses in your
12:38 18  facilities, if there was a corrective action
12:38 19  issued, would you have been notified?
12:38 20    A.  Depending on the subject matter.  I may
12:38 21  have, but, generally, no, I would not.  For minor
12:38 22  issues, I would not be involved with that.
12:38 23    Q.  Okay.  Are you aware of any corrective
12:38 24  actions issued to Ms. Williams?

Page 94

12:38 1    A.  I believe that there was for attendance.
12:38 2  She was coming late. I'm certain there was. I
12:38 3  know there was some matter or issue relating to her
12:39 4  coming late in the morning, arriving late at work.
12:39 5    Q.  Anything else?
12:39 6    A.  That's all I recall.
12:39 7    Q.  How about Dr. Liping Zhang?
12:39 8    A.  She was a physician at the facility, at
12:39 9  Stateville.
12:39 10    Q.  And did you supervise Dr. Zhang?
12:39 11    A.  No, not directly.
12:39 12    Q.  Okay.  Do you recall there being any
12:39 13  corrective actions against Dr. Zhang?
12:39 14    A.  Yes.
12:39 15    Q.  Okay.  For what?
12:39 16    A.  I recall a clinical matter for which she
12:39 17  was disciplined and possibly terminated, and I
12:40 18  don't recall if she was disciplined and then
12:40 19  resigned or she was actually terminated.
12:40 20    Q.  Do you recall what the circumstances of
12:40 21  that clinical matter were?
12:40 22    A.  Not the details of it.  It was -- this
12:40 23  would have been about seven or eight years ago,
12:40 24  maybe longer, so I don't remember specifically.

Page 95

12:40 1    Q.  Is there a limit on corrective actions
12:40 2  that you can receive before you are terminated?
12:40 3    A.  The number?
12:40 4    Q.  Yes.
12:40 5    A.  No, it's a progressive discipline.  So
12:40 6  it progresses, depending on what the matter is, and
12:40 7  it progresses to termination, if that is indicated.
12:41 8    Q.  Okay.  What about Dr. Fe Poblete
12:41 9  Fuentes?
12:41 10    A.  Dr. Fuentes.  I am aware of her.  She
12:41 11  was at a facility, Menard, that is not in my
12:41 12  district.  I was aware of her as a physician at the
12:41 13  facility, but that is all.
12:41 14    Q.  Okay.  What about Dr. Samuel Nwaobasi?
12:41 15    A.  Again, I know of him as a physician at
12:41 16  Menard, which is a facility that I did not
12:41 17  supervise, so I don't have direct -- did not have
12:41 18  direct involvement with him.  I just knew of his
12:41 19  presence or employment with Wexford in that
12:41 20  capacity.
12:41 21    Q.  What region is Menard in?
12:41 22    A.  Southern.  Southern part of the state.
12:41 23    Q.  Okay.  Who is the supervising person for
12:42 24  that region?

Page 96

12:42 1    A.  Presently, it's Dr. Glen Babich,
12:42 2  B-a-b-i-c-h.
12:42 3    Q.  Okay.
12:42 4    A.  But at the time, it would have been
12:42 5  somebody -- he has been in prison for a long time,
12:42 6  so up until two years ago, we had two regional
12:42 7  medical directors.  The state was divided north and
12:42 8  south.  The southern would have been Dr. Rob
12:42 9  Matticks, M-a-t-t-i-c-k-s, and Menard would have
12:42 10  been in his district.  Two years ago a third
12:42 11  regional medical director was added, and we divided
12:42 12  the state from two into three.
12:42 13    Q.  Did you ever work in the southern region
12:42 14  during your time at Wexford?
12:42 15    A.  No.  I never worked in the southern
12:42 16  region, but there was also a time between regional
12:43 17  medical directors, where I was the only regional
12:43 18  medical director.  That was only about, I think,
12:43 19  maybe six months or so, until they hired the second
12:43 20  regional medical director, or the one -- the
12:43 21  previous one had left, and I was the only one for
12:43 22  about six months.
12:43 23    Q.  Do you recall about when that was?
12:43 24    A.  It would have been about early 2000s,

Page 97

12:43 1 like 2008, I think. 2008, 2009, I'm guessing,
12:43 2 around there.
12:43 3     Q. Is it fair to say that the various
12:43 4 regions are all governed by the same guidelines in
12:43 5 Illinois?
12:43 6     A. Yes. Yes. Individual facilities have
12:44 7 individual makeups, so they have different
12:44 8 missions, but generally that statement is true.
12:44 9     Q. Okay. So let me ask a better question.
12:44 10 So for Stateville, for example, is there a written
12:44 11 set of guidelines that Wexford employees would
12:44 12 refer to or look at?
12:44 13     A. Yes. So it's Stateville. There's no
12:44 14 second S, but everyone thinks there is. Yes, there
12:44 15 are -- there are guidelines that apply to the
12:44 16 entire state, and then each site will have specific
12:44 17 guidelines for its specific needs.
12:44 18     Q. Okay. Are you familiar with a
12:45 19 Dr. Robert Shaefer?
12:45 20     A. Yes.
12:45 21     Q. Okay. And --
12:45 22     A. It's Ronald. Ronald Shaefer, it should
12:45 23 be.
12:45 24     Q. It's Ronald. Okay.

Page 98

12:45 1     And you indirectly supervise
12:45 2 Dr. Shaefer?
12:45 3     A. Yes. Actually at one point directly.
12:45 4 He had different positions in the company.
12:45 5     Q. Okay. And do you recall any corrective
12:45 6 actions being issued to Dr. Shaefer?
12:45 7     A. Not that I recall, no.
12:45 8     Q. And the corrective actions, is that a
12:45 9 written notice?
12:46 10     A. It could be written or verbal.
12:46 11 Generally, it would be done in writing,
12:46 12 memorialized in writing.
12:46 13     Q. Okay. Are you familiar with a Dr. Magid
12:46 14 Fahim?
12:46 15     A. Yes.
12:46 16     Q. What is your familiarity with Dr. Fahim?
12:46 17     A. He was the medical director at Menard
12:46 18 for a period of time.
12:46 19     Q. Did you have any supervisory duties with
12:46 20 regards to Dr. Fahim?
12:46 21     A. No. The only exception, in that brief
12:46 22 period of time when I was solo in the state, that
12:46 23 if that happened to coincide -- and I don't
12:46 24 remember if he was medical director at that time,

Page 99

12:46 1 but that would be the only time that I would have
12:46 2 been his direct supervisor.
12:46 3     Q. What about Dr. Arturo Sevilla?
12:47 4     A. I know a Dr. Sevilla, but it was not
12:47 5 Arturo. It was -- it was a female. I don't
12:47 6 remember her first name though.
12:47 7     Q. And how do you know Dr. Sevilla?
12:47 8     A. She was a staff physician at -- at
12:47 9 Stateville Correctional Center but only for a brief
12:47 10 period of time.
12:47 11     Q. Does Dr. Sevilla still work at Wexford,
12:47 12 to your knowledge?
12:47 13     A. No, she does not.
12:47 14     Q. Do you know when Dr. Sevilla left?
12:47 15     A. I don't recall the dates, no.
12:47 16     Q. Are you aware of any corrective actions
12:47 17 issued to Dr. Sevilla?
12:48 18     A. No, I'm not aware of any.
12:48 19     Q. Do you know why she left?
12:48 20     A. No, I don't recall. It's not for
12:48 21 everybody. Corrections is a unique environment,
12:48 22 and some doctors just don't like it.
12:48 23     Q. Fair enough. Okay. We are about to
12:48 24 turn to the procedures or some procedures handbook.

Page 100

12:48 1     Let's see. I will mark the Wexford Health Provider
12:49 2 Handbook as Exhibit No. 2, and I will share my
12:49 3 screen.
12:50 4     Dr. Funk, can you see my screen now?
12:50 5     A. Yes, I can.
12:50 6     Q. And I will --
12:50 7     A. Better. Thank you.
12:50 8     Q. Okay. So we are looking at Exhibit
12:50 9 No. 2, which is the Wexford Health Provider
12:50 10 Handbook, so I'm just going to ask you some
12:50 11 background questions about this.
12:50 12     So, first of all, do you know who puts
12:50 13 together this provider handbook?
12:50 14     A. The person who signs it. There's a
12:50 15 signature on the second page. So it's put out by
12:51 16 the corporation, but the person who reviews it and
12:51 17 updates it -- it should have a signature on the
12:51 18 second page. It probably is the corporate medical
12:51 19 officer, chief medical officer.
12:51 20     Q. Okay. Let's see.
12:51 21     A. There it is.
12:51 22     Q. So Dr. Thomas Lehman, the corporate
12:51 23 medical director?
12:51 24     A. Lehman, yes.

Page 101

12:51 1    Q.   Does anyone else review it besides
12:51 2  Dr. Lehman?
12:51 3    A.   Whoever he chooses.  He's the one who
12:51 4  does the final review and issues it.  He may give
12:51 5  it to other individuals for their opinion.
12:51 6  Actually, I have been asked to give an opinion on
12:51 7  the -- and make changes to the physician handbook,
12:52 8  but it's at his discretion.
12:52 9    Q.   Okay.  And what is the purpose of this
12:52 10  handbook?
12:52 11    A.   It's used in orientation of a new
12:52 12  provider to give them information about the company
12:52 13  and corrections and the specific population that we
12:52 14  provide services to.
12:52 15    Q.   Can you give me more detail about how
12:52 16  it's used in training?
12:52 17    A.   Yes.  It's handed to the new applicant
12:52 18  as a prospective employee to review, and it is
12:52 19  reviewed -- I review it with the providers during
12:52 20  my orientation with them.
12:52 21    Q.   Are you --
12:52 22    A.   I'm sorry.  And in that review, they
12:52 23  have the opportunity to ask questions about any of
12:53 24  the contents of the handbook.

Page 102

12:53 1    Q.   Do you have this particular handbook?  I
12:53 2  believe this is the one effective November 21,
12:53 3  2016, with you or near you?
12:53 4    A.   No.
12:53 5    Q.   Okay.  We'll keep it up on the screen
12:53 6  then.
12:53 7         Now, you mentioned that you hand this
12:53 8  handbook to the people that you are training and go
12:53 9  through it with them.  Are there particular
12:53 10  sections -- and I'll look at the table of
12:53 11  context -- that you go through with physicians?
12:53 12    A.   No.  I hand it to them in advance, ask
12:53 13  them to read it, and then I go over it with them
12:53 14  page by page or section by section and ask -- give
12:53 15  them the opportunity of asking any questions
12:53 16  relative to those areas.
12:53 17    Q.   Okay.  Just so I understand, you go over
12:54 18  the entire handbook with them?
12:54 19    A.   Yes.
12:54 20    Q.   Okay.  To make things easier, when I
12:54 21  refer to it, I'll highlight it so you can see what
12:54 22  I'm talking about.
12:54 23    A.   Okay.  Could I ask for maybe one more
12:54 24  magnification?  Okay.  Great.  Thanks.

Page 103

12:54 1    Q.   So I highlighted a particular passage on
12:55 2  page 3 of Exhibit No. 2.
12:55 3    A.   Yes.
12:55 4    Q.   It says, All readers are encouraged to
12:55 5  consult their site specific operational policies
12:55 6  and procedures with regards to facility protocols.
12:55 7  Did I read that accurately?
12:55 8    A.   Yes.
12:55 9    Q.   When you train physicians, do you hand
12:55 10  them a copy of their site specific operational
12:55 11  policies and procedures?
12:55 12    A.   Some of them.  Yeah, some of them would
12:55 13  be at the facility, and they would evolve.  They
12:55 14  would receive those during time, and some of them
12:55 15  they would receive in training from other
12:55 16  individuals.  But some of them, yes.
12:55 17    Q.   Going to page 5 now of this handbook.
12:56 18  If you look at letter E.
12:56 19    A.   Yes.
12:56 20    Q.   Is there a chronic clinic for rheumatoid
12:56 21  arthritis patients?
12:56 22    A.   Not specifically for rheumatoid
12:56 23  arthritis patients.  There's a general medical
12:56 24  clinic in which a rheumatoid arthritis patient can

Page 104

12:56 1  be added to, where they would be seen on a
12:56 2  scheduled basis, but there's not specifically a
12:56 3  rheumatoid arthritis clinic.
12:56 4    Q.   How would an inmate get added to that
12:56 5  specific medical clinic, where they could be seen
12:56 6  on a regular basis for their rheumatoid arthritis?
12:57 7    A.   At the discretion of the clinician, if
12:57 8  they chose to see him in a structured clinic, such
12:57 9  as the general medical clinic, they could do that
12:57 10  by assigning them to the clinic.  That would be
12:57 11  something written that would indicate them to be
12:57 12  added to the general medical clinic.
12:57 13    Q.   In your experience, if a patient was
12:57 14  experiencing active symptoms with regards to
12:57 15  rheumatoid arthritis, would you find it acceptable
12:57 16  for a physician to refer them to the general
12:57 17  medical clinic?
12:57 18    A.   Yes.
12:57 19    Q.   I just highlighted a particular passage
12:58 20  on page 5.  Do you see this reads, Wexford Health
12:58 21  has an extensive manual on chronic care clinics to
12:58 22  help you with the management of these disease
12:58 23  states.  Do you see that part?
12:58 24    A.   Yes.

Page 105

12:58 1     Q.  Is there a manual for the general
12:58 2  medical clinic?
12:58 3     A.  No.
12:58 4     Q.  As you sit here today, do you know of a
12:58 5  manual that specifically references how to care for
12:58 6  patients with rheumatoid arthritis?
12:58 7     A.  No. Not a manual, no.
12:58 8     Q.  You are saying not a manual. Is there
12:58 9  other documentation?
12:58 10     A.  It may be in the medical guidelines. It
12:58 11  may be mentioned in the medical guidelines. I
12:59 12  don't know that offhand. I did not have time to
12:59 13  review that.
12:59 14     Q.  Is that something that you would
12:59 15  typically review?
12:59 16     A.  Review in what sphere, in what setting?
12:59 17     Q.  In preparation for a deposition.
12:59 18     A.  I would review all information that was
12:59 19  provided and relative to the deposition, so, yes, I
12:59 20  would generally review that, if I had the time.
12:59 21     Q.  Now moving on to page 6 of Exhibit
13:00 22  No. 2. I highlighted a particular paragraph.
13:00 23  Sorry. My computer is being -- give me one second.
13:01 24     A.  Sure. It's way too small. You are

Page 106

13:01 1  going to have to blow it up, but I do see it, that
13:01 2  it is there.
13:01 3     Q.  I need to blow it up, is what you said?
13:01 4     A.  Yes. Yes, please.
13:01 5     Q.  Okay.
13:01 6     A.  Now what is happening is, it's getting
13:01 7  cut off, as it's getting larger.
13:01 8     Q.  Let me -- I know what I can do. Okay.
13:02 9  Can you see it now?
13:02 10     A.  Yes.
13:02 11     Q.  Now, I highlighted a particular passage,
13:02 12  and I'm going to start reading below that passage
13:02 13  though and then come back to it.
13:02 14     A.  Okay.
13:02 15     Q.  Starting with what is marked as A, Many
13:02 16  variables must be considered when deciding a course
13:02 17  of treatment. These include but are not limited to
13:02 18  the following. Did I read that accurately?
13:02 19     A.  Yes.
13:02 20     Q.  Now, I'm going to skip down to letter D.
13:02 21  Letter D is, Whether the problem initiated in the
13:03 22  Department of Corrections or prior to
13:03 23  incarceration. So why is D relevant when
13:03 24  considering -- when deciding a course of treatment?

Page 107

13:03 1     A.  To define what the condition is and what
13:03 2  the course of action should be. The time of when
13:03 3  the illness developed would be relevant and it
13:03 4  would -- the decision of treatment would be
13:03 5  impacted by their current incarceration status.
13:03 6     So some conditions that are longstanding
13:03 7  would -- the impact of incarceration would impact
13:03 8  on the decision of treatment or what type of
13:03 9  treatment would be relevant.
13:04 10     Q.  So let's go to letter F. How long is
13:04 11  the inmate's sentence? When will he or she be
13:04 12  released? Why is that an important variable to
13:04 13  consider when deciding a course of treatment?
13:04 14     A.  There's something in medicine called
13:04 15  continuity of care. That is when a condition is
13:04 16  treated, the effort should be made to complete the
13:04 17  course of treatment, so that if a person has a
13:04 18  complication, they are under the same care of the
13:04 19  same provider. Incarceration for most instances is
13:04 20  a temporary housing situation, where they are
13:04 21  housed from a place where they don't reside. So
13:04 22  should they have a complication from treatment or
13:05 23  should their release not allow the treatment to be
13:05 24  completed, that could negatively impact on their

Page 108

13:05 1  care.
13:05 2     For example, this comes up for treatment
13:05 3  for Hepatitis C, which is a very costly treatment,
13:05 4  and it is generally not accessible in the community
13:05 5  because of its cost. But because it's a viral
13:05 6  illness, it has an adverse result to have that
13:05 7  treatment interrupted, and knowing that a person is
13:05 8  going to be released would be a reason not to
13:05 9  implement treatment while they are incarcerated
13:05 10  because it would actually worsen the illness when
13:05 11  it was incompletely treated. It could cause a
13:05 12  viral resistance to occur.
13:05 13     Similarly, if a person is not there to
13:06 14  have the treatment completed, it would be -- you
13:06 15  know, for example, in surgery, the physician would
13:06 16  need to know that the person was in the facility or
13:06 17  in custody for a procedure to be done and
13:06 18  scheduled. It often takes months before a
13:06 19  procedure can be -- with all of the necessary
13:06 20  preoperative things that need to be done and the
13:06 21  scheduling, you would not want the person to be
13:06 22  released shortly before surgery or not have the
13:06 23  surgery -- be able to accomplish the surgery while
13:06 24  the person was incarcerated. So the date -- the

Page 109

13:06 1 length of time that the person will be a patient of
13:06 2 the physician is relevant.
13:06 3 Q. Is that consideration relevant when it
13:06 4 comes to treatment for rheumatoid arthritis, in
13:07 5 particular prescribing methotrexate?
13:07 6 A. It may. If I had a patient who was soon
13:07 7 going to be released, I probably would not start
13:07 8 them on methotrexate because it's an
13:07 9 immunosuppressive drug that requires monitoring,
13:07 10 and it could potentially harm a patient where they
13:07 11 likely will not have access to a provider in the
13:07 12 community. But it would depend on the individual
13:07 13 circumstance. If the person said they did have a
13:07 14 physician -- which most of them don't, but if they
13:07 15 happened to say they would, then I would not have
13:07 16 that concern.
13:07 17 But there is concern, particular
13:07 18 concern, with that medication because of its
13:08 19 immunosuppressive -- it depresses the person's
13:08 20 resistance against fighting off infections. And,
13:08 21 again, it would depend on a number of other
13:08 22 factors. The general health of the patient, their
13:08 23 age. There's a number of factors that would be
13:08 24 considered and impact on my decision to treat

Page 110

13:08 1 somebody or not.
13:08 2 Q. Okay. And in a similar scenario where
13:08 3 someone is temporarily transferred to a facility
13:08 4 but that is not their home facility, would you
13:08 5 delay prescribing methotrexate until they got back
13:08 6 to their home facility?
13:08 7 A. Perhaps. It depended on where they were
13:08 8 transferred and how long before they were going to
13:08 9 be released. Whenever there's transition, it opens
13:08 10 up the door for something not going right. It just
13:08 11 increases the possibility of miscommunication of
13:08 12 that.
13:08 13 So there is a general principle that you
13:08 14 try to -- you take those factors into
13:09 15 consideration, and it's best to have the person at
13:09 16 one site for treatment with oversight of one
13:09 17 provider rather than adding other people, but it's
13:09 18 not a strict consideration. It's not something
13:09 19 that would always be done. Again, it would depend
13:09 20 on what the medication was, what the purpose of the
13:09 21 medication was, how much the person needed the
13:09 22 medication, you know, what the -- all of those
13:09 23 factors would make -- would be relevant.
13:09 24 Q. Do you know if methotrexate -- am I

Page 111

13:09 1 saying that right?
13:09 2 A. Yes. You got that one right. Very
13:09 3 good.
13:09 4 Q. Do you know if that is available in the
13:09 5 commissary at --
13:09 6 A. No.
13:09 7 Q. Sorry. Go ahead.
13:09 8 A. I cut you off, but you were saying is it
13:09 9 available at the commissary?
13:09 10 Q. Yeah. I asked, is it available at the
13:09 11 commissary?
13:09 12 A. No. No, it is a prescription drug. It
13:10 13 is not available in the commissary. It can only be
13:10 14 issued with a prescription by a physician or a
13:10 15 provider.
13:10 16 Q. And walk me through how the inmates, if
13:10 17 they are prescribed that medicine, how would they
13:10 18 receive it then?
13:10 19 A. They would receive it from a nurse that
13:10 20 would either provide it on a daily basis and most
13:10 21 likely would be provided that way. Or it can be
13:10 22 issued on what is called a blister pack, which is a
13:10 23 card that has little bays of the medication, where
13:10 24 the patient pushes through the plastic bay and it

Page 112

13:10 1 pops out the back through foil, and they would take
13:10 2 it themselves. It depends on how the physician
13:10 3 would order it. This medication generally is a
13:10 4 witness dose medication or a nurse administered
13:11 5 medication rather than a keep-on-person medication,
13:11 6 as the other example.
13:11 7 Q. For methotrexate, if it's issued on a
13:11 8 daily basis and you skip doses for various reasons,
13:11 9 in your experience, are there side effects?
13:11 10 A. There are not side effects. It's less
13:11 11 effective because the medication is not in the
13:11 12 system, but it would actually be the opposite.
13:11 13 There would be less side effects or potential for
13:11 14 side effects if it's not taken. The side effects
13:11 15 arise from taking the medication, and invariably it
13:11 16 depresses the immune system.
13:11 17 Q. Okay.
13:11 18 A. That is not a side effect. That is a
13:11 19 result of taking the medication and a concern,
13:11 20 therefore, of the medication or the use of the
13:11 21 medication.
13:11 22 Q. We are now moving on to page 7 of
13:12 23 Exhibit No. 2. I'm going to ask you a few
13:12 24 questions.

---

Page 113

13:12  1          Are you familiar with the National
13:12  2    Commission on Correctional Health Care standards?
13:12  3          A.   Yes.
13:12  4          Q.   And are the most recent standards
13:12  5    provided to the physicians that work at your sites?
13:12  6          A.   They may have the standards at the
13:12  7    facility, but many of them have them -- have
13:12  8    obtained them on their own because they have the
13:12  9    certification, the CCHP certification, and the
13:13  10   standards are part of the certification.  Review of
13:13  11   them is necessary for the certification.  Most of
13:13  12   our providers are CCHP certified.
13:13  13         Q.   Do you recall whether Dr. Obaisi was
13:13  14   CCHP certified?
13:13  15         A.   No, I don't recall.
13:13  16         Q.   What about the American Correctional
13:13  17   Association standards, are your physicians provided
13:13  18   with those standards?
13:13  19         A.   They may be at the site, at the
13:13  20   facility.  We do not provide them directly as a
13:13  21   company policy.  We do not provide those standards.
13:13  22   The facility may have them at the site, but we
13:13  23   don't provide them.
13:13  24         Q.   Okay.  Now, there's something in

---

Page 114

13:14  1    Section IV referred to as the negotiated health
13:14  2    service contract.  Do you see that?
13:14  3          A.   Yes.
13:14  4          Q.   Okay.  What is that?
13:14  5          A.   That is the contract that exists between
13:14  6    Wexford, the Illinois Department of Corrections,
13:14  7    and Health and Family Services.
13:14  8          Q.   And are the physicians provided with a
13:14  9    copy of that contract?
13:14  10         A.   It is at the facility.  It is also
13:14  11   online, yes.
13:14  12         Q.   You said it's also online?
13:14  13         A.   Yes.
13:14  14         Q.   Okay.  Do you have separate employment
13:14  15   agreements with each of the physicians that are
13:14  16   employed at the site?
13:14  17         A.   Yes.
13:14  18         Q.   And do you have separate employment
13:14  19   agreements with each of the nurses that are
13:14  20   employed at the site?
13:14  21         A.   Yes.
13:14  22         Q.   I assume those are written agreements;
13:15  23   is that accurate?
13:15  24         A.   Yes.

---

Page 115

13:15  1          Q.   Now, on page 9 of Exhibit 2 -- and I'm
13:15  2    highlighting the passage for you.  So this is
13:15  3    Section I on page 9 of Exhibit 2.  And the passage
13:15  4    that I highlighted says, At your disposal are two
13:15  5    cardiologists, a Hepatitis C and infectious disease
13:15  6    specialist, a nephrologist, a rheumatologist, an
13:16  7    internist, a family practice physician, and a wound
13:16  8    care specialist.  Did I read that accurately?
13:16  9          A.   Yes.
13:16  10         Q.   Who is the rheumatologist that you would
13:16  11   go to for your region?
13:16  12         A.   I'm not sure I understand the question.
13:16  13   What do you mean in my region?
13:16  14         Q.   I'm sorry.  I missed the last part of
13:16  15   your response.
13:16  16         A.   I'm not sure what you mean by "the
13:16  17   rheumatologist in my region."
13:16  18         Q.   Okay.  Let me ask a better question.
13:16  19              Who are these corporate medical
13:16  20   directors that are referred to on page 9?
13:17  21         A.   There's a number of corporate medical
13:17  22   directors, so they would be situated in the
13:17  23   corporate office in Pittsburgh.
13:17  24         Q.   And is one of them a rheumatologist?

---

Page 116

13:17  1          A.   A rheumatologist was not a corporate
13:17  2    medical director.  He was a physician, but he was
13:17  3    not a medical director.
13:17  4          Q.   So who is that rheumatologist then?
13:17  5          A.   His name escapes me right now.  It might
13:17  6    actually be on the bottom of the document, if you
13:18  7    go all of the way to the end, if you want to do
13:18  8    that.  I believe it's listed there.
13:18  9          Q.   All of the way at the end of the
13:18  10   document; is that what you are saying?
13:18  11         A.   Yes.  I believe if you go all of the way
13:18  12   to the end, his name would be listed with the
13:18  13   extension or contact number.
13:18  14         Q.   Okay.  When we get to that part, I'll
13:18  15   show it to you and ask you --
13:18  16         A.   Okay.
13:18  17         Q.   -- if it jogs your memory.
13:18  18              So we are on page 12 of Exhibit No. 2,
13:18  19   and under Interview Techniques, No. 2 says, Have as
13:19  20   much knowledge as possible at hand when you start
13:19  21   the interview.  Review the inmate chart (if one is
13:19  22   available).  A few minutes of chart review will
13:19  23   save you considerable duplication of work and
13:19  24   evaluation.  Did I read that accurately?

Page 117

13:19 1      A.  Just a second, please.  My computer is
13:19 2  telling me my battery is running low.  I have to
13:19 3  make sure that I'm plugged in here.
13:20 4      Okay.  I think I'm plugged in now.  I'm
13:20 5  sorry.  Could you please repeat the last question?
13:20 6      Q.  Yes, I can.  So I was reading under
13:20 7  Section B, Interview Techniques, No. 2 says, have
13:19 8  as much knowledge as possible at hand when you
13:19 9  start the interview.  Review the inmate chart (if
13:19 10  one is available).  A few minutes of chart review
13:19 11  will save you considerable duplication of work and
13:19 12  evaluation.  Did I read that accurately?
13:20 13      A.  Yes.
13:20 14      Q.  During your time as the regional medical
13:20 15  director, have the inmate charts been in paper
13:20 16  format?
13:20 17      A.  Yes.  The majority of them have been,
13:20 18  except for the female system, which is on a
13:20 19  computerized system.
13:20 20      Q.  Can you say that last part one more
13:20 21  time?
13:20 22      A.  The female sites are computerized, but
13:21 23  the male sites, which are the majority, are paper.
13:21 24      Q.  I want to scroll up.  So one of the

Page 118

13:21 1  things that I have seen in this handbook a couple
13:21 2  of times is references to inmates and manipulation.
13:21 3  Why is it important when you are training
13:21 4  physicians to discuss this?
13:21 5      A.  Because it's a consideration in
13:21 6  treatment of a patient, that some can be
13:21 7  manipulative, and that is a factor that is
13:21 8  considered in treating patients.
13:22 9      Q.  And how is that factor considered in
13:22 10  treating them?
13:22 11      A.  It's a factor that is considered in
13:22 12  determining what treatment should be appropriate
13:22 13  for a specific patient, so it is something that is
13:22 14  relevant in interactions with a patient, that one
13:22 15  would consider that they may be manipulative.
13:22 16      Q.  Okay.  Let's move on to the next page.
13:22 17  So I'm looking at No. 8, and I'm going to highlight
13:22 18  some text from that.  So No. 8 says -- the first
13:22 19  three words are in all caps -- DO NOT EVER explain
13:23 20  symptoms you would expect to see to confirm a
13:23 21  diagnosis to an inmate.  If you should, those
13:23 22  symptoms will likely be present with the next
13:23 23  visit.  Did I read that accurately?
13:23 24      A.  Yes.

Page 119

13:23 1      Q.  Okay.  And what is the purpose behind
13:23 2  this recommendation in particular, those two
13:23 3  sentences that I read?
13:23 4      A.  So some patients can be suggested to
13:23 5  have an illness from symptoms that are explained by
13:23 6  a clinician.  About a third of our population have
13:23 7  mental illness, and that population or patients who
13:23 8  have mental illness can -- are suggestible to be --
13:23 9  to sometimes believe they have symptoms that are
13:23 10  suggested from an interview.  So in our -- for that
13:23 11  reason, that is why this statement is written.
13:24 12  It's advised not to suggest symptoms, but rather to
13:24 13  ask open-ended questions of what a person has.  Not
13:24 14  suggest, for example, do you have this?  Because a
13:24 15  tendency in some patients is to answer yes to any
13:24 16  question.
13:24 17      Q.  Okay.  And so in that situation, in your
13:24 18  experience, are there times where an inmate may
13:24 19  have symptoms that could help your diagnosis but
13:24 20  just doesn't know to verbalize those particular
13:24 21  symptoms?
13:24 22      A.  No.  I would say they may not be able to
13:25 23  explain it in the way that is -- another person
13:25 24  might be able to, but they are able to communicate

Page 120

13:25 1  what their symptom is, just using different words
13:25 2  that you might see from another person.
13:25 3      So, no, I don't think that there's any
13:25 4  restriction or limitation on a person being able to
13:25 5  express those symptoms, and if the physician
13:25 6  thought that, they could ask the question or
13:25 7  suggest something.  These are -- this is a general
13:25 8  guideline.  It does not apply, as the preface
13:25 9  states, to every specific patient.
13:25 10      Q.  So in your experience physicians might
13:25 11  ask questions about particular symptoms if they
13:25 12  thought it was appropriate?
13:25 13      A.  Yes.  Yes, absolutely.
13:25 14      Q.  Moving on to page 15 of Exhibit No. 2,
13:26 15  and at the top, Section I is Intake Reception and
13:26 16  Classification?
13:26 17      A.  Yes.
13:26 18      Q.  I'm going to highlight the first
13:26 19  sentence of the second paragraph, which reads,
13:26 20  Within 14 days following the intake screening, a
13:26 21  complete history and physical examination should be
13:26 22  completed, including whatever routine and other
13:26 23  indicated laboratory and biometric testing is
13:26 24  indicated to establish claimed problems.  Did I

Page 121

13:26 1 read that accurately?

13:26 2 A. Yes.

13:26 3 Q. Is it fair to say that you would expect

13:27 4 each inmate to have a full complete history and

13:27 5 examination in their file from their intake?

13:27 6 A. Yes, except if they refused it.

13:27 7 Q. How often do inmates refuse it, in your

13:27 8 experience?

13:27 9 A. The intake physical, not that commonly,

13:27 10 or they may refuse a part of it. There's an

13:27 11 unpleasant exam that used to be part of the exam,

13:27 12 called a rectal exam. That is commonly refused,

13:27 13 but the entire exam, just a few percent will refuse

13:27 14 the exam completely.

13:27 15 Q. Okay. Going to page 17 of Exhibit

13:28 16 No. 2. I'm highlighting the last sentence of the

13:28 17 first paragraph on that page that reads, If you, as

13:28 18 responsible physician, believe specialty services

13:28 19 are indicated and identify a medical need, the case

13:28 20 must be discussed in collegial review. Please

13:28 21 review the utilization management policies and

13:28 22 procedures for all off-site care. Did I read that

13:28 23 accurately?

13:28 24 A. Yes.

Page 122

13:28 1 Q. Now, as we discussed earlier, the

13:28 2 collegial review process is no longer in place as

13:28 3 of today; is that correct?

13:28 4 A. Correct.

13:28 5 Q. But for the entire time that you have

13:28 6 been medical director, so since 2005, up until

13:28 7 about six months ago, the collegial review process

13:28 8 was in place; is that correct?

13:28 9 A. Nine months ago, yes.

13:28 10 Q. Nine months ago. Okay.

13:29 11 When a collegial review happens, is

13:29 12 there any documentation that is made concerning the

13:29 13 collegial review?

13:29 14 A. Yes, there is.

13:29 15 Q. And what is the documentation?

13:29 16 A. From the physician's end, it would be in

13:29 17 the progress notes, and from the corporate end, it

13:29 18 would be in their records, their computer system.

13:29 19 Q. And when you reviewed the records for

13:29 20 the plaintiff's case, did you see documentation of

13:29 21 a collegial review?

13:29 22 A. Yes.

13:29 23 Q. And what documentation did you see?

13:29 24 A. That it took place, and that there was

Page 123

13:29 1 an approval for a rheumatology visit, for one, and

13:29 2 then there were some others. It must have been

13:29 3 because he had some specialized testing, MRIs.

13:30 4 There must have been. I just don't recall them,

13:30 5 but they must be in there.

13:30 6 Q. And did you see both the corporate

13:30 7 documentation and the progress notes with regards

13:30 8 to the collegial review?

13:30 9 A. Yes.

13:30 10 Q. Okay. We are now on the last page, and

13:31 11 I just wanted to come to this page of Exhibit No. 2

13:31 12 to see if one of these names rung a bell for the

13:31 13 rheumatologist?

13:31 14 A. Yeah. Is there another part to it?

13:31 15 These are the other people that would have been

13:31 16 referenced in that paragraph, but the

13:31 17 rheumatologist -- I think his name was Breen,

13:31 18 B-r-e-e-n, if I recall correctly. Does it continue

13:31 19 onto the next page or no?

13:31 20 Q. This is all I have.

13:31 21 A. It's not there.

13:31 22 Q. So it possibly does.

13:31 23 A. He's not added, but they don't list it

13:31 24 here.

Page 124

13:31 1 Q. Okay. Well, I will stop sharing my

13:31 2 screen.

13:31 3 MR. LOMBARDO: Would this be a good time for

13:31 4 maybe just a five-minute bathroom break?

13:32 5 MS. REED: Yes, that is fine.

13:32 6 MR. LOMBARDO: Thank you very much.

13:32 7 MS. REED: Let's go off the record.

13:32 8 (WHEREUPON, a recess was had.)

13:32 9 BY MS. REED:

13:45 10 Q. Dr. Funk, do you understand that you are

13:45 11 still under oath?

13:45 12 A. I do.

13:45 13 Q. Okay. Let's continue. Are inmates

13:45 14 allowed to request treatment from an outside

13:45 15 physician?

13:45 16 A. They can request it, yes.

13:45 17 Q. Then what happens after they request it?

13:45 18 A. The physician evaluates them, if that

13:45 19 request is appropriate or not, and then makes a

13:45 20 decision accordingly.

13:45 21 Q. And if the physician agrees with that

13:45 22 request, then does it go up to the collegial

13:45 23 review?

13:45 24 A. Yes.

Page 125

13:45 1     Q.   Is there any way to bypass the collegial
13:46 2  review?
13:46 3     A.   Yes.  There would be a way around that.
13:46 4     Q.   How is that?
13:46 5     A.   Well, there's a few ways.  So if it was
13:46 6  an emergency, there's no collegial review for that,
13:46 7  or an urgent thing/matter.  The physician would
13:46 8  have the latitude to do that.
13:46 9          The agency medical director could
13:46 10  authorize treatment or a procedure bypassing the
13:46 11  collegial review, so those would be the common
13:46 12  ways.
13:46 13     Q.   Okay.  And once a collegial review --
13:46 14  when it results in a yes for the physician and the
13:46 15  physician can refer out, how do you choose who the
13:46 16  case or the patient is referred to outside of
13:46 17  Wexford?
13:46 18     A.   The physician would determine which
13:46 19  provider would be utilized, so there is a list of
13:46 20  providers that are a specialist that see our
13:47 21  patients, and the provider would choose which
13:47 22  doctor should see the patient.
13:47 23     Q.   Okay.  Are there any restrictions on the
13:47 24  physician's choice of which provider should see the

Page 126

13:47 1  patient?
13:47 2     A.   No.
13:47 3     Q.   So it's completely up to the physician's
13:47 4  discretion?
13:47 5     A.   It's up to the physician, if he has a
13:47 6  choice.  He may not have a preference.  In some
13:47 7  cases there may not be a preference for that, and
13:47 8  he'll just say whoever is available, but he may
13:47 9  express a specific -- or request a specific
13:47 10  physician to see the patient.
13:47 11     Q.   Okay.  If the inmate has a specific
13:47 12  physician in mind, someone they saw before or
13:47 13  someone a family recommended, would the physician
13:47 14  consider that as well?
13:47 15     A.   They would consider it.  Generally, if a
13:47 16  person had been seen, an effort would be made for
13:47 17  the physician -- for the patient to return to that
13:48 18  provider.  But they can make a request, but it
13:48 19  would not be a determination.  They could not make
13:48 20  that determination to see a specific person.
13:48 21     Q.   Okay.  Are you familiar with the
13:48 22  approved medication list?
13:48 23     A.   Yes.
13:48 24     Q.   Okay.  And just for the record, can you

Page 127

13:48 1  describe what that is?
13:48 2     A.   It's called a formulary.  There are
13:48 3  medications in specific groups that are preferred
13:48 4  for use by the company, so it's a company
13:48 5  formulary.
13:48 6     Q.   And how does the company determine which
13:48 7  medications are preferred for use?
13:48 8     A.   By a vote from the physicians that
13:48 9  worked for Wexford.  They determine which
13:48 10  medications should be added or removed from the
13:49 11  formulary.  There's a meeting that takes place, and
13:49 12  physicians and other clinicians will vote on what
13:49 13  medications should be added or removed.
13:49 14     Q.   So is it all the physicians that work
13:49 15  for the company, or I guess how do you select which
13:49 16  physicians vote?
13:49 17     A.   It would be at the direction of the
13:49 18  corporate medical officer, and it's a select group
13:49 19  of physicians and providers that would meet
13:49 20  specifically for that purpose.
13:49 21     Q.   How does Wexford and you, in
13:49 22  particular, as a regional medical director, ensure
13:49 23  that your physicians are adhering to the standard
13:49 24  of care with regards to particular diseases and

Page 128

13:49 1  diagnoses?
13:50 2     A.   From reviewing and evaluating the
13:50 3  decisions that they make on an ongoing basis.
13:50 4     Q.   Are your medical files and medical
13:50 5  decisions ever reviewed by outside physicians to
13:50 6  determine if your physicians are keeping to the
13:50 7  standard of care?
13:50 8     A.   By outside physicians, you mean those
13:50 9  that are not working for Wexford?  Is that what you
13:50 10  are saying?
13:50 11     Q.   Correct.  Yes.
13:50 12     A.   And are you asking me if we engage
13:50 13  physicians working to do those reviews or they are
13:50 14  done by other parties?
13:50 15     Q.   If Wexford engages physicians to review
13:50 16  their employed physicians.
13:50 17     A.   No.  All of the physicians that would
13:50 18  review others would be employed or engaged by
13:50 19  Wexford.
13:50 20     Q.   Okay.  Are you familiar with what is
13:51 21  referred to as a sick call?
13:51 22     A.   Yes.
13:51 23     Q.   And what is your understanding of what a
13:51 24  sick call is?

Page 129

13:51 1     A.  Sick call is the term for a clinic
13:51 2  visit, so it would be what an office visit
13:51 3  equivalent would be in the community.
13:51 4     Q.  In your experience, how are inmates able
13:51 5  to request a sick call?
13:51 6     A.  The facility will define its procedure
13:51 7  through something called an inmate or offender
13:51 8  handbook, which will explain to them the procedure
13:51 9  for them to access sick call.  Generally, for
13:52 10  nonemergent matters, it entails a sick call request
13:52 11  slip, so the offender or the inmate will fill out
13:52 12  the information, reason for his visit, and then
13:52 13  that is submitted to the health care unit and then
13:52 14  processed.
13:52 15     Q.  And how does the health care unit
13:52 16  process that request?
13:52 17     A.  A nurse reviews the request and then
13:52 18  refers it to the right source, or they may conduct
13:52 19  what is called nurse sick call, where they may
13:52 20  address common complaints by use of nursing
13:52 21  treatment protocols.
13:52 22     Q.  To your knowledge, are there site
13:52 23  specific policies and procedures with regards to
13:52 24  processing sick calls?

Page 130

13:52 1     A.  Yes.  Each site has its own process,
13:53 2  depending on the facility makeup, its needs, so
13:53 3  each site has its own specific policies.
13:53 4     Q.  And in your experience, are those
13:53 5  policies written policies?
13:53 6     A.  They would be written, yes, and they
13:53 7  could also be verbally communicated to the
13:53 8  offenders, to the inmates.  Generally, that is done
13:53 9  at orientation when they arrive at the facility.
13:53 10     Q.  If you wanted to access a written policy
13:53 11  with regards to sick calls, is there an online
13:53 12  database that you can go to to access it, if you
13:53 13  need to?
13:53 14     A.  No.
13:53 15     Q.  How would you get ahold of that written
13:53 16  policy?
13:53 17     A.  By requesting it from the facility, from
13:53 18  the health care unit administrator at the facility.
13:54 19     Q.  Who is the health care unit
13:54 20  administrator at Stateville?
13:54 21     A.  Her name is Galindo.  I think
13:54 22  Lucecita -- Lucy Galindo, I believe is her first
13:54 23  name.  Last name is Galindo, G-a-l-i-n-d-o.
13:54 24     Q.  Okay.  I'm going to essentially show you

Page 131

13:54 1  a string of documents and ask you questions about
13:54 2  them, but that is -- I'm nearing the end.  Once we
13:54 3  get through these documents, we'll be close.
13:55 4     MS. REED:  Counsel, do you want me to continue
13:55 5  sending the exhibits in the chat?
13:55 6     MR. LOMBARDO:  As long as you are screen
13:55 7  sharing them, that is fine with me.  I'm not using
13:55 8  the ones in the chat, but thanks for asking.
13:55 9  BY MS. REED:
13:55 10     Q.  So I'll show you what will be marked as
13:55 11  Exhibit No. 3.  Can you see Exhibit No. 3?
13:56 12     A.  Yes.
13:56 13     Q.  Okay.  Exhibit No. 3 is an excerpt from
13:56 14  the Wexford guidelines, and it refers to urgent
13:56 15  requests.  Do you see that?
13:56 16     A.  Yes.
13:56 17     Q.  Okay.  In particular, looking at the
13:57 18  procedure, starting with A, If the site medical
13:57 19  director or designee determines a need for urgent
13:57 20  medical services, the site personnel submits the
13:57 21  request outlining need for urgent request to the UM
13:57 22  department via e-mail.  The e-mail must include the
13:57 23  word "urgent" in the subject heading to assist in
13:57 24  facilitating a timely response to the request.

Page 132

13:57 1  And I stopped before I read the last
13:57 2  sentence, and I omitted a part in brackets.  Other
13:57 3  than that, did I read that accurately?
13:57 4     A.  Yes.
13:57 5     Q.  What is the UM department?  Is that the
13:57 6  utilization management department?
13:57 7     A.  Correct.
13:57 8     Q.  So when you were reviewing the file for
13:57 9  this case, did you see e-mails marked "urgent" with
13:58 10  regards to the plaintiff?
13:58 11     A.  No.
13:58 12     Q.  Did you have access to the UM department
13:58 13  e-mails when you were preparing for this deposition
13:58 14  today?
13:58 15     A.  There are notes that I have, yes.
13:58 16     Q.  What I asked is, did you have access to
13:58 17  their e-mails with regard to the plaintiff?
13:58 18     A.  Well, they didn't -- they are not
13:58 19  e-mails, but they are screen shots.  So their
13:58 20  communication is written in their software, and
13:58 21  somehow they print out their documentation.  So
13:58 22  it's not an e-mail communication.  It's written in
13:58 23  the -- their software and then they print it out,
13:58 24  and it looks like a screen shot.

Page 133

13:58 1   Q.   So what you have -- go ahead.
13:58 2   A.   It does not look like an e-mail, but
13:58 3   it's their communication.
13:58 4   Q.   When you say "their communication," do
13:59 5   you mean the UM department's communication?
13:59 6   A.   Correct, yes.
13:59 7   Q.   Okay.  And when you were looking at the
13:59 8   UM department communications, did you also see
13:59 9   communications from the site director, site medical
13:59 10  director in that?
13:59 11  A.   I'm sorry.  Go ahead.
13:59 12  Q.   I guess what I want to understand is,
13:59 13  when you refer to the screen shots from the UM
13:59 14  department, do those screen shots include both
13:59 15  sides of the communication or just the UM's
13:59 16  response to something?
13:59 17  A.   It's the UM's summary of the
13:59 18  conversation, which includes the communication from
13:59 19  the medical director.
13:59 20  Q.   Does it include a summary of that
13:59 21  communication, or is the verbatim communication
13:59 22  attached to that?
13:59 23  A.   No, it's a summary.  It is not verbatim,
13:59 24  and there's nothing attached to it.

Page 134

13:59 1   Q.   Okay.  Now I'm going to mark Exhibit
14:00 2   No. 4.  Dr. Funk, I'm going to blow this up a
14:00 3   little bit.  Can you see what I'm displaying as
14:00 4   Exhibit No. 4?
14:00 5   A.   Yes.
14:00 6   Q.   Okay.  Exhibit No. 4 is a grievance form
14:01 7   from plaintiff.  It's dated December 11, 2014.
14:01 8   Does that appear accurate from your standpoint?
14:01 9   A.   Yes, it does, but -- yeah, I remember
14:01 10  reviewing this.  And I would be surprised if I was
14:01 11  incorrect, but I don't believe the words urgent
14:01 12  were on the top of it, at least the one that I
14:01 13  reviewed.  I actually have that here.  I can look
14:01 14  at that and verify it, to see if I'm right or not.
14:01 15       Can I do that?
14:01 16  Q.   Yes.  That is fine.
14:02 17  A.   Okay.  I'm wrong.  First time it
14:02 18  happened.  No, actually, that is correct.  It did
14:02 19  say "urgent" on top.  The other ones did not have
14:02 20  that written, but this is an accurate copy.
14:02 21  Q.   Okay.
14:02 22  A.   Thanks for letting me prove myself
14:02 23  wrong.
14:02 24  Q.   Of course.  And so I guess, based on

Page 135

14:03 1   what you just said, you have had a chance to review
14:03 2   this particular grievance; is that correct?
14:03 3   A.   Yes, yes.
14:03 4   Q.   Do you see at the bottom of this, there
14:03 5   is a box that is marked Emergency Review?
14:03 6   A.   Yes.
14:03 7   Q.   And can you tell who that signature is
14:03 8   for that?
14:03 9   A.   It appears to be Mr. Daniels' signature.
14:03 10  Q.   For the emergency review.
14:03 11  A.   Yes.  Where it says, Check only if an
14:03 12  emergency grievance.
14:03 13  Q.   Sorry.  We are on different sections.
14:03 14  That is my fault.  I am looking at the very bottom
14:03 15  of page 1 of Exhibit 4.
14:03 16  A.   Okay.
14:04 17  Q.   Go ahead.
14:04 18  A.   Could you please go up a little bit
14:04 19  higher?  There's a black box.  Stop there.  Yeah,
14:04 20  actually a little bit higher.  I have a black box
14:04 21  here that says, Introducing Zoom app.  Can you go
14:04 22  up a little bit?
14:04 23  Q.   Yes.  I think the problem is when I go
14:04 24  up a little bit, it just goes to the next page.

Page 136

14:04 1   A.   Okay.  So --
14:04 2   Q.   Let me see if I can figure that out.
14:04 3   A.   Let me see if I can X that box out.  I
14:04 4   got it.  It's gone.
14:04 5   Q.   Okay.
14:04 6   A.   Yeah.  So the name Tarry Williams
14:04 7   appears, and then something after that.  I'm not
14:04 8   sure what that is, initials.
14:04 9   Q.   Do you know a Tarry Williams?
14:04 10  A.   It's the name of a warden.  It probably
14:05 11  is him.
14:05 12  Q.   Okay.  I can go on to the next one.  I'm
14:05 13  sorry.  We are going to go back to that one really
14:05 14  quick.
14:06 15       We are on page 2 of Exhibit 4, and
14:06 16  towards the bottom of this page, there's a relief
14:06 17  requested.  Do you see that?
14:06 18  A.   Yes.
14:06 19  Q.   Okay.  And towards the end, it
14:06 20  references his joint pains.  Do you see that?
14:06 21  A.   Yes.
14:06 22  Q.   It also references his out of range
14:06 23  rheumatoid factor?
14:06 24  A.   Yes.

Page 137

14:06 1    Q.  Are those the types of complaints that
14:06 2  you would expect to hear from somebody with
14:06 3  rheumatoid arthritis?
14:06 4    A.  No.
14:06 5    Q.  Why not?
14:06 6    A.  Because patients generally don't report
14:07 7  their lab findings.  It would be uncommon for a
14:07 8  patient to present this way.  He is interpreting
14:07 9  his own laboratory results, and thereby may be
14:07 10  fluid by those results, which I believe he is, has
14:07 11  been.
14:07 12    Q.  Now, what about the reference to the
14:07 13  joint pain?  Is that a typical complaint for
14:07 14  someone with rheumatoid arthritis?
14:07 15    A.  It's a part of the complaint that a
14:07 16  patient with rheumatoid arthritis will have, but it
14:07 17  will be characteristic -- a joint complaint is
14:07 18  nonspecific and is usually due to things other
14:07 19  than -- or, actually, it's rarely due to rheumatoid
14:07 20  arthritis.  It's generally due to osteoarthritis,
14:08 21  which he has as well.
14:08 22    So this is not a -- to answer your
14:08 23  question.  This is not the way that a patient would
14:08 24  present with -- he is distressed by his laboratory

Page 138

14:08 1  finding, which is clear, but a patient who has
14:08 2  symptoms of rheumatoid arthritis will be
14:08 3  distressed -- will present with the symptoms of
14:08 4  that and not like this at all.
14:08 5    Q.  In your experience, do inmates have
14:08 6  access to their lab test results?
14:08 7    A.  Yes, they do.  That is how he obtained
14:08 8  it.
14:09 9    Q.  You said, that is how he obtained them?
14:09 10    A.  Yes, obviously he did.  So they do have
14:09 11  access, and he obtained it.
14:09 12    Q.  Okay.  I'm going to go to the next one.
14:10 13  So I'm sharing with you Exhibit No. 5.  Exhibit
14:10 14  No. 5 is labelled, Medical Policies and Procedures,
14:10 15  Region: Illinois.  Do you see that?
14:10 16    A.  Yes.
14:10 17    Q.  And I believe that we received this from
14:10 18  your counsel yesterday?
14:10 19    A.  Yes.
14:10 20    Q.  And I think the note with it is that you
14:10 21  thought that it would helpful for this case; is
14:10 22  that accurate?
14:10 23    A.  No.  It would be helpful to review it,
14:10 24  that is what I said.

Page 139

14:10 1    Q.  Okay.  Could you explain why, in your
14:11 2  opinion, it would be helpful to review it?
14:11 3    A.  Because you are likely to ask questions
14:11 4  on it, so that I can respond to those.
14:11 5    Q.  Let me ask a better question.  Is there
14:11 6  any particular section of this document that you
14:11 7  found relevant to the plaintiff's case?
14:11 8    A.  No.  I did not produce this or request
14:11 9  that this would be produced.  It was done by
14:11 10  counsel.
14:11 11    Q.  Okay.  And did you review these medical
14:11 12  policies and procedures prior to this deposition
14:11 13  today?
14:11 14    A.  Not for this deposition.  I have
14:11 15  reviewed them in the past, but I did not have time
14:11 16  to review these, as I just received them yesterday.
14:11 17    Q.  Okay.  And in your past review or based
14:11 18  on your past review, is there any sections of this
14:11 19  document that are relevant to the diagnosis of
14:12 20  rheumatoid arthritis?
14:12 21    A.  It may be.  I have not committed it to
14:12 22  memory and there may be, but I don't know without
14:12 23  looking at it.
14:12 24    Q.  Okay.  I did not see any.  I just wanted

Page 140

14:12 1  to make sure I was not missing any.
14:12 2    A.  Okay.
14:12 3    Q.  If there's a particular one that you
14:12 4  recall, then I just wanted to make sure that I knew
14:12 5  about it.
14:12 6    A.  No, I don't recall, and there may not
14:12 7  be -- there may not be specifically for rheumatoid
14:12 8  arthritis.
14:12 9    Q.  Okay.
14:12 10    MR. LOMBARDO:  I know I'm not the deponent
14:12 11  here, but I did go through the policies and there
14:12 12  were none about rheumatoid arthritis.
14:13 13    MS. REED:  Okay.  Thank you.
14:13 14    MR. LOMBARDO:  We produced the orthopedic
14:13 15  guidelines because there is mention of
14:13 16  osteoarthritis and the treatment for that.  Okay?
14:13 17    MS. REED:  Okay.  And I noticed, upon
14:13 18  reviewing this, that the chronic pain management
14:13 19  section was missing.
14:13 20    MR. LOMBARDO:  We can produce that.
14:13 21    MS. REED:  Awesome.  Thank you.
14:13 22  BY MS. REED:
14:13 23    Q.  Okay.  Moving on.  Quick question,
14:14 24  Dr. Funk.  When a grievance is filed by an inmate

Page 141

14:14 1 related to a medical issue, is that escalated to
14:14 2 you at any point?
14:14 3 A. Generally, no.
14:14 4 Q. Okay. You said, Generally, no. Have
14:14 5 there been times when it was escalated to you?
14:14 6 A. In isolated instances, if it involved a
14:14 7 matter that was found to be of substance, I may
14:14 8 be -- the incident may be referred to me, but not
14:14 9 for most grievances. It would be rare that that
14:14 10 would occur.
14:14 11 Q. So, to your knowledge, are those
14:14 12 grievances handled by the prison facility?
14:15 13 A. Yes. By the staff at the facility, yes.
14:15 14 Q. And is someone other than you from
14:15 15 Wexford typically involved in the grievance
14:15 16 process, if it's medically related?
14:15 17 A. Yes.
14:15 18 Q. And who would that be?
14:15 19 A. The person that was involved in the
14:15 20 matter would be interviewed. They would be -- they
14:15 21 would participate in it, and from that -- from the
14:15 22 investigation. The grievances that are found to
14:15 23 have merit are discussed -- at least those are
14:15 24 discussed at the monthly CQI meeting that occurs at

Page 142

14:15 1 the facility, and the regional manager and medical
14:15 2 director at least participate in those meetings.
14:15 3 But if there was something that was
14:15 4 found, for example, if it was something relating to
14:16 5 employee conduct or something like that, it could
14:16 6 be referred to me from the matter of grievance.
14:16 7 Q. You mentioned a monthly, what you called
14:16 8 a CQI meeting?
14:16 9 A. Yes.
14:16 10 Q. And what is that?
14:16 11 A. Continuous quality improvement, a
14:16 12 meeting that takes place on a monthly basis at the
14:16 13 facility.
14:16 14 Q. And does someone keep the meeting
14:16 15 minutes for those?
14:16 16 A. Yes.
14:16 17 Q. And that is a written document?
14:16 18 A. Yes.
14:16 19 Q. If you wanted to look back at prior
14:16 20 CQI meetings for Stateville, would you have access
14:16 21 to those meeting minutes?
14:16 22 A. They would be at the facility. I would
14:16 23 have to go to the facility, but they are kept there
14:17 24 and stored for a period of time.

Page 143

14:17 1 Q. Do you know how long?
14:17 2 A. No. They belong to the Department of
14:17 3 Corrections, so it would be according to their
14:17 4 policy.
14:17 5 Q. Now, with regards to corrective actions
14:17 6 for physicians, is there a database where those
14:17 7 corrective actions are stored that you know of?
14:17 8 A. Not a database. It would be in their
14:17 9 employee file, if it was a written discipline or a
14:17 10 written corrective action rather.
14:17 11 Q. Are the employee files digitized?
14:17 12 A. No. Well, whenever I see them, they are
14:17 13 in paper format, so I don't know what the corporate
14:17 14 office does, if they digitize them and then
14:17 15 undigitize them, but I get paper copy or paper
14:17 16 versions.
14:17 17 Q. Do you know where those paper versions
14:17 18 are held?
14:18 19 A. They are somewhere in the corporate
14:18 20 office. Maybe in the cloud, but it's not -- the
14:18 21 human resources department is in Pittsburgh.
14:18 22 Q. Do you know how long those corrective
14:18 23 actions remain in an employee's file?
14:18 24 A. Well, they remain permanently as long as

Page 144

14:18 1 the person is employed, and then for at least seven
14:18 2 years after they leave employment, their employee
14:18 3 file exists or is stored.
14:18 4 Q. Does Wexford scan copies of the patient
14:18 5 records or progress notes?
14:18 6 A. On isolated and specific instances, yes,
14:19 7 but not in general, no.
14:19 8 Q. We are going to look at a few progress
14:19 9 notes and then I promise we are almost done.
14:19 10 A. Okay.
14:19 11 Q. So I'm showing you what is marked as
14:20 12 Exhibit No. 6. Can you see Exhibit No. 6?
14:20 13 A. Yes.
14:20 14 Q. So Exhibit No. 6 is a form that is
14:20 15 labelled Illinois Department of Corrections,
14:20 16 Offender Outpatient Progress Notes, Stateville
14:20 17 Correctional Center?
14:20 18 A. Yes.
14:20 19 Q. And this first page of Exhibit No. 6
14:20 20 does not have any information, it just has an X on
14:20 21 it; is that right?
14:20 22 A. Yes.
14:20 23 Q. But is this the form that has been used
14:20 24 throughout your tenure as a regional medical

Page 145

```
14:20  1   director?
14:20  2       A.  Yes.
14:20  3       Q.  At any point during your tenure, did
14:20  4   this form change?
14:20  5       A.  No.
14:20  6       Q.  Okay.  And these forms are stored at the
14:20  7   facilities after they are filled out?
14:20  8       A.  Yes.
14:20  9       Q.  Now I'm looking at page 2, and I just
14:21 10   want to go over how these forms are set up.  So in
14:21 11   the left-hand column, is the date/time of the
14:21 12   examination?
14:21 13       A.  Correct.  That's correct.
14:21 14       Q.  Then the middle column is the
14:21 15   Subjective/Objective Assessment column?
14:21 16       A.  Correct.
14:21 17       Q.  It's my understanding from reading the
14:21 18   regulations that they first allow the inmates to
14:21 19   describe their subjective symptoms; is that
14:21 20   correct?
14:21 21       A.  Yes.
14:21 22       Q.  And then they would do an objective
14:21 23   assessment of those symptoms; is that accurate?
14:21 24       A.  Of their complaint, yes.
```

Page 146

```
14:21  1       Q.  And then there's an assessment after
14:22  2   that; is that correct?
14:22  3       A.  Correct.
14:22  4       Q.  And in the last column for page 2 of
14:22  5   Exhibit No. 6 is plans, and so I'm guessing that is
14:22  6   like the follow-up based on the complaint; is that
14:22  7   correct?
14:22  8       A.  Yes.  It's the plan.  It's what course
14:22  9   of action is to be done.
14:22 10       Q.  Okay.  So we are looking at this
14:22 11   particular exhibit, Exhibit 6, the date and time is
14:22 12   August -- that is either a 4 or a 9, 2012?
14:22 13       A.  Yes.  It looks to me, yes.
14:22 14       Q.  And there is a -- looking at the third
14:22 15   line, starting in -- we'll start with the first
14:23 16   one.  S/O is that symptoms of?
14:23 17       A.  No, subjective and objective.
14:23 18       Q.  Oh, subjective.  Okay.  Then what about
14:23 19   the I/H in the second line?
14:23 20       A.  It would be I/M, and it's an
14:23 21   abbreviation for inmate.
14:23 22       Q.  For inmate.  Okay.  Then there's --
14:23 23       A.  I'm sorry.  That is I/H, and that is
14:23 24   probably in-house.  It looked like an M to me, but
```

Page 147

```
14:23  1   as I look at it closer, I think that is H and that
14:23  2   would reasonably be in-house.
14:23  3       Q.  Then there's an MD/SC next to that?
14:23  4       A.  Right.  That would be an abbreviation
14:23  5   for MD sick call.
14:23  6       Q.  Okay.  And it says, For care of pain
14:23  7   and -- I'm not sure what that next word is --
14:23  8   numbness?
14:24  9       A.  Right.  C/O is complaint of.
14:24 10       Q.  Complaint of.
14:24 11       A.  And it is numbness, pain and numbness.
14:24 12       Q.  Then the B/L on the next line, what does
14:24 13   that stand for?
14:24 14       A.  Want to guess?  You are doing pretty
14:24 15   well so far.
14:24 16       Q.  It's probably faster if you do it
14:24 17   though.
14:24 18       A.  Bilateral.
14:24 19       Q.  Bilateral hands and feet?
14:24 20       A.  Correct.
14:24 21       Q.  And then SR is?
14:24 22       A.  Self-reported.
14:24 23       Q.  Is that joints?
14:24 24       A.  Joints or joint.  It might be joint, and
```

Page 148

```
14:24  1   the next word is pain causing these symptoms.
14:24  2       Q.  It says, And he is unable to do daily
14:24  3   activities, is the next line?
14:24  4       A.  Yes.  That is what it appears, yes.
14:24  5       Q.  Then there is an A that is circled.  Do
14:24  6   you see that on the next line?
14:24  7       A.  Yes.
14:24  8       Q.  What does that stand for?
14:24  9       A.  A stands for assessment.
14:25 10       Q.  So assessment, bilateral hands, feet
14:25 11   pain and numbness.
14:25 12       A.  Yes.
14:25 13       Q.  Okay.  Now, are these the types of
14:25 14   complaints that you would expect to hear from
14:25 15   somebody with rheumatoid arthritis?
14:25 16       A.  Possibly, yes.  These -- this statement
14:25 17   paragraph here, These would not be inconsistent
14:25 18   with the patient that had rheumatoid arthritis.
14:25 19       Q.  Okay.
14:25 20       MR. LOMBARDO:  I just want to jump in really
14:25 21   quick.  I should have made an objection earlier.
14:25 22   Dr. Funk is doing -- based on foundation, just
14:25 23   because this is not his document.  He did not
14:25 24   actually draft this.  I think he's doing a good job
```

Page 149

14:25 1 reading the handwriting, but I just want to make
14:26 2 that objection to this document. Sorry for
14:26 3 interrupting.
14:26 4 BY MS. REED:
14:26 5 Q. Okay. Going down to sort of the bottom
14:26 6 of the last, like, five or so lines of Exhibit
14:26 7 No. 6, page 2, it appears like they are getting
14:26 8 complaints of joint pain off and on, stomach ache.
14:26 9 I'm not going to try to read that. And it says
14:26 10 that he's seeing blood off and on on tissue.
14:26 11 A. It says, Like when, is what it says.
14:27 12 Stomach ache like when I had H. pylori.
14:27 13 Q. Okay. Reading the description in the
14:27 14 last six lines of page 2 of Exhibit 6, does that
14:27 15 description -- is it consistent with what you would
14:27 16 expect to see from a patient with rheumatoid
14:27 17 arthritis?
14:27 18 A. No.
14:27 19 Q. Okay. And what is not consistent about
14:27 20 these six lines?
14:27 21 A. Because the patient is presenting with
14:27 22 symptoms that -- for instance, stomach ache would
14:27 23 not be suggestive of rheumatoid arthritis or
14:27 24 expected to be present in rheumatoid arthritis.

Page 150

14:27 1 Blood in the tissue would also not be present --
14:27 2 expected. Itchy sensation on urination also would
14:28 3 not be linked in or a symptom of rheumatoid
14:28 4 arthritis, so the presentation is not consistent at
14:28 5 all with rheumatoid arthritis.
14:28 6 Q. What about the off-and-on joint pain
14:28 7 that is referenced, is that consistent?
14:28 8 A. No.
14:28 9 Q. And why not?
14:28 10 A. Not in the description like that because
14:28 11 it is -- it is a progressive usually daily pain
14:28 12 that they have, and they would not describe it as
14:28 13 that and limit the symptom as being joint pain.
14:28 14 They would be more descriptive and relay the other
14:28 15 symptoms that characterize rheumatoid arthritis.
14:28 16 Q. If a patient who had rheumatoid
14:28 17 arthritis was on painkillers, for example, but
14:28 18 inconsistent painkillers, would their pain be off
14:28 19 and on?
14:29 20 A. The painkillers reduce the pain, but
14:29 21 they don't eradicate the pain. They don't relieve
14:29 22 it entirely. So patients who are on pain
14:29 23 medication that have rheumatoid arthritis will
14:29 24 still have pain and will relay that as a symptom,

Page 151

14:29 1 but they will have lesser pain.
14:29 2 Q. Okay. So there's a reference to
14:29 3 nordazepam?
14:29 4 A. Naprosyn.
14:29 5 Q. Naprosyn. What is that.
14:30 6 A. Naprosyn is a nonsteroidal
14:30 7 antiinflammatory medication.
14:30 8 Q. And is that a medication that you would
14:30 9 use to treat someone with rheumatoid arthritis?
14:30 10 A. It could be. Yes, it could be used in
14:30 11 rheumatoid arthritis.
14:30 12 Q. And what -- why would a doctor use that
14:30 13 to treat rheumatoid arthritis?
14:30 14 A. It would help to alleviate -- it's a
14:30 15 nonspecific medication that is used for many
14:30 16 different types of pain. It's not specific to
14:30 17 rheumatoid arthritis, but it reduces pain and
14:30 18 inflammation.
14:30 19 Q. And is that a prescription medication
14:30 20 for the facility, or is that available at the
14:30 21 commissary?
14:30 22 A. Each facility has its own commissary --
14:30 23 list of commissary items. What is on the
14:30 24 commissary is determined by the warden. They

Page 152

14:30 1 sometimes have nonsteroidals, and I think in the
14:31 2 deposition, it was stated -- Mr. Daniels stated
14:31 3 that Motrin was available. But naprosyn in a lower
14:31 4 dose is over-the-counter. It's called Aleve, and
14:31 5 it's possible, but I don't know if it's available
14:31 6 from the commissary.
14:31 7 Q. Okay. If someone was -- I'm going to
14:31 8 stop sharing this now. If someone was prescribed
14:31 9 that medication and it, you know, was sold out at
14:31 10 the commissary but generally available, would they
14:31 11 be able to get it from the physician at the
14:31 12 facility instead?
14:31 13 A. Yes.
14:31 14 Q. And what would they have to do -- what
14:31 15 would an inmate have to do to get that medication
14:31 16 from the physician?
14:31 17 A. The inmate would have to request, and
14:31 18 the physician would have to agree and write the
14:31 19 prescription for it.
14:31 20 Q. When physicians draft these progress
14:32 21 notes, do they allow the patients to review them
14:32 22 before finalizing?
14:32 23 A. At the time, you mean, do they allow
14:32 24 them to --

Page 153

14:32 1    Q.   Yes.
14:32 2    A.   No.  No, they don't.  They have access
14:32 3  to the notes and can review them, but it isn't
14:32 4  reviewed with them.  They generally are -- the
14:32 5  notes are generally in view of the patient, as the
14:32 6  writing of it is typically done in -- with the
14:32 7  patient present and they can see what you are
14:32 8  writing.  So they commonly do, in fact, see it, but
14:32 9  there's no policy that says, you know, you have
14:33 10 to -- you need to prove my note before I submit it
14:33 11 or whatever.
14:33 12   Q.   Okay.  Are you familiar with the term
14:33 13 "discovery responses"?
14:33 14   A.   The legal term?
14:33 15   Q.   Yes.
14:33 16   A.   Somewhat.
14:33 17   Q.   For this case were you asked to help
14:33 18 with any discovery responses?
14:33 19   A.   I may have been in one of the
14:33 20 conversations.  I don't recall, but I am involved
14:33 21 in many cases.  It's hard for me to keep them all
14:33 22 straight.  I may have been, but I don't recall.
14:33 23   Q.   Okay.  If a prescription is not on the
14:34 24 approved medication list or if a particular

Page 154

14:34 1  medication is not on the approved medication list,
14:34 2  does the inmate still have access to it?
14:34 3    A.   Yes.
14:34 4    Q.   How so?
14:34 5    A.   By the physician ordering it and filling
14:34 6  out a non-formulary request.
14:34 7    Q.   Can an inmate request a medication that
14:34 8  is not on the approved medication list?
14:34 9    A.   They can request it, yes.  They can't
14:34 10 order it, but they can certainly request it of a
14:34 11 physician.
14:34 12   Q.   Okay.  If a physician recommends a
14:35 13 follow-up appointment and an inmate is not able to
14:35 14 attend for some reason, is there a protocol for
14:35 15 making sure that the inmate is, in fact, seen for a
14:35 16 follow-up, even if it's not on the scheduled date?
14:35 17   A.   It depends on the reason why the
14:35 18 appointment is not kept.  Patients have a right to
14:35 19 refuse.  If they refuse, then they have refused the
14:35 20 visit.  They would not be rescheduled.
14:35 21        If they are not seen for an
14:35 22 administrative purpose -- for instance, there's a
14:35 23 lockdown or something like that, where they are not
14:35 24 able to come because of security reasons or there's

Page 155

14:35 1  some -- a fight or something occurring, then they
14:35 2  would be rescheduled.  They should be rescheduled.
14:35 3    Q.   Okay.
14:36 4    MS. REED:  Can I just have a five-minute break
14:36 5  to review my notes?
14:36 6    MR. LOMBARDO:  Sure.
14:36 7        (WHEREUPON, a recess was had.)
14:44 8    MS. REED:  We are now back on the record.
14:44 9  BY MS. REED:
14:44 10   Q.   Dr. Funk, do you understand that you are
14:44 11 still under oath?
14:44 12   A.   Yes, I do.
14:44 13   Q.   Okay.  Have you reviewed the assessment
14:44 14 done by Dr. Amar Sawar?
14:44 15   A.   Yes.
14:44 16   Q.   And when you reviewed his assessment,
14:44 17 was there anything in particular that stood out to
14:44 18 you that you disagreed with?
14:44 19   A.   Not that I disagreed with.  I saw some
14:45 20 inconsistency, I thought, in his -- in his report.
14:45 21   Q.   What was the inconsistency?
14:45 22   A.   The examination of his joint.  In the
14:45 23 first encounter he wrote that he had normal joints
14:45 24 and normal strength.  Then when you saw him six

Page 156

14:45 1  weeks later, stated he had plus one swelling, I
14:45 2  think is what he wrote.
14:45 3        It would be unusual for a person to have
14:45 4  developed that in six weeks, where it had not been
14:45 5  present the first time.  That just seemed -- that
14:45 6  struck me as just being a little unusual.
14:46 7    Q.   Now, in Dr. Sawar's assessment, he notes
14:46 8  seropositive rheumatoid arthritis, generalized
14:46 9  osteoarthritis, and peripheral neuropathy.  Do you
14:46 10 recall that assessment?
14:46 11   A.   Neuropathy.  That was in one of his
14:46 12 visits.  That is not his initial impression.  When
14:46 13 he first saw the patient, his impression was
14:46 14 different.  I don't have the note in front of me,
14:46 15 but he did not assess him with have rheumatoid
14:46 16 arthritis on the first visit.
14:46 17   Q.   So I think the particular date I'm
14:46 18 looking at is June 17, 2016, so it's one of the
14:46 19 later visits.
14:46 20   A.   Yes.
14:46 21   Q.   So do you disagree with that assessment
14:47 22 then?
14:47 23   A.   Yes, I disagree with -- yes, I do
14:47 24 disagree with it.

Page 157

14:47 1     Q. Okay.

14:47 2     A. Not his -- not all aspects of it. I

14:47 3 do -- I agree with him having osteoarthritis and

14:47 4 possibly peripheral neuropathy, although his EMG

14:47 5 was normal, but it's possible to have peripheral

14:47 6 neuropathy with a normal EMG.

14:47 7     But the diagnosis of rheumatoid

14:47 8 arthritis is questionable. My opinion is that he

14:47 9 does not meet criteria for that. I have not

14:47 10 personally examined him, so I can't speak from my

14:47 11 personal view. But from review of all of the

14:47 12 information -- and, again, I have a perspective

14:47 13 that Dr. Sawar does not, that having been able to

14:48 14 know what the consequence was of treatment and his

14:48 15 subsequent exams by physicians, what that has

14:48 16 revealed.

14:48 17     Plus, I'm certain that he did not review

14:48 18 every encounter since he was incarcerated, as I

14:48 19 did. I respect him as a rheumatologist, and I'm

14:48 20 not detracting from him, but I think if he had

14:48 21 access to the same material that I did, his opinion

14:48 22 would also change.

14:48 23     Q. Is there a benefit to actually

14:48 24 conducting a physical exam versus just reviewing

Page 158

14:48 1 medical records?

14:48 2     A. Yes.

14:48 3     Q. And for rheumatoid arthritis in

14:48 4 particular, is it easier to make an objective

14:48 5 assessment of the patient's symptoms if you are

14:48 6 assessing him in person?

14:48 7     A. Yes, of course.

14:48 8     Q. Is there another rheumatologist that you

14:49 9 would have referred the plaintiff to besides

14:49 10 Dr. Sawar?

14:49 11     A. There are many rheumatologists. I don't

14:49 12 know him personally, so, again, I don't think it's

14:49 13 the difference of a person. It's the perspective

14:49 14 that is gained from having all of the information

14:49 15 that exists available in making an assessment. And

14:49 16 when anyone does that and when they have limited

14:49 17 information, then their judgment can only be -- is

14:49 18 confined by that.

14:49 19     Q. So let me ask a different question. If

14:49 20 you didn't have the benefit of all of the

14:50 21 information that you have now, if you were in

14:50 22 Dr. Sawar's shoes doing an assessment, would you

14:50 23 have agreed with his assessment without -- taking

14:50 24 out the extra knowledge that you have?

Page 159

14:50 1     A. I may have. I mean, only seeing the

14:50 2 patient for those brief periods of time and not

14:50 3 being able to review records, I may have because

14:50 4 these things that he said at the time may have led

14:50 5 him -- I may have come to the same conclusion.

14:50 6     Q. Do you disagree with the prescription of

14:50 7 methotrexate for that assessment?

14:50 8     A. Yes. I do now, yes.

14:51 9     Q. Would you -- if you credit Dr. Sawar and

14:51 10 agree with his assessment, then would you agree

14:51 11 with the prescription for methotrexate?

14:51 12     A. So in the situation that I did not have

14:51 13 access to his other records and subsequent records,

14:51 14 I think it would have been more reasonable to have

14:51 15 observed him over a period of time, reexamined him

14:51 16 because methotrexate is a -- it's a toxic drug. It

14:51 17 functions -- the only way that one has benefit is

14:51 18 by your immune system being depressed, and that is

14:51 19 a very serious condition. You could potentially

14:51 20 die from that, if you were to develop pneumonia,

14:51 21 for example, or some other infection. So I think

14:51 22 it would have been more reasonable to have held off

14:51 23 and examined him again before making that decision.

14:52 24     Q. So when an outside referral is made, do

Page 160

14:52 1 the physicians provide the outside physician with

14:52 2 the medical records that were the basis of that

14:52 3 referral?

14:52 4     A. They provide limited records. It would

14:52 5 be the -- his records were probably more than 1,000

14:52 6 pages, and they are in paper. It would be

14:52 7 impractical to do that, so we don't provide all of

14:52 8 the records. In practice, it's not that it's not

14:52 9 valuable. It is. But in practice, people rely on

14:52 10 a patient's history in relaying their symptoms, and

14:52 11 they don't take the time to review the records.

14:52 12     It would be -- it took me probably four

14:53 13 hours to go through records, and you know from

14:53 14 patients, when you have seen the doctor, they don't

14:53 15 spend four hours with you.

14:53 16     Q. Just to clarify. You don't know whether

14:53 17 or not Dr. Sawar read the prior medical records or

14:53 18 which medical records he received, it's just in

14:53 19 general practice, your assumption is it's likely he

14:53 20 did not review them?

14:53 21     A. No. If they had copied the thousand

14:53 22 pages, I would have heard about it. It would be

14:53 23 unusual. It would not be consistent with practice

14:53 24 to do that. It never occurs to provide the entire

Page 161

14:53 1    record, make a copy of it and send it. So I don't
14:53 2    know -- I was not specifically involved, but that
14:53 3    would be an unusual and unprecedented occurrence
14:53 4    from my 26 years of working in corrections.
14:53 5        Q. Let me ask, but what about with limited
14:54 6    records that would be related to this particular
14:54 7    referral, would it be typical for him to receive
14:54 8    those?
14:54 9        A. Yes. To provide some information, like
14:54 10    laboratory results, that likely was provided so
14:54 11    that they would not necessarily need to be
14:54 12    repeated, X-ray results. That is the reason why
14:54 13    those kind of things were -- would be provided, but
14:54 14    all of the records are relevant. And even where
14:54 15    there are complaints not related to rheumatologic
14:54 16    conditions are relevant records in this setting.
14:54 17    It tells me what was bothering a patient, what
14:54 18    level he chose to come forward with complaints,
14:54 19    whether he had significant complaints or minor
14:54 20    complaints. Some people just complain a lot. We
14:54 21    have those kind of patients, and that is reflected
14:54 22    in their medical record. So all of it is important
14:54 23    and it should be reviewed.
14:54 24        Q. Okay. And in your time as the regional

Page 162

14:55 1    medical director, what percentage of your
14:55 2    supervisory duties have involved diagnosis of
14:55 3    rheumatoid arthritis?
14:55 4        A. A very small percent, only from patients
14:55 5    that I would directly see, and that represents a
14:55 6    very small percent.
14:55 7        Q. Okay. One quick document and then I
14:55 8    will pass it over to opposing counsel. Can you see
14:55 9    my screen, Dr. Funk?
14:55 10        A. Yes.
14:55 11        Q. I have what is marked as Exhibit No. 7.
14:56 12    Exhibit No. 7 is another progress note. The date
14:56 13    on the top of the progress note is October 26,
14:56 14    2010, and it's referenced as a PA note. Do you see
14:56 15    that?
14:56 16        A. Yes.
14:56 17        Q. I'll give you a chance to review this
14:56 18    quickly and then I'll ask a few questions.
14:56 19        A. Okay.
14:56 20        Q. Now, this seems to indicate that there
14:57 21    was a family history of rheumatoid arthritis. Is
14:57 22    that how you read this progress note as well?
14:57 23        A. Yes. The patient reported to the
14:57 24    physician assistant that there was a maternal

Page 163

14:57 1    family history.
14:57 2        Q. And there's also a reference to
14:57 3    complaints of whole body joint aches over the past
14:57 4    several years?
14:57 5        A. Yes. Increasing over the past several
14:57 6    years, is what it states.
14:57 7        Q. Okay. And it says, Some days he's
14:57 8    confined to his bed. Do you see that?
14:57 9        A. Yes.
14:57 10        Q. In your experience, are those complaints
14:57 11    consistent with someone who has rheumatoid
14:57 12    arthritis?
14:57 13        A. No. It would be more consistent with
14:57 14    other conditions.
14:57 15        Q. What other conditions?
14:57 16        A. Other rheumatologic conditions, but not
14:57 17    typically of a patient with rheumatoid arthritis.
14:57 18    So things like fibromyalgia would be one syndrome.
14:58 19    Polymyalgia rheumatica, polymyositis, lupus. Those
14:58 20    diseases would be more consistent with a whole body
14:58 21    kind of a complaint.
14:58 22        Q. And if someone has a whole body
14:58 23    complaint and a family history of rheumatoid
14:58 24    arthritis, would it be appropriate to refer them to

Page 164

14:58 1    a rheumatologist for further study?
14:58 2        A. No, I would not say so.
14:58 3        Q. Why not?
14:58 4        A. It would -- because that -- evaluation
14:58 5    is appropriately done by primary care providers to
14:58 6    determine what the disorder is, if there is a
14:59 7    disorder.
14:59 8        Q. And when does it become appropriate to
14:59 9    refer it out to a rheumatologist?
14:59 10        A. When the clinician feels they need an
14:59 11    opinion for different reasons in the management of
14:59 12    the patient by somebody that is -- has a
14:59 13    specialty -- as a specialist, as a rheumatologist.
14:59 14        MS. REED: That is all of my -- sorry. A
14:59 15    couple of housekeeping matters. So throughout the
14:59 16    deposition, Dr. Funk, we have talked about various
14:59 17    documents related to your job duties, related to
15:00 18    the physicians, and I believe those documents are
15:00 19    responsive to both the deposition notice, which
15:00 20    asks for documents, and to prior discovery. And so
15:00 21    I'm just making a note on the record for opposing
15:00 22    counsel that we will be following up on that and
15:00 23    pursuing those documents. It's not a question for
15:00 24    you, Dr. Funk. It's just a note for the record.

Page 165

15:00 1    MR. LOMBARDO: I'll just respond briefly. As
15:00 2  stated in the e-mail, Rule 30 specifically states
15:00 3  that document requests being made to a party in
15:00 4  connection with the deposition notice must be
15:00 5  accompanied by a Rule 34 request.
15:00 6    In this particular case, fact discovery
15:00 7  has been closed for more than a year. Judge
15:00 8  Cummings made an order allowing discovery to be
15:00 9  reopened for the limited purpose of conducting
15:00 10  today's 30(b)(6) deposition.
15:00 11    Defendants take the position that no
15:00 12  further -- the document requests that were made
15:01 13  part of the 30(b)(6) notice, that there's no
15:01 14  obligation for us to respond to those.
15:01 15    MS. REED: We'll just note for the record that
15:01 16  to the extent that there are documents that were
15:01 17  reviewed specifically for this deposition and
15:01 18  relied upon as well as documents that were not
15:01 19  responsive, like I said, we'll be following up on
15:01 20  that.
15:01 21    To that end, I'm going to leave the
15:01 22  deposition open so that we can resolve any
15:01 23  discovery dispute, and that concludes my
15:01 24  questioning. I'll turn it over to opposing

Page 166

15:01 1  counsel.
15:01 2    MR. LOMBARDO: Sure. Just briefly. All
15:01 3  documents that Dr. Funk has been provided and
15:01 4  reviewed in connection with this deposition have
15:01 5  been produced already, and we would object to
15:01 6  leaving this deposition open or a second part of
15:01 7  this deposition.
15:01 8    EXAMINATION
15:01 9  BY MR. LOMBARDO:
15:01 10    Q. I'll start with just some brief
15:01 11  follow-up questions.
15:02 12    Dr. Funk, you stated earlier that
15:02 13  each IDOC correctional facility has specific
15:02 14  guidelines for specific needs. Were you referring
15:02 15  to a written set of guidelines that is facility
15:02 16  specific?
15:02 17    A. There are both written and verbal, yes.
15:02 18    Q. Were the written ones you are referring
15:02 19  to Wexford documents, or are you referring to
15:02 20  institutional directives that are generated by the
15:02 21  Illinois Department of Corrections?
15:02 22    A. I was referring to those guidelines
15:02 23  including institutional directives but,
15:02 24  specifically, those that are formulated by the site

Page 167

15:02 1  or the Office of Health Services specific to the
15:02 2  site.
15:02 3    Q. Are these Wexford documents or State
15:02 4  documents?
15:02 5    A. No. Sorry. They are all State. I was
15:02 6  referring to State documents.
15:02 7    Q. You also inferred that each employee has
15:03 8  an employee agreement with Wexford. So in law, a
15:03 9  contract employee has kind of a certain legal
15:03 10  definition.
15:03 11    Were you saying that Wexford employees
15:03 12  are contract employees, or could you clarify what
15:03 13  agreements that you are referring to?
15:03 14    A. Okay. So I'm not sure exactly what the
15:03 15  definition of contract employee is, but it is
15:03 16  actually an offer letter. I take that as a
15:03 17  contract or an agreement, so there's an agreement
15:03 18  of employment. But I don't even know what the
15:03 19  definition of a contract employee would be.
15:03 20    Q. Okay. So you are referring to an offer
15:03 21  letter that is signed by the employee who accepts
15:03 22  the position, when you are referring to a contract
15:03 23  employee?
15:03 24    A. Yes. I was inferring that to be a

Page 168

15:03 1  contract. I see that, in my opinion, to be a
15:03 2  contract.
15:03 3    Q. The one that I was referring to before
15:03 4  is kind of like a professional athlete who will
15:04 5  sign a contract where they get X amount of dollars
15:04 6  for X amount of years. That can happen outside as
15:04 7  a professional service too, so that is a legal
15:04 8  definition of a contract employee.
15:04 9    A. Okay.
15:04 10    Q. That is not what you were referring to,
15:04 11  correct?
15:04 12    A. No.
15:04 13    Q. You referred a couple times to the
15:04 14  position of the health care unit administrator. Is
15:04 15  that a Wexford employee or an IDOC employee?
15:04 16    A. IDOC employee.
15:04 17    Q. You also referenced a continuous quality
15:04 18  improvement meeting. Is that a meeting that is
15:04 19  only attended by Wexford employees, or is that a
15:04 20  joint function of both Wexford and State personnel?
15:04 21    A. The second, both by Wexford and State.
15:04 22    Q. Is it the health care unit administrator
15:05 23  that runs that meeting?
15:05 24    A. Yes, or the person that she or he

Page 169

15:05  1   designates.

15:05  2       Q.  We talked a little bit about medication,

15:05  3   specifically over-the-counter medications.  I think

15:05  4   you mentioned Aleve.  Motrin was another one that

15:05  5   was mentioned.

15:05  6           If a medicine is over-the-counter, can

15:05  7   an inmate still get it for free if the provider

15:05  8   deems it is clinically indicated and orders it for

15:05  9   them?

15:05 10       A.  Yes.  So there are two things.  One is

15:05 11   that the prescription -- the medication at a higher

15:05 12   level has to be provided by a prescription, but the

15:05 13   provider can order it and it would be less costly

15:05 14   for a provider to order it rather than the patient

15:05 15   obtaining it from the commissary.

15:05 16       Q.  Is rheumatoid arthritis a condition that

15:05 17   can be cured?

15:06 18       A.  No.  It would not be -- it would not be

15:06 19   cured, no.

15:06 20       Q.  When you were discussing treatments

15:06 21   earlier, those treatments were -- excuse me -- are

15:06 22   intended to address the symptoms of rheumatoid

15:06 23   arthritis, not to eradicate the disease itself; is

15:06 24   that accurate?

Page 170

15:06  1       A.  Not quite.  It is to address the

15:06  2   symptoms.  But it is also to alter the course of

15:06  3   the illness, and that is the effects of the --

15:06  4   primarily on the effects of the joint but also on

15:06  5   other organs where that -- when a patient has

15:06  6   active disease.

15:06  7       Q.  Based on your review of Mr. Daniels'

15:06  8   medical records, did his complaints regarding joint

15:06  9   pain ever require emergent medical care?

15:06 10       A.  No.

15:06 11       Q.  How about urgent medical care?

15:07 12       A.  Neither.  No.

15:07 13       Q.  What about his complaints related to

15:07 14   stomach pain, did those ever require urgent medical

15:07 15   care?

15:07 16       A.  No.

15:07 17       MS. REED:  Objection, lacks foundation, vague.

15:07 18   BY THE WITNESS:

15:07 19       A.  No.

15:07 20   BY MR. LOMBARDO:

15:07 21       Q.  What about emergent medical care?

15:07 22       A.  No.

15:07 23       MS. REED:  Same objection.

      24

Page 171

15:07  1   BY MR. LOMBARDO:

15:07  2       Q.  And, Dr. Funk, you did spend time, as

15:07  3   you stated, reading these hundreds of pages of

15:07  4   Mr. Daniels' medical records in his IDOC medical

15:07  5   file?

15:07  6       A.  Yes.

15:07  7       Q.  Based on your review, do you feel that

15:07  8   you are in a position to give an opinion whether he

15:07  9   had an emergent or urgent medical condition?

15:07 10       A.  Yes, I am.

15:07 11       MS. REED:  Objection, lacks foundation.

15:07 12   BY MR. LOMBARDO:

15:07 13       Q.  Dr. Funk, you gave several opinions

15:07 14   today that are beyond the scope of a layperson.

15:07 15   Were all of those opinions made to a degree of

15:07 16   medical certainty?

15:07 17       A.  Yes, I would say so.

15:08 18       Q.  Was there anything else that you wanted

15:08 19   to comment on or clarify any of your answers?

15:08 20       A.  Well, my comment of what I would have is

15:08 21   his evaluation subsequent to his release into the

15:08 22   comment also demonstrated an inconsistent picture

15:08 23   with him having rheumatoid arthritis.  The findings

15:08 24   of those four visits that occurred, again,

Page 172

15:08  1   strengthened and informed my belief that he did not

15:09  2   have rheumatoid arthritis, and his symptoms were

15:09  3   due to other factors and that was their opinion as

15:09  4   well.

15:09  5       MR. LOMBARDO:  All right.  I have no more

15:09  6   questions based on that.

15:09  7       MS. REED:  I don't have any other questions.

15:09  8       MR. LOMBARDO:  Okay.  Dr. Funk, would you like

15:09  9   to reserve signature or waive?

15:09 10       THE WITNESS:  I'll waive it.

15:09 11       MR. LOMBARDO:  Excellent.  Did you order the

15:10 12   transcript?

15:10 13       MS. REED:  I would like a copy of the

15:10 14   transcript.

15:10 15       MR. LOMBARDO:  We'll also take a copy, e-trans

15:10 16   only, please.

      17           FURTHER DEPONENT SAITH NOT.

      18           (WHEREUPON, certain documents

      19           were marked Funk Deposition

      20           Exhibit Nos. 1 through 7, for

      21           identification.)

      22

      23

      24

Page 173

```
 1    STATE OF ILLINOIS )
                       ) SS:
 2    COUNTY OF C O O K )
 3
            I, KRISTIN C. BRAJKOVICH, a Certified
 4    Shorthand Reporter of said state, do hereby
      certify:
 5
            That previous to the commencement of the
 6    examination of the witness, the witness was duly
      sworn to testify the whole truth concerning the
 7    matters herein;
 8          That the foregoing deposition transcript
      was reported stenographically by me,
 9    was thereafter reduced to typewriting under my
      personal direction and constitutes a true record
10    of the testimony given and the proceedings had;
11          That the said deposition was taken
      before me at the time and place specified;
12
            That I am not a relative or employee
13    or attorney or counsel, nor a relative or
      employee of such attorney or counsel for any of
14    the parties hereto, nor interested directly or
      indirectly in the outcome of this action.
15
            IN WITNESS WHEREOF, I do hereunto set my
16    hand and affix my seal of office at Chicago,
      Illinois, this 28th day of March 2022.
17
18
19
20
21          _____
            C.S.R. Certificate No. 84-3810.
22
23
24
```