UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOVAN D. DANIELS, | ) |
| Plaintiff, | ) Case No. 16-cv-00014 |
| v. | ) Judge Sharon Johnson Coleman |
| WEXFORD HEALTH SOURCES, INC., *et al.* | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Jovan Daniels, brings this action against Wexford Health Sources, Inc. ("Wexford"), La Tanya Williams, P.A. ("PA Williams"), and Ghaliah Obaisi, as Independent Executor of the Estate of Saleh Obaisi, M.D., ("Dr. Obaisi") (collectively, "defendants"), alleging that defendants violated his rights under the Eighth Amendment by acting with deliberate indifference to his medical needs. For the reasons set forth below, defendants' motion for summary judgment [184] is granted in part and denied in part.

**Background**

The following facts are undisputed unless otherwise noted. Daniels, 44, was formerly incarcerated by the Illinois Department of Corrections ("IDOC") at Stateville Correctional Center ("Stateville"). Wexford is a private healthcare provider that has contracted with the State of Illinois to provide medical treatment to IDOC inmates, including those incarcerated at Stateville. Dr. Obaisi was employed by Wexford as the medical director at Stateville until his death in 2017. PA Williams has been employed by Wexford as a Physician's Assistant since 2005.

<u>Plaintiff's Care at Stateville</u>

On December 10, 2008, Mr. Williams first presented to PA Williams with complaints of headaches, nausea, dizziness, neck stiffness and tightness, yellow nose discharge, and pain and

1

pressure in his right eye. (Dkt. 186, ¶ 10). PA Williams prescribed plaintiff Periactin, an antihistamine, and Tylenol; she also ordered serum H. Pylori, a blood or stool test. Plaintiff asserts that the medical record from Mr. Daniel's December 10, 2008 visit include "the first indication of [RA]." (Dkt. 193, ¶ 25). Defendants dispute this characterization. The Court notes that the handwritten medical record in question has two relevant markings: one reads "RF 28 (high)," and the other reads "A. RA."[1] (Dkt 193-4, at 11).

Over the coming years, Mr. Daniels continued to seek attention for related symptoms. On May 20, 2009, he presented to PA Williams with complaints of pain in his left side and sinus problems. (Dkt. 186, ¶ 11). He was prescribed Afrin, a nasal spray; Chlor-Trimeton, an antihistamine; Periactin; and Naprosyn, a non-steroidal anti-inflammatory drug ("NSAID") for pain and inflammation. PA Williams also ordered a sinus profile. On October 26, 2010, plaintiff presented to PA Williams for complaints of body joint aches. (Dkt 186, ¶ 12). After examination, PA Williams prescribed Tylenol, ordered additional diagnostic testing, and advised plaintiff to apply heat to the affected area and drink more water. On December 14, 2010, plaintiff again presented to PA Williams with complaints of joint pain. (Dkt 186, ¶ 13). PA Williams assessed his nasal complaints as allergic rhinitis. Defendants assert that PA Williams also "noted" that plaintiff's lab results indicated an elevated rheumatoid factor ("RF"), but plaintiff claims that PA Williams never told him about his elevated RF. (Dkt. 193, at 6). PA Williams prescribed nasal saline for the allergic rhinitis and Indocin, an NSAID used to treat pain and inflammation, for joint pain. On May 18 and December 12, 2011, plaintiff received x-rays that did not reveal fracture or "arthritic changes." (Dkt 186, ¶¶ 14, 15).

---

[1] RF may refer here to plaintiff's rheumatoid factor, a test used to measure risk for diseases including rheumatoid arthritis. RA may refer here to rheumatoid arthritis. Additionally, the precise date on which these markings were made is unclear from the face of the exhibit. Suffice it to say, the content and significance of this particular medical record are a genuine issue of fact.

2

Plaintiff continued to present to PA Williams with joint pain and other symptoms from 2012–2014. On September 4, 2014, plaintiff informed PA Williams that his prescriptions for Naprosyn and Motrin were not effective and he had decided to stop taking the medications. (Dkt 186, ¶ 20). PA Williams again ordered additional testing and assessed Mr. Daniels as having an elevated RF and RA. Per plaintiff, this visit was the first time he was informed of either his elevated RF or RA diagnosis. (Dkt. 193, ¶ 13). On January 20, 2015, PA Williams directed plaintiff to continue taking Piroxicam, an NSAID he had been prescribed by Dr. Alma Martija. On February 10, 2015, Mr. Daniels again presented to PA Williams with complaints of joint pain. (Dkt. 186, ¶ 23). Plaintiff explained that the Piroxicam was not working. Defendant asserts that plaintiff had ceased taking Piroxicam, but plaintiff disputes this characterization. (Dkt. 193, at 10).

On March 27, 2015, plaintiff presented to Dr. Obaisi for complaints of joint pain. (Dkt. 186, ¶ 24). Dr. Obaisi prescribed Bentyl, for plaintiff's irritable bowel syndrome ("IBS"); Mobic, an NSAID; and Sulfalazine, a disease-modifying anti-rhematic drug ("DMARD") used to treat symptoms of rheumatoid arthritis. Plaintiff saw Dr. Obaisi again on May 21, 2015, and explained that the pain medication was not working and he wanted to see a rheumatologist; Dr. Obaisi then made a referral for plaintiff to be seen by a rheumatologist. (Dkt. 186, ¶ 26).

Care after Stateville

On June 25, 2015, plaintiff was transferred to Menard Correctional Center ("Menard"). There, he began visiting a neurology and arthritis clinic. His specialist, Dr. Amar Sawar, prescribed Methodextrate, an immunosuppressive drug used to treat RA, which plaintiff took for approximately two to three months with little effect. (Dkt. 186, ¶ 29). Plaintiff left IDOC on parole in July 2019. Plaintiff has attended a number of medical appointments since his incarceration ended. He has not been treated for RA, nor have his care providers indicated that he suffers from joint inflammation or other symptoms of RA.

Wexford Policy

Certain Wexford policies and procedures are also relevant to this action. Wexford's employee handbook directs staff not to explain to inmates symptoms they would expect to see to confirm a diagnosis. (Dkt. 193, ¶ 6).

**Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

The Court finds that there is a genuine issue of material fact as to whether the individual defendants were deliberately indifferent to plaintiff's serious medical condition, and thus denies defendants' motion for summary judgment with respect to defendants PA Williams and Dr. Obaisi. However, because plaintiff cannot establish a causal connection between any Wexford policy and his alleged injury, defendants' motion for summary judgment is granted with respect to corporate defendant Wexford.

Deliberate Indifference

4

Prison officials and employees violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference claims have two components, one objective and one subjective. First, the plaintiff must demonstrate that "he suffers from an objectively serious medical condition." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)). Second, plaintiff must show that defendants acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The burden to establish deliberate indifference is high. Negligence or even recklessness is insufficient. *Id.* at 837. Mere disagreements between an inmate and his doctors cannot, without more, give rise to a viable Eighth Amendment claim. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).

With regards to the first prong, defendants do not dispute that RA is an objectively serious medical condition, but do appear to dispute whether plaintiff actually suffers from RA.[2] It is possible that expert discovery, deferred until after resolution of the present motion, will shed more light on whether plaintiff indeed has, or had, RA. But at the moment, the Court finds that there is a disputed question of material fact on this issue.

The Court now turns to the second prong. Defendants urge the Court to look at the "totality" of care that plaintiff received, arguing that because they provided "frequent" and

---

[2] Defendants point to the testimony of Wexford's Corporate Representative, Dr. Arthur Funk; it is his opinion plaintiff does not suffer from RA. (Dkt. 186, ¶¶ 51–52). But as plaintiff notes, Dr. Funk is not an expert witness, and this is merely an opinion, not a statement of fact. (Dkt. 193, at 24).

"continuous" care to plaintiff throughout the period in question, they cannot have displayed deliberate indifference to his needs. *Wilson v. Adams,* 901 F.3d 816, 821-22 (7th Cir. 2018). It is clear that defendants provided frequent care to plaintiff throughout the period in question. But a "defendant's showing that a plaintiff received 'some' treatment does not resolve the issue conclusively if the treatment was 'blatantly inappropriate.'" *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *see also McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010) ("[A] medical professional's actions may reflect deliberate indifference if he or she chooses an easier and less efficacious treatment without exercising professional judgment.") (internal quotation omitted).

Drawing reasonable inferences in favor of plaintiff, PA Williams and Dr. Obaisi's actions could amount to deliberate indifference because they delayed proper care of his RA, providing blatantly inappropriate care in the interim. In plaintiff's version of events, PA Williams first assessed his symptoms as RA in 2008. Despite that, for years, Mr. Daniels' medical team primarily responded to his complaints of joint pain, which they knew to be caused by RA, by prescribing NSAIDs and other painkillers. A reasonable fact finder could find that the care provided to Mr. Daniels after his 2008 RA diagnosis—which allegedly focused primarily (and apparently, ineffectively) on pain management and not on treating the underlying RA—could, when combined with the failure to refer Mr. Daniels to a specialist or even inform him of his diagnosis for over 6 years, amount to deliberate indifference. See *Pyles*, 771 F.3d at 411 ("[I]f the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition") (internal quotation omitted); *Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008) (denying motion for summary judgment where defendant prison physician had declined to refer prisoner with increasingly painful scrotal cysts and spasms to urologist).

6

Indeed, Wexford's own standard of care for the treatment of RA contemplate early and aggressive use of DMARDs—"ideally within three months of symptom onset"—and caution against using painkillers like NSAIDs as the sole or primary treatment. (Dkt. 193, ¶ 4). Mr. Daniels, by comparison, was first prescribed a DMARD in 2015, seven years after he alleges he was initially diagnosed with RA. In the interim, he claims he was treated primarily with painkillers while his medical team hid his true diagnosis from him. *See Arnett v. Webster*, 658 F.3d 742, 753–54 (7th Cir. 2011) (finding of deliberate indifference was possible when physicians treated patient with RA exclusively with painkillers they knew were not reducing plaintiff's pain).

Many of the facts necessary to support a conclusion of deliberate indifference are disputed. At a minimum, the following relevant facts are disputed: (1) when plaintiff was first diagnosed with RA; (2) when plaintiff was first informed of his RA diagnosis; (3) whether Dr. Obaisi and PA Williams' treatment of plaintiff's symptoms comported with the standard of care for RA; (4) when PA Williams and Dr. Obaisi became aware their course of treatment was not effective. Precisely because of these disputes of material fact, the question of whether PA Williams and Dr. Obaisi were deliberately indifferent is inappropriate for disposition at summary judgment. Defendants' motion is denied with respect to defendants Williams and Obaisi.

*Monell* Liability

Mr. Daniels also alleges that Wexford is liable for the Eighth Amendment violations he suffered. As § 1983 does not permit *respondeat superior* liability, *Maniscalco v. Simon*, 712 F.3d 1139, 1145–46 (7th Cir. 2013), Mr. Daniels must show that Wexford's policies or customs were a "'direct cause' of or 'moving force' behind his constitutional injury." *Pyles*, 771 F.3d at 409–10 (quoting *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010)). "An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual

7

who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). Plaintiff must show a causal connection between his injury and Wexford's official policy or custom. *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014).

Plaintiff points to two Wexford policies or customs that he argues give rise to *Monell* liability. First, plaintiff claims that Wexford's failed to develop a medical clinic or specialized set of procedures for treatment of RA. (Dkt. 191, at 12). Second, plaintiff points to Wexford's policy, contained in its handbook, of not explaining to patients symptoms they would expect to confirm a diagnosis.

First, Wexford's alleged failure to develop a specialized RA clinic or procedures was not a driving force behind Mr. Daniels' injury. Although defendants dispute plaintiff's factual assertion here, this claim would be insufficient to support *Monell* liability even if true. Plaintiff did not identify—and this Court's research did not yield—any case law suggesting that prison medical systems must have specialized procedures in place for treatment of each serious medical condition, nor specialized clinics for them. And indeed, defendants' eventual prescription of DMARDs and referral of Mr. Daniels to a rheumatologist belies his argument that Wexford was not equipped to treat RA. Rather, the plausibility of his deliberate indifference claim lies in Dr. Obaisi and PA Williams' failure to follow standard practice.

Second, Wexford's policy of refusing to explain confirmatory symptoms to patients, though problematic, is not causally connected to Daniels' alleged injury. While the policy might explain a delay in diagnosis, it cannot be attributed for a delay in care after diagnosis.[3] Again, the reasoning

---

[3] Although plaintiff and defendants dispute the purpose and scope of this policy, it is easy to imagine a scenario where a medical provider's refusal to explain to a patient additional symptoms that might help confirm a diagnosis would result in delaying a proper diagnosis, and thus, a delay of treatment. See *Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015) (holding that policies "capable of causing delays in treatment" warrant denial of defendant Wexford's motion for summary judgment). Although the facts at hand do not match that hypothetical scenario, it deserves consideration.

behind plaintiff's deliberate indifference claim undermines his argument for corporate liability. Plaintiff's deliberate indifference claim is not that his diagnosis was delayed, but that after he was diagnosed with RA, PA Williams and Dr. Obaisi delayed (1) informing him of the diagnosis, (2) properly treating the RA, and (3) referring him to a specialist. Delayed diagnosis is not the cause of Mr. Daniels injury, and thus any Wexford policy that might allegedly result in delayed diagnoses cannot be causally connected to his injury. Simply put, the policy did not cause plaintiff's injury. The Court thus grants defendants' motion for summary judgment with respect to defendant Wexford, which is now dismissed from the suit.

Damages

Lastly, the Court reserves judgment on the question of punitive damages which is premature at this time.

**Conclusion**

For the foregoing reasons, defendants' motion for summary judgment [184] is denied with respect to defendants PA Williams and Dr. Obaisi and granted with respect to defendant Wexford. IT IS SO ORDERED.

Date: 3/9/2023

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge